Richard H. Gill (Ala. State Bar No. GILL007)
George W. Walker, III (Ala. State Bar No. WAL097)
C. Nelson Gill (Ala. State Bar No. GIL055)
COPELAND, FRANCO, SCREWS & GILL, P.A.
P. O. BOX 347
Montgomery, Alabama 36101-0347
Telephone: 334.834.1180
Facsimile: 334.834.3172

Charles R. Gibbs (Texas State Bar No. 07846300)
Eric C. Seitz (Texas State Bar No. 24067863)
AKIN GUMP STRAUSS HAUER & FELD LLP
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
Telephone: 214.969.2800
Facsimile: 214.969.4343

ATTORNEYS FOR WHITE SANDS, LLC

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **MORRIS RADIO ENTERPRISES,** | § | **CASE NO. 09-31416-HDH-11** |
| **L.L.C., dba THE BUSINESS SHRINK** | § | |
| **and** | § | |
| | § | |
| **PRS II, LLC, dba FORT MORGAN** | § | **CASE NO. 09-31436-BJH-11** |
| | § | |
| **DEBTORS.** | § | **Jointly Administered Under** |
| | § | **Case No. 09-31416-HDH-11** |
| | § | |

## WHITE SANDS, LLC'S MOTION TO DISMISS
## DEBTOR PRS II LLC'S CHAPTER 11 CASE,
## OR, IN THE ALTERNATIVE, FOR CHANGE OF VENUE

**NO HEARING WILL BE CONDUCTED HEREON UNLESS A WRITTEN RESPONSE IS FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AT 1100 COMMERCE STREET, ROOM 1254, DALLAS, TEXAS 75242 BEFORE CLOSE OF BUSINESS ON JANUARY 6, 2010, WHICH IS TWENTY-ONE (21) DAYS FROM THE DATE OF SERVICE HEREOF. IF SERVICE IS BY MAIL, THREE**

1

**ADDITIONAL DAYS ARE ALLOWED PURSUANT TO FED. R. BANKR. P. 9006(f).**

**ANY RESPONSE MUST BE IN WRITING AND FILED WITH THE CLERK, AND A COPY MUST BE SERVED UPON COUNSEL FOR THE MOVING PARTY PRIOR TO THE DATE AND TIME SET FORTH HEREIN. IF A RESPONSE IS FILED, A HEARING WILL BE HELD WITH NOTICE ONLY TO THE OBJECTING PARTY.**

**IF NO HEARING ON SUCH NOTICE OR MOTION IS TIMELY REQUESTED, THE RELIEF REQUESTED SHALL BE DEEMED TO BE UNOPPOSED, AND THE COURT MAY ENTER AN ORDER GRANTING THE RELIEF SOUGHT OR THE NOTICED ACTION MAY BE TAKEN.**

**TO THE HONORABLE HARLIN D. HALE**
**UNITED STATES BANKRUPTCY JUDGE:**

COMES NOW White Sands, LLC ("White Sands"), a creditor and party in interest in the above styled bankruptcy proceeding, and hereby files its Motion to Dismiss Debtor PRS II LLC's ("PRS II") Chapter 11 Case, or, in the Alternative, for Change of Venue (the "Motion").[1] In support of this Motion, White Sands respectfully shows the Court as follows:

## PRELIMINARY STATEMENT

This Court has before it a Chapter 11 proceeding, as styled above, in which the bankruptcy proceedings of PRS II have been jointly administered with those of Morris Radio Enterprises, L.L.C. ("Morris Radio"). There is no independent jurisdiction or venue of this Court as to PRS II, which is an entity with no nexus to the Northern District of Texas.[2] Rather, the purported justification for filing in Texas is that Peter Morris, an individual residing in Chicago, Illinois, is a minority-owner of an interest in both Morris Radio and PRS II. Neither Morris Radio nor PRS II have any ownership interest in the other entity, and Mr. Morris,

---

[1] In a separate filing, White Sands also files a Motion for Relief from the Automatic Stay.
[2] PRS II is an LLC organized in the State of Delaware, with its principal place of business either in Alabama or in Illinois.

2

individually, is not in bankruptcy. Thus, PRS II and Morris Radio are not "affiliates" as defined in section 101(2)(B) of title 11 of the United States Code (the "Bankruptcy Code").

The purported insolvency status is predicated on allegations of debts to PRS II's principals, and in good faith do not justify any bankruptcy protection. The mortgage debt of PRS II to the Langans, which is the subject of the adversary proceeding, is non-recourse.

Except for listed "claims" of PRS II's litigation counsel and the PRS II insiders, there are essentially no true unsecured (outside) creditors of any consequence.

All of the property of PRS II is located in Baldwin County, Alabama, where there are already long-pending civil claims in the state Circuit Court. Those claims include claims against debtor PRS II by White Sands, which have been pending since 2005, with two intervening appeals concluded in the Supreme Court of Alabama, and which are ready for trial.

The whole of PRS II's business is the purchase and development of a large tract of land in Baldwin County, Alabama. That land was acquired from the Langans (the defendants in the adversary proceeding lodged by PRS II in this court), and a portion of that land was claimed by White Sands. At all times, PRS II knew it was engaged in litigation with White Sands; indeed, that it had initiated the litigation and that such litigation was pending on appeal in the Supreme Court of Alabama when the current bankruptcy petition was filed. At the time of the original action brought to clear the title of White Sands' interest, PRS II and the Langans were represented by the same attorney, and both of those parties pled that they had full knowledge of the White Sands contract, but believed it to be invalid. However, PRS II did not list White Sands as a creditor, nor did it advise White Sands or the Alabama Supreme Court of the filing, or serve them with notice. The filing was made on March 6, 2009, and on September 4, 2009, the

3

Alabama Supreme Court ruled against PRS II in the appeal;[3] only then, faced with an adverse ruling which determined that PRS II must defend the damage claims against it in the Alabama trial court, did PRS II file a "Notice of Bankruptcy" in the Alabama state court.

The allegations of the adversary proceeding, which relate to the sale of the Alabama land, are materially false and are directly contrary to PRS II's own in judicio assertions and testimony. The purpose of the adversary complaint is for PRS II to obtain the Alabama land for nothing, or for a reduced price of $2,000,000, rather than the contract price of $18,875,000, and thereby to deprive the sellers of the benefit of the bargain and petitioners of their interest in the land.

Thus, this Court is confronted with:

(1)     A petition based on false venue grounds and false jurisdictional allegations.

(2)     A deliberate attempt to avoid notice to White Sands, and to attempt to manipulate the court system by waiting to see the outcome of the Alabama appeal. If PRS II had given notice to White Sands, then the fraudulent allegations in the adversary proceeding, which directly contradict the position urged by PRS II to the Alabama Supreme Court, could have been made known to the Supreme Court, exposing PRS II to, among other things, severe sanctions.

(3)     An attempt to prevent White Sands (and the Langans) from having their claims heard in Alabama where PRS II had dealt with them, where the only asset of PRS II is sited, and where the litigation was already lodged. The Langans and White Sands (as well as the non-identified members of PRS II) all are already represented by Alabama counsel familiar with the case.

---

[3]   In fact, under the Alabama Appellate Rules, the mandate of the Court does not issue until 18 days following the release of the Court's opinion and judgment (to allow for any application for rehearing, plus a three-day allowance for mailing of such application). The issuance of the mandate terminates the Supreme Court's jurisdiction, and the filing of the Notice of Bankruptcy was timed to arrive at the Court on the day after the mandate, so that White Sands, the prevailing party, could not ask the Supreme Court to examine what had happened. Moreover, the PRS II bankruptcy petition also fails to disclose the existence or identity of two of PRS II's principals - Michael Asfour and Peter Sterling, both residents of New York - who are parties with PRS II in the Alabama litigation.

(4)    An adversary proceeding which is predicated on demonstrably false allegations. If the allegations of the adversary proceeding were to succeed, both the Langans and White Sands would be deprived of the value of their property and claims.

For all the reasons set out below, the tactics of PRS II should not be permitted to succeed.

## JURISDICTION

1.    This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Consideration of the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This Court has authority to grant the relief requested pursuant to Bankruptcy Code sections 105(a) and 1112(b)(1).

## BACKGROUND

2.    White Sands is a Baldwin County, Alabama LLC comprised of three members, Chris Rolison, Jeff Valentine and Jerry Rolison.  White Sands' primary business is developing real estate.[4]

3.    In May, 2004, White Sands, through Jeff Valentine, became aware of a real estate opportunity in Baldwin County.  The Langan family of Mobile (the "Langans"), Alabama owned approximately 96 acres of land which is commonly referred to as Pilot Town or Fort Morgan (the "Property").  The Langans intended to develop the Property into a residential subdivision, along with some condominiums and other amenities such as boat slips.  White Sands sought to buy five lots in the residential portion of the subdivision.  Jeff Valentine and Tommy Langan negotiated the sale, and White Sands and the Langans signed a written contract for White Sands to purchase the five lots for the price of $425,000.

---

[4]    Except where pertinent to this bankruptcy and adversary proceeding, White Sands has generally not cited to evidentiary documents.  All facts referenced in this filing can be documented in the filings in the Circuit Court of Baldwin County, Alabama.

4.     Shortly after White Sands entered into its agreement with the Langans, two individuals from New York, Peter Sterling and Michael Asfour, also entered into an agreement with the Langans, to purchase the remainder of Pilot Town, minus the White Sands' lots and several other residential lots reserved for the Langan family. This initial contract, executed in July, 2004, provided that Sterling and Asfour would purchase the land for $16.2 Million, and, as noted, did not include the White Sands lots. This July purchase agreement contained a number of contingencies relating to zoning and density that the purchasers wanted satisfied prior to closing. The closing was set for March 1, 2005.

5.     Sterling and Asfour needed help in financing the purchase of the land, and they came into contact with Peter Morris, a Chicago real estate developer. Morris agreed to become a part of the deal, and together they and others entered into a joint venture called PRS. Later, the entity became PRS II. PRS II was composed of Peter Morris, Sterling and Asfour, the McCarthy Trust, and Tommy Langan. PRS II's business purpose was to purchase and develop the property known as Pilot Town.

6.     Between the initial July agreement and the closing on the property on March 1, 2005, PRS II, through its members, began various preparations for a large scale condominium development, and sought, initially, to satisfy the contingencies relating to density and zoning. Sometime around October, 2004, Peter Morris took control of the proposed development, and engaged the master planning firm Hart Howerton, and other planning firms, to design the condominium development. In planning this development, Morris needed the entirety of the property. This necessitated getting rid of White Sands, and its prior purchase agreement.

7.     Morris and PRS II undeniably had knowledge of White Sands' contract from the very beginning. See Deposition of Peter Morris (the "Morris Depo.") at pp. 157-159, 166-167,

192, 213, attached hereto and incorporated by reference as Exhibit B. Morris saw the White Sands contract in late 2004, and he had ongoing discussions with Tommy Langan over the validity of the contract, and how to avoid it. Langan and Morris concluded that they would assert that the contract was not valid and enforceable, and Morris convinced the Langans to "void" the deal with White Sands. Morris Depo. at pp. 213-214; see also Offer of Morris, attached hereto and incorporated by reference as Exhibit C. As a backup in the event the contract were determined to be valid, Morris required the Langans to give him a contingent $875,000 set-off from the purchase price of the property if White Sands prevailed in a lawsuit against them. Morris Depo. at pp. 146-147. Morris also agreed to indemnify the Langans for the costs relating to any lawsuit over the validity of the contract. Id.; see also Indemnification Agreement, attached hereto and incorporated by reference as Exhibit D.

8.     On March 1, 2005, PRS II closed its purchase of Pilot Town, agreeing to pay the Langans $18,875,000.[5] The closing provided that $875,000 would be deducted from the purchase price if White Sands' contract were found to be enforceable. At the closing, Morris and PRS II waived the previously imposed contingencies because Morris was unsure of the final plans for the project. Morris Depo. at p. 169. Morris and PRS II were then aware of the lawsuit between Baldwin County and the City of Gulf Shores over zoning. Mr. Morris testified:

> The status of the project today is --- is basically difficult because of the three part lawsuit over jurisdiction on planning between Baldwin County, Gulf Shores, and the --- over the annexation that's being protested by some environmental groups.
>
> So, in effect, you have Gulf Shore asserting jurisdiction, you have a group of environmentalists on behalf of Baldwin saying that the annexation was improper and it should be in Baldwin County, and at the moment, there's no clear direction

---

[5]   The additional $2,000,000 was because the price now included the five White Sands' lots and the lots reserved to the Langans.

as to which jurisdiction will prevail in hearing an application for increased density or --- or any master plan to be proposed. So --- . Morris Depo. at pp. 291-292.[6]

Morris had no idea what he even wanted to do in terms of development at the time of the closing. Morris Depo. at p. 169.

9.    Following the closing on March 1, 2005, White Sands filed a claim in the Baldwin County Probate Court in regard to the lots that it had under contract with the Langans, which lots had been included in the purchase by PRS II. Upon hearing of this, Mr. Morris expressed his displeasure to Peter Sterling:

> . . . You [Sterling] have repeatedly told Tommy [Langan], and several times told me, that you can handle Mr. Rollins [Rolison] and his partner and move him into another direction, as it makes no sense for a guy, who has very little pull with Volkert, very little standing in the community, and has provided no real service or palpable benefit, to somehow potentially hijack a 500 million project, with five misapplied, misdesigned, mismarketed, and misplaced, out of context units, with a tail to wag the proverbial dog of our master planned project. It is demonstrably not in your interest to allow this to happen and you have repeatedly represented and reflected to Tommy and to me that you can control the situation . . . . Email dated March 17, 2005, attached hereto and incorporated by reference as Exhibit F.

This prompted PRS II to preemptively file a lawsuit against White Sands in the Circuit Court of Baldwin County in August, 2005, alleging that there was no enforceable contract between the Langans and White Sands. White Sands filed a counterclaim against the Langans (for breach of their purchase contract) and against PRS II for intentional interference with the business relation between White Sands and the Langans. See PRS II v. White Sands, 2005-923, Baldwin County, Alabama. The intentional interference claim remains pending against PRS II, and the validity for the cause of action has been affirmed by the Supreme Court of Alabama. See PRS II v. White Sands, 2009 WL 2841114 (Ala. 2009). However, the lawsuit is now stalled because of this bankruptcy proceeding, of which White Sands was given no notice.

---

[6]  Prior to closing, a petition to annex the property by the City of Gulf Shores, Alabama was filed. During litigation in Alabama state court, PRS II and the Langan entities jointly filed an affidavit stating that the property had been annexed into Gulf Shores. The affidavit is attached hereto and incorporated by reference as Exhibit E.

10.     In the Baldwin County lawsuit, the Langans and PRS II filed every pleading, response, brief, etc. together.  In each filing, PRS II took the in judicio position that it always knew about White Sands' contract with the Langans, but that the contract was not valid and enforceable:

> Prior to the purchase, PRS II was informed by the sellers of the property [the Langans] of the existence of the May 17 Letter . . . . After determining that the May 17 Letter was not binding (and, even if it was the contingency to not pursue the subdivision was exercised), PRS II purchased the property.  Trial Court Excerpts, attached hereto and incorporated by reference as Exhibit G.

PRS II and the Langans argued that the agreement with White Sands was: 1) illegal, 2) indefinite and 3) not a contract at all.  Id.

11.     PRS II and the Langans prevailed on these arguments in the Baldwin County Circuit Court in rulings made in July and August 2007.  When the rulings were appealed, PRS II and the Langans both continued to assert in the appellate court that there was no contract.  For example, in their briefs to the Supreme Court of Alabama, PRS II and the Langans continuously represented: "The Appellees maintain that the Letter is not a contract . . . ."  "The Appellees allege that the Letter is not a contract since it is indefinite and there was no meeting of the minds."  "PRS II and the Langans, comfortable with the unenforceability of May 17 Letter, closed on the property." Appellate Court Excerpts, attached hereto and incorporated by reference as Exhibit H.   Notwithstanding the fact that White Sands disagreed with the holding, the Supreme Court ruled, as PRS II had urged, that the contract was not enforceable because it was too indefinite.  See PRS II v. White Sands, 998 So.2d 1042 (Ala. 2008).  Therefore, PRS II and the Langans prevailed upon their position that there was not an enforceable contract.[7]

---

[7] The Supreme Court left pending White Sands' claims for tortious interference with a business relation.  See White Sands Group, LLC v. PRS II, LLC, et al., 2009 WL 2841114 (Ala., Sept. 4, 2009).

## A.     The Adversary Proceeding

12.     PRS II has now filed an adversary proceeding in this Court against the Langans and their related LLCs asserting, among other things, that the Langans fraudulently induced them into purchasing the Pilot Town property for the price of $18,875,000. PRS II (and Peter Morris) seeks a variety of relief ranging from completely voiding its purchase of the Pilot Town property to reforming and reducing the purchase price to $2,000,000. The factual underpinning for all of the claims that PRS II pleads is that the Langans "misrepresented" certain facts to it prior to the closing, primarily that the Langans concealed from PRS II (of which Tommy Langan is a member) that there was a valid and binding contract with White Sands for a portion of the land, and that therefore PRS II is entitled to the relief requested in this Court.

13.     While many adjectives could be used to describe what has been done, the adversary filing by PRS II, to put it simply, is a fraud on the Court. The fraud by PRS II directly affects White Sands because it not only has halted the ongoing lawsuit in Baldwin County, but also stands to reduce, or completely negate, the value of the only asset of PRS II, which is the real property in Baldwin County.

14.     PRS II's charade begins from the outset, misstating even the identity of its own members to this Court. PRS II represents to the Court that its "original members" were Langan Development, LLC, PRM Realty Group, and McCarthy International, LLC.     Adversary Complaint, ¶7. This description intentionally omits Peter Sterling, Michael Asfour and their company, P & M.   This is significant because Sterling and Asfour were the parties who originally entered into the purchase contract on the property, and they are the members of PRS II who would unquestionably be able to show that the allegations of the adversary proceeding are

10

false.[8] Asfour and Sterling are co-defendants with PRS II on White Sands' claims in state court. Yet, Sterling and Asfour's names <u>do not appear anywhere</u> in the bankruptcy filings of PRS II, although they are members of the entity. PRS II would be unable to perpetrate this fraud if Sterling and Asfour were mentioned.

15.    From this beginning, PRS II goes on to assert six counts against the Langans. While there are differing legal theories and claims, the underlying assertions of PRS II remain the same throughout. PRS II asserts that:

- <u>it was not told</u> "that Defendants White Sands Group, LLC, Jeff Valentine and Chris Rolison had entered into <u>an enforceable agreement</u> with Langan Development Company . . . for the sale of five lots on the Fort Morgan Property before the sale of the Property to PRS II" (emphasis added);

- it was not made aware, <u>at any point,</u> of the lawsuit between Baldwin County and the City of Gulf Shores over zoning jurisdiction;

- it was not made aware that the Langans had entered into a transaction with David Lutz, a real estate broker;

- the Langans failed to advise PRS II of the property taxes due on the Pilot Point Property; and

- the parties made a "mutual mistake" regarding good title, annexation, etc.

Each of these allegations is an intentional misrepresentation by PRS II designed to fraudulently allow PRS II to get out of, or re-value the purchase of the Property from the Langans, which would prevent White Sands from being able to collect any judgment against PRS II.

**1)    PRS II knew of the agreement between White Sands and the Langans, and together, PRS II and the Langans sought and succeeded in arguing that the contract was not enforceable.**

16.    In paragraphs 37-42 of its adversary complaint, PRS II explains that the Langans conveyed the Property to it via warranty deeds, and thus warranted "good title" to the property.

---

[8]  The Complaint contains an elaborate ruse to make it appear that the Langans and Morris were negotiating directly from the beginning, and that Sterling and Asfour never existed. <u>See, e.g.</u>, Complaint, ¶18 ("prior to January, 2005 the Langan family entered into discussions with Peter Morris . . . .")

PRS II then asserts that, despite the warranted good title, the "title was not clean." In feigned shock, PRS II states that, after the closing, White Sands first contended that it had entered into "an enforceable agreement for the sale of five lots" with the Langans prior to the purchase of the Property by PRS II. This claim, according to PRS II, forced it to file an action to quiet title to the Property. "Despite the warranty of good title in the Warranty Deeds, [the Langans] refused to defend title against the claims of White Sands . . . . Instead, PRM Realty Group [Morris] was compelled to defend title by prosecuting and paying the costs of the suit to quiet title in the name of PRS II." Adversary Complaint, ¶¶ 37-42.

17.    PRS II first contends that it is entitled to recover for the costs of the Baldwin County lawsuit because of the warranties in the deeds. Second, it contends that it is entitled to rescind the purchase of the Property because the Langans fraudulently omitted "the fact that [White Sands] had entered into an enforceable agreement . . . before the sale of the Property to PRS II." Adversary Complaint, ¶ 63. PRS II restates this position later in its complaint:

> In breach of their fiduciary duties, neither [the Langans] nor [the Langans] disclosed to PRS II that [the Langans] had entered into an allegedly enforceable agreement with [White Sands] for the sale of five lots on the Fort Morgan Property, which constituted a cloud on title, requiring PRS II to file a suit to quiet title. Id. at ¶ 80.

18.    White Sands has been involved in litigation with Mr. Morris for some time, and it is obvious that he does not view honesty as a requirement in the filing of court papers. Statements consistent with those quoted above are littered throughout PRS II's complaint. They are intentional misrepresentations and cannot fairly be characterized as anything else. Peter Morris and PRS II knew about the White Sands agreement, discussed it with the Langans, and actually negotiated a reduction in the sales price if White Sands were to win a lawsuit over the

property. Morris even agreed, in writing, to indemnify the Langans for the costs of the upcoming lawsuit with White Sands. In his deposition, Morris testified:

> A. [The purchase price] was, in my recollection, it was approximately 18 million plus or minus subject to a condition subsequent of a reduction of about $800,000 if the issue with White Sands went towards the direction of – of a – of a sale to [White Sands]. Morris Depo. at page 129.

> A. I will say again that it's 18 million plus or minus including $800,000 plus or minus as a clawback if the White Sands people prevail on their claim. Morris Depo. at page 130.

> Q. All right. **Now, of course, you knew the existence of [White Sands] and the fact that they were asserting a claim to these all along, and, in fact, you agreed to take on that dispute and wind it up yourself, didn't you?**

> **A. Absolutely.** Morris Depo. at 247-248 (emphasis added).

Now, this Court has been presented with allegations that not only assert that the Langans never told PRS II (and Morris) about White Sands at all, but that the Langans failed to tell Morris that White Sands had <u>an enforceable contract</u>. This position is facially ludicrous considering that the Supreme Court of Alabama - at the urging of PRS II, Morris and the Langans - ruled that White Sands did <u>not</u> have an enforceable contract. PRS II and the Langans, together, argued that the contract was not enforceable in every filing in every court, until this one. <u>See, e.g.,</u> Trial Court Excerpts; Appellate Court Excerpts. PRS II's current allegations are a sham.

19.     Although clever, even PRS II's allegations regarding the warranty deed are a fraud. The land containing White Sands' lots was deliberately transferred <u>separately</u> from the remainder of the Property so as to isolate the area where a full warranty of title was in question; as Morris swore, the deed reflected the White Sands "cloud on the title":

> Q. Well, is there any document in – associated with closing that reflects the $800,000 plus or minus contingency?

> A. My recollection is that <u>it is on the deed</u>, but I did not review the documents at the closing. <u>It is – it is on the deed.</u>

20. Thus, every allegation contained in this adversary complaint regarding White Sands is intentionally false.

### 2) PRS II was aware of the ongoing lawsuit between Baldwin County and Gulf Shores, and otherwise did not even know what it intended to develop at the time of closing.

21. First, the adversary complaint insinuates that the lawsuit between the county and municipality somehow directly related to the Pilot Point Property, and that it blocked the annexation of the Property into the City of Gulf Shores. This is completely false. The Property was annexed into the City of Gulf Shores shortly after closing, and PRS II used that annexation in its arguments to the Circuit Court of Baldwin County to bolster its position that the contract with White Sands was not valid. Furthermore, the zoning lawsuit had already been going on for years prior to the closing, and it had nothing to do with the Property specifically.

22. In any event, Morris and PRS II were certainly aware of the ongoing lawsuit, and any rudimentary due diligence would have discovered it even if they claim they were not aware of it. Again, one of the positions that PRS II took in the Baldwin County lawsuit was to assert that it never had any idea what it was going to develop, because White Sands asserted that it intended to build a condominium development which necessitated getting rid of White Sands' interest. Morris used the zoning lawsuit to bolster PRS II's position:

> The status of the project today is --- is basically difficult because of the three part lawsuit over jurisdiction on planning between Baldwin County, Gulf Shores, and the --- over the annexation that's being protested by some environmental groups.
>
> So, in effect, you have Gulf Shore asserting jurisdiction, you have a group of environmentalists on behalf of Baldwin saying that the annexation was improper and it should be in Baldwin County, and at the moment, there's no clear direction as to which jurisdiction will prevail in hearing an application for increased density or --- or any master plan to be proposed. So --- . Morris Depo. at pp. 291-292.

14

This deposition was taken in August, 2006. Even if one were to assume, blindly, that PRS II knew nothing about the lawsuit prior to that very day, any fraud claim would now be facially barred by the applicable statute of limitations. See Ala. Code § 6-2-38 (two-year limitation for fraud claims). Of course, PRS II did know, and it had someone charged with monitoring the lawsuit:

> A. We are not an intervenor and we're not amicus, we're not represented in the suit. We're following it.
>
> Q. Who is monitoring it for you?
>
> A. Two people, Logan Gray, who is a consultant from Alabama, and then --- that I mentioned before, and then in our office, our director of development now, Alice Rebechini. Morris Depo. at pp. 292-293.

Morris and his partners also had a lawyer before the closing looking into the zoning issues. Email of February 23, 2005, attached hereto and incorporated by reference as Exhibit I.

23.     The PRS II allegations are intentional misrepresentations. In Baldwin County, PRS II (Morris) did not even testify that the Langans had anything to do with getting the density on the Property approved. Rather, Morris testified that Peter Sterling (his own partner) and Chris Rolison (member of White Sands) were involved in getting the density determined. Morris Depo. at pp. 54-55. This allegation, of course, was necessitated because Chris Rolison had a services contract with Sterling, that Sterling contended PRS II was obligated to pay. In order to defend that claim, Morris sought to claim that it was Rolison who had not obtained the desired density. The Langans were never mentioned as having any responsibility or relationship to the zoning issues – they were only planning a residential subdivision. Of course, Morris also consistently testified that he did not even know what "density" he wanted prior to closing, because he did not know the ultimate scope of the development. Morris Depo. at page 169.

**3)** PRS II <u>entered</u> into the contract with realtor David Lutz that it claims that it was not told about.

24.    In what is one of the most beyond-the-pale of PRS II's assertions, PRS II claims that the Langans did not tell it about an agreement that <u>they</u> (the Langans) had made with David Lutz, a local realtor which would have entailed a commission. Adversary Complaint, ¶ 63 (asserting that <u>the Langans</u> had entered into an agreement with Lutz). PRS II seeks to use this supposed misrepresentation to be relieved of its obligations in regard to the Property.

25.    David "Beau" Lutz was the realtor involved in the initial purchase contract for the Property. Peter Sterling, <u>Morris' partner and member of PRS II</u>, made the deal with Lutz for Lutz to be paid $400,000 upon the closing of the purchase. <u>See</u> Service Agreement, attached hereto and incorporated by reference as <u>Exhibit J</u>. The deal was in writing, and the Langans were not a party to the contract. <u>Id.</u>

26.    David Lutz was Sterling and Asfour's real estate agent. They are members of PRS II and transferred all of their rights, interest and liabilities to PRS II when it was formed. This "Lutz" allegation shows clearly why PRS II misrepresented its members to this Court, and concealed the interest of Sterling and Asfour, because otherwise, this allegation could not even be asserted.

**4) The property taxes do not give rise to any relief for PRS II.**

27.    PRS II claims that the property taxes were not paid on the Property for a year after it purchased the Property, and that the Langans should have informed it of the delinquent taxes because they were the former record owner. This alleged wrong necessarily arose after the purchase and, if the omission occurred and is a breach of some unspecified duty, that is entirely extraneous to the purchase contract for the land. Generally, White Sands does not have any independent knowledge about the property taxes, except that it is hard to comprehend how the

owner of the Property (PRS II) is not responsible for its own taxes. PRS II complains about the fact that one of the Langans purchased part of the Property at a tax sale, but PRS II certainly should be happy that it was the Langans and not someone else. This is just more smoke and mirrors by PRS II, and they should not be entitled to any relief because of the claims about taxes.

### 5) There was no "mutual mistake."

28.     As a contradictory aside, PRS II asserts that all the parties were involved in a "mutual mistake" regarding the annexation, the zoning and the title to the Property, and, therefore, the Property was improperly valued at $18,875,000. This, again, is comical, considering that Morris set the price of the Property himself, and because part of the valuation expressly accounted for the issues with White Sands and its prior agreement to buy part of the land. See Offer of Morris. As the facts show, there was no "mistake" by anyone. What has happened here is that Morris believed that he could make $500,000,000 dollars through this project, and, because he didn't, he and PRS II have resorted to making fraudulent allegations.

### B.     White Sands' Reasons for Filing

29.     White Sands is filing this Motion because PRS II is not only seeking to defraud this court and the Langans, but it is affirmatively seeking to injure White Sands. White Sands contends that the Bankruptcy proceeding itself is a sham, and venue does not lie in Texas; however, the adversary proceeding is certainly an attempted fraud on this Court. White Sands' claim against PRS II, which is pending in the Circuit Court of Baldwin County, Alabama (which the Supreme Court of Alabama has described as involving "substantial evidence of intentional interference"), is now halted while PRS II seeks to perpetrate this action in Texas. White Sands was intentionally not listed as a creditor, and was not told of this pending proceeding until well after it had been filed. Such a process should not be allowed.

17

## RELIEF REQUESTED AND REASONS THEREFOR

### I.    DISMISSAL

30.    As the Court file discloses, White Sands was neither listed as a creditor (or potential creditor) nor notified of the filing of the Petition. White Sands does not desire or seek to litigate its claims in this Bankruptcy forum, and asks leave to appear for the limited purposes of seeking dismissal of the Petition, or, in the alternative, a change in venue to the Bankruptcy Court for the Southern District of Alabama.

31.    At least 99.8% of the claims listed by PRS II in its schedules are related to the same factual nucleus at issue in the state court litigation pending in Baldwin County, Alabama or are claims of insiders. Ninety-one percent (91.1%) are claims related to the Langans and the violations of state tort and contract law alleged by PRS II to have been committed by them related to a single piece of real property also located in Baldwin County, Alabama. Because those claims are currently the subject of litigation in the Circuit Court of Baldwin County, Alabama, it is there these claims should be adjudicated. See In re Muskogee Envtl. Conservation Co., 236 B.R. 57 (Bankr. N.D. Okla. 1999) (dismissing bankruptcy case involving two-party dispute governed by non-bankruptcy law that could readily be resolved by state court).

32.    White Sands respectfully requests that this Court dismiss the chapter 11 case filed by PRS II (hereafter also referred to as the "Debtor") because it has been filed by the Debtor in bad faith and offends the fundamental principles and objectives underlying bankruptcy policy and jurisprudence.

### A.    Petition Not Filed in Good Faith Constitutes "Cause" for Dismissal

33.    Bankruptcy Code section 1112(b) provides that the Court may dismiss a chapter 11 case "for cause." 11 U.S.C. § 1112(b). "For cause," as that phrase is used in § 1112(b),

includes the filing of a case in bad faith. See In re Little Creek Dev. Co., 779 F.2d 1068, 1072 (5th Cir. 1986); Marsch v. Marsch (In re Marsch), 36 F.3d 825, 828 (9th Cir. 1994); In re SGL Carbon Corp., 200 F.3d 154 (3d Cir. 1999). See also In re Humble Place Joint Venture, 936 F.2d 814, 817 (5th Cir. 1991) (holding that "[b]ecause Little Creek explicitly treated the question of good faith dismissals under § 1112, the case settles any statutory or constitutional question about that procedure.").

34.    "Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings." Little Creek, 779 F.2d at 1071.  Good faith generally is held to require "honesty of intention."  See In re Metro. Realty Corp., 433 F.2d 676, 678 (5th Cir. 1970) ("Good faith' implies an honest intent and genuine desire on the part of the petitioner to use the statutory process to effect a plan of reorganization and not merely as a device to serve some sinister or unworthy purpose.").  If a case is found not to have been filed in good faith, dismissal is an appropriate remedy. See, e.g., Pacific Rim Invs., LLP v. Oriam, LLC (In re Pacific Rim Invs., LLP), 243 B.R. 768, 771 (affirming dismissal of chapter 11 case on grounds that petition was an attempt by debtor to forum shop for the purpose of escaping jurisdiction of state court, and therefore filed in bad faith and an abuse of process).

35.    Findings of lack of good faith in proceedings based on Bankruptcy Code section 1112(b) have been predicated on certain recurring but non-exclusive patterns, and they are based on a conglomerate of factors rather than on any single item.

**B.    Illicit Litigation Tactics and Forum Shopping Each Demonstrate Bad Faith**

36.    PRS II is effectively seeking to thwart pending state court litigation by not listing White Sands, the counterclaim plaintiff in such litigation, as a creditor in either its Voluntary

Petition or Amended Voluntary Petition (to which it is a necessary party), while simultaneously availing itself of a remote and otherwise unavailable forum, with respect to which its connections are tenuous at best, with the objectives of inconveniencing all other parties thereto and re-litigating in this forum what should have been cross-claims in the state court proceeding. Further, PRS II now takes a position directly in conflict with its previous position which was finally adjudicated in its favor in that state court litigation. PRS seeks to accomplish these ends by prostituting the bankruptcy process to indirectly "remove" non-removable state law claims between non-diverse parties.

37.     As described above, Debtor PRS II is currently involved in state court litigation in Baldwin County, Alabama. The Baldwin County litigation relates exclusively to issues of Alabama tort law as applied to business relations and communications pertaining solely to one parcel of real property located within the state of Alabama; notably, this tract of real property comprises the only material asset of Debtor PRS II. PRS II's own description of this property on Schedule A attached to its Amended Voluntary Petition concedes as much by describing the property as "Vacant Lot – Baldwin County, Alabama"; no other asset is listed.

38.     The Baldwin County litigation has been ongoing for over four years; it has consumed extensive resources of the Alabama court system, including two appeals heard and decided by the Supreme Court of Alabama.

39.     The very parties named as defendants in the Adversary Proceeding filed by PRS II in this bankruptcy proceeding were, in addition to PRS II, counterclaim defendants in the Baldwin County litigation. Specifically, these persons include Thomas J. Langan, Jr., Patrick Langan, Mark Langan, Michael Langan, Bar Pilot Land, LLC, Pilots Pointe Development, LLC,

and Langan Development Company, LLC. All of these persons are, as noted by PRS II in its Adversary Proceeding Complaint, "life-long residents of Baldwin County, Alabama".

40.    Contrary to Paragraph 63(b) of the Original Complaint filed by PRS II, the Baldwin County Circuit Court expressly ruled that an enforceable contract did not exist between White Sands and Langan Development Company, LLC, a position asserted by PRS II and subsequently upheld by the Supreme Court of Alabama.

41.    By commencing bankruptcy proceedings in the Northern District of Texas, Dallas Division, PRS II was able to (a) indefinitely stall the Baldwin County litigation, (b) avoid being both judicially and collaterally estopped from asserting that such contract existed with respect to White Sands and, therefore, any and all claims based thereon, and (c) litigate its case before a distant forum lacking any logical or actual connection to either the underlying property or each party claiming an interest therein.

42.    A chapter 11 case filed as a litigation tactic is not within the policies contemplated by the Bankruptcy Code and should be dismissed. See In re SGL Carbon Corp., 200 F.3d 154, 165 (3d Cir. 1999) (stating that "because filing a Chapter 11 petition merely to obtain tactical litigation advantages is not within the legitimate scope of the bankruptcy laws, courts have typically dismissed Chapter 11 petitions under these circumstances"); In re Fonke, 310 B.R. 809, 815 (Bankr. S.D. Tex. 2004); In re Block K Assocs., 55 B.R. 630, 634; see also Furness v. Lilinefield, 35 B.R. 1006, 1013 (D. Md. 1983) ("The Bankruptcy provisions are intended to benefit those in genuine financial distress. They are not intended to be used as a mechanism to orchestrate pending litigation.").

**C.** **Other Factors Demonstrating Bad Faith**

43. The U.S. Fifth Circuit has held that the following conditions generally accompany a bad faith chapter 11 filing, and this case is certainly no exception:

> (a) The debtor has one asset, such as a tract of undeveloped or developed real property;
>
> (b) The property is encumbered by secured creditors' liens;
>
> (c) The debtor has no employees, with the exception of the principals;
>
> (d) There are only a few, if any, unsecured creditors whose claims are relatively small;
>
> (e) The debtor has little or no cash flow and no source of income to sustain a plan of reorganization; and
>
> (f) The debtor has either:
>
>> (i) been unsuccessful in defending a foreclosure action in state court; or
>>
>> (ii) proceeded to a standstill in state court litigation and (A) lost, or (B) must post bond which it cannot afford.

See Little Creek, 779 F.2d at 1073. Although courts typically do not consider it necessary that all of the foregoing conditions be present before a filing is deemed to have been made in bad faith, each condition is eerily conspicuous with regard to PRS. As the Little Creek court remarked, "[n]either the bankruptcy courts nor the creditors should be subjected to the costs and delays of a bankruptcy proceeding under such conditions. Id. at 1073. The Little Creek factors apply here:

(i) PRS II's assets consist exclusively of a single parcel of land. Irrespective of any trivial attempt on behalf of PRS to describe the tract of land in Baldwin County, Alabama as other than a single asset, the land continues to be a single undeveloped tract. Any argument to the contrary must be viewed as a distinction without meaning. Notably, the

22

secured interests in the property, when taken in the aggregate, would entitle the respective holders to the entirety of the property; yet each security interest contains a virtually identical description of a single parcel of land.

(ii)     The chapter 11 petition filed by PRS II provides that the total amount of secured claims existing with respect to the land in Baldwin County, Alabama is $26,363,059.91. Assuming the valuation contained therein is correct—which is anything but a foregone conclusion—secured claims encumber ninety-five percent (95%) of the land's value. However, if any one or more of the assertions in PRS II's Original Adversary Complaint are proved true (e.g., that an enforceable agreement of sale for a portion of the land existed in favor of White Sands, or that the property was in fact worth a mere $2,000,000 on the date PRS II purchased the same rather than the $18,850,000 PRS II actually paid, the property's value is most assuredly "underwater". See Adversary Complaint, ¶¶ 63(b), 87.

(iii)    PRS II does not now, nor has it ever, had any employees who are not principals (in this case, members) of the company.

(iv)     The listed and non-disputed claims of unsecured creditors provided by PRS II in its petitions, excluding the claims of insiders, amount to less than 1% of PRS II's total listed liabilities (or $52,669.56).

(v)     The Monthly Operating Reports filed by PRS II in this bankruptcy proceeding clearly demonstrate PRS's lack of monthly cash flow. PRS II has additionally failed to demonstrate any reasonable prospect of future cash flows which could justifiably support a legitimate chance for a successful reorganization in bankruptcy. However, if PRS II contends otherwise and that is in fact the case, PRS II has no need for bankruptcy, as it is

financially healthy pending the judicial resolution of its state law contract claims against its only real non-insider creditor – the Langans – as, in PRS II's own words, they are mere "alter egos of one another." Original Complaint at ¶ 11.

(vi) PRS II has recently lost an appeal to the Supreme Court of Alabama, which ruled that White Sands' claim for tortious interference with a business relationship could proceed against PRS II and its counter-claim co-defendants. PRS II, the Langans, and White Sands have engaged in very substantial litigation over the past four years. To start anew in a distant forum would necessarily impose extraordinarily significant costs on White Sands and the Langans, each of whom is now an adversarial party with respect to PRS II.

## II. TRANSFER OF VENUE

44. In the alternative, White Sands requests that the Court transfer venue to the Bankruptcy Court for the Southern District of Alabama, pursuant to 28 U.S.C. § 1412. If the case is not dismissed, a transfer of venue would both be in the interest of justice and for the convenience of the parties.

45. PRS II has no relation to the Northern District of Texas, other than its claimed affiliation with Morris Radio. On the other hand, PRS II's sole asset is in Baldwin County, Alabama and PRS II is currently engaged in litigation with White Sands in that County. There are no creditors in Texas –the creditors are in Illinois (the Illinois creditors being the insiders) or Alabama. The single largest creditor, the Langans, is in Baldwin County, Alabama. Furthermore, the majority of witnesses that could be necessary for the adversary proceeding are in Alabama. The only potential witnesses that do not reside in Alabama are Mr. Morris, Peter Sterling, and Michael Asfour, none of whom reside in Texas. The adversary proceeding wholly relates to matters that took place in Alabama.

46.     It is within the discretion of the Court to transfer venue. See In re Commonwealth Oil Refining Co., Inc., 596 F.2d 1239, 1247 (5th Cir. 1979). The factors to be considered when deciding whether to transfer venue are:

> (1) The proximity of creditors of every kind to the Court;
> (2) The proximity of the debtor to the Court;
> (3) The proximity of the witnesses necessary to the administration of the estate;
> (4) The location of the assets;
> (5) The economic administration of the estate; and
> (6) The necessity for ancillary administration if bankruptcy should result.

Id. In the present case, these factors would clearly support a transfer of venue to the Southern District of Alabama.

47.     Wherefore, based upon the facts and reasons set forth in this Motion, if the Court does not dismiss PRS II's bankruptcy proceedings, White Sands respectfully prays that the Court will transfer the venue of the case to the Southern District of Alabama.

**NO PRIOR REQUEST**

48.     No previous request for the relief sought in this Motion has been made to this or any other court.

**CONCLUSION**

49.     The Supreme Court has indicated that a primary goal of chapter 11 is to maximize the property available to creditors. Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 453 (1999). This purpose is not met by PRS II's bankruptcy filings. It is readily apparent from the circumstances set forth herein, as well as the facts present in the record, that "the Langans" represent over 90% of the listed claims of creditors. Another 9.8% represents unsecured claims of PRS II insiders. Thus, under these circumstances, it would be wholly disingenuous, although less than surprising, for PRS II to represent that its bankruptcy filings were for the benefit of "the Langans".

50.     If PRS II is successful in asserting the claims set forth in its Original Adversary Complaint, in state court in Baldwin County, Alabama — the appropriate forum for adjudication of the same—the company will hardly be insolvent or in need of bankruptcy reorganization. If unsuccessful, those same claims will have been liquidated in the proper forum, and bankruptcy might then be a legitimate course of action.

51.     As such, dismissal is mandated to protect the judicial integrity of this Court and to prevent the misuse of the chapter 11 process.

**WHEREFORE**, White Sands respectfully prays requests that the Court enter an order, substantially in the form annexed hereto as Exhibit A, (a) dismissing the case pursuant to Bankruptcy Code section 1112(b), (b) in the alternative, transferring venue to the Bankruptcy Court for the Southern District of Alabama pursuant to 28 U.S.C. § 1412, and (c) granting White Sands such other and further relief as is proper.

Respectfully submitted this 16th day of December 2009.

**COPELAND, FRANCO, SCREWS & GILL, P.A.**

_s/ C. Nelson Gill_
C. Nelson Gill (Ala. State Bar No. GIL055)
Richard H. Gill (Ala. State Bar No. GILL007)
George W. Walker, III (Ala. State Bar No. WAL097)
P. O. Box 347
Montgomery, Alabama 36101-0347
Telephone: 334.834.1180
Facsimile: 334.834.3172

-and-

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Charles R. Gibbs (Tex. State Bar No. 07846300)
Eric C. Seitz (Tex. State Bar No. 24067863)
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
Telephone: 214.969.2800
Facsimile: 214.969.4343

**ATTORNEYS FOR WHITE SANDS, LLC**

## CERTIFICATE OF CONFERENCE

I hereby certify that on December 14, 2009, I attempted to confer with counsel for the Debtor regarding the foregoing Motion, but was unable to reach Rakhee Patel by telephone prior to filing.

*s/ C. Nelson Gill*
C. Nelson Gill

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the White Sands, LLC Motion to Dismiss Debtor PRS II LLC's Chapter 11 Case, or, in the Alternative, for Change of Venue was provided via e-mail (**w/out exhibits**) to the parties listed below and a copy of same (**w/exhibits**) to the parties listed on the attached Service List via United States mail, postage prepaid, on this the 16th day of December 2009.

Office of the U.S. Trustee
c/o Erin Schmidt
1100 Commerce Street, Room 976
Dallas, Texas 75242-1496
erin.schmidt2@usdoj.gov

Gerrit M. Pronske
Pronske & Patel, P.C.
2200 Ross Avenue, Suite 5350
Dallas, TX 75201
gpronske@pronskepatel.com

*s/ Eric C. Seitz*
Eric C. Seitz

**SERVICE LIST**
**Morris Radio Enterprises, L.L.C.**
**Case No. 09-31416**
**Document No. 6420490**

Morris Radio Enterprises, L.L.C.
PRM Realty Group, LLC
Sarles & Ouimet
900 Jackson St.
Dallas, TX 75202

Gerrit M. Pronske
Pronske & Patel, P.C.
2200 Ross Avenue, Suite 5350
Dallas, TX 75201

U.S. Trustee
1100 Commerce Street, Room 976
Dallas, TX 75242-1496

Peter Morris
150 N. Wacker Dr., Suite 1120
Chicago, IL 60606

Douglas S. Hackett
171 English Landing, #210
Parkville, MO 64152

WVIP
Hudson Weschester Radio, Inc.
One Broadcast Forum
New Rochelle, NY 10801

Tom Athans d/b/a Talk USA
1247 Woodward Avenue, Apt. 801
Detroit, MI 48226-2030

Peter Laufer
1225 Bodega Avenue
Bodega Bay, CA 94923

Clear Channel Communications
Washington DC Market
5567 Collection Center Drive
Chicago, IL 60693

Foundation of National Progress
Attn: Kevin Medford
222 Sutter Street, Suite 600
San Francisco, CA 94108

Sydney Stern
c/o PRM Realty Group, LLC
150 N. Wacker Dr., #1120
Chicago, IL 60606

Jerome E. Speegle
Zieman, Speegle, Jackson & Hoffman,
L.L.C.
P.O. Box 11
Mobile, AL 36601

Laurie A. Spindler
Linebarger Goggan Blair & Sampson,
LLP
2323 Bryan Street, Suite 1600
Dallas, TX 75201

Charles M. Cobbe / Claude D. Smith
Cavazos, Hendricks, Poirot & Smitham,
P.C.
900 Jackson Street
570 Founders Square
Dallas, TX 75202

PRM Realty Group, LLC
150 N. Wacker Dr., #1120
Chicago, IL 60606

Pilot Pointe Development, LLC
2280 Hurricane Bay Drive
Theodore, AL 36582

Bar Pilot Land, LLC
3380 Hurricane Bay Drive
Theodore, AL 36582

Peter Sterling
11 Raeburn Court
Babylon Village, NY 11702

Zieman, Speegle, Jackson & Hoffman,
L.L.C.
5 Dauphin Street, Suite 301
Mobile, AL 36602

Brockington and Associates
4836 Brecksville Road
Richfield, OH 44286

Ross Security Consultants
Central Square, Suite 68
Central Avenue & Route 9
Linwood, NJ 08221

Marks Paneth & Schron
622 3rd Avenue, 7th Floor
New York, NY 10017

Robert Michael Galloway
Galloway, Wettermark, Everest, Rutens
& Gaillard, LLP
P.O. Box 16629
Mobile, AL 36616