## **EXHIBIT B**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 1

1          IN THE CIRCUIT COURT OF BALDWIN COUNTY, ALABAMA

2     PRS, II, L.L.C.,                )

                                      )                 ▢ **COPY**

3                    Plaintiff,       )

                                      )

4          -vs-                       )   Case No. CV-05-923

                                      )

5     WHITE SANDS GROUP, L.L.C.       )

      and JEFF VALENTINE,             )

6                                     )

                    Defendant.        )

7

8          Videotaped deposition of PETER R. MORRIS, taken

9     before NICOLE MARIE DeBARTOLO, C.S.R., R.P.R., and

10    Notary Public, pursuant to the provisions of the Code

11    of Civil Procedure of the State of Alabama and the

12    Rules of the Supreme Court thereof, pertaining to the

13    taking of depositions, at 321 North Clark Street,

14    Chicago, Illinois, commencing at 9:18 a.m., on the

15    8th day of August, 2006.

16

17

18

19

20

21

22

23

24

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 54

| | | |
|---|---|---|
| 10:23:19 | 1 | negotiations with White Sands? |
| 10:23:22 | 2 | A    No.  At the time that we were looking at this |
| 10:23:26 | 3 | and the time that -- that Sterling had optioned this, |
| 10:23:33 | 4 | he didn't give me information on the -- on the |
| 10:23:37 | 5 | valuation of the lots for White Sands, and I hadn't |
| 10:23:43 | 6 | seen the paperwork in the beginning either, as I |
| 10:23:47 | 7 | said. |
| 10:23:48 | 8 | I think in general he felt that the water |
| 10:23:51 | 9 | lots, if they were to remain that way, had some very |
| 10:23:57 | 10 | good value, between 500 and 800,000, but that's my |
| 10:24:03 | 11 | recollection.  As I sit here, it's not firm.  But he |
| 10:24:06 | 12 | did say look, here on the water, they have a lot of |
| 10:24:09 | 13 | value, but then, again, we can move this along |
| 10:24:13 | 14 | differently and go vertical for a chunk of this, and |
| 10:24:16 | 15 | that's going to have more value. |
| 10:24:18 | 16 | And that was the whole pitch, as I told you, |
| 10:24:22 | 17 | when Sterling brought it to us.  He said, you know, |
| 10:24:27 | 18 | we have a team that can cause the entitlements to |
| 10:24:32 | 19 | bring up to 1,000 units on here.  That's what |
| 10:24:35 | 20 | attracted me to it. |
| 10:24:37 | 21 | Q    Well, when you used the phrase "we can go |
| 10:24:40 | 22 | vertical", you mean high-rise, taller building? |
| 10:24:44 | 23 | A    Yes, on some of the land, yes. |
| 10:24:46 | 24 | Q    Who did he say was on this team that could |

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 55

| 10:24:49 | 1 | accomplish these things? |
| 10:24:51 | 2 | A   Sterling said to Tommy Langan and then he |
| 10:24:58 | 3 | mentioned Chris Rollins and said that -- |
| 10:25:04 | 4 | Q   Chris Rolison? |
| 10:25:07 | 5 | A   Rolison.  Yeah, I don't remember the exact |
| 10:25:09 | 6 | spelling, but yes. |
| 10:25:10 | 7 | Q   That's fine. |
| 10:25:10 | 8 | A   And then there was also a -- an engineering |
| 10:25:19 | 9 | firm named Volkert that would also be able to be |
| 10:25:24 | 10 | helpful in that. |
| 10:25:26 | 11 | Q   Anyone else that he named? |
| 10:25:29 | 12 | A   He may have, but this is what I recall as I |
| 10:25:32 | 13 | sit here. |
| 10:25:32 | 14 | Q   Well, let's see what he said Tommy Langan |
| 10:25:36 | 15 | brought to it.  What did they tell you was Tommy |
| 10:25:39 | 16 | Langan's source of ability to be of such assistance? |
| 10:25:43 | 17 | A   They said that Tommy -- Tommy and his family |
| 10:25:46 | 18 | had good political connections in the area with the |
| 10:25:50 | 19 | county governments and that -- and that Tommy had |
| 10:25:56 | 20 | ability to assist in infrastructure and dirt and |
| 10:26:02 | 21 | earth moving.  He never represented Tommy to be a |
| 10:26:06 | 22 | developer of high-rise condo or a builder of |
| 10:26:10 | 23 | high-rise project, but earth moving, infrastructure, |
| 10:26:13 | 24 | roads, political contacts, and then that type of |

Page 129

| | | |
|---|---|---|
| 13:07:08 | 1 | THE VIDEOGRAPHER: And we are back on the record |
| 13:08:01 | 2 | at 1:04 p.m. |
| 13:08:03 | 3 | BY MR. GILL: |
| 13:08:06 | 4 | Q   Mr. Morris, before lunch, I was asking you |
| 13:08:08 | 5 | about the payments on the debt and the role of the |
| 13:08:16 | 6 | McCarthys. And is that payment of approximately |
| 13:08:20 | 7 | $31,000 a month an interest only payment? |
| 13:08:25 | 8 | A   That's my recollection, that it's all |
| 13:08:28 | 9 | interest on a cash basis, and there's an accrual |
| 13:08:32 | 10 | feature as well. |
| 13:08:33 | 11 | Q   What do you mean by this -- an "accrual |
| 13:08:35 | 12 | feature"? |
| 13:08:36 | 13 | A   Meaning that the stated rate is higher than |
| 13:08:39 | 14 | the cash pay rate the difference accruing, meaning |
| 13:08:44 | 15 | being added to principal and due upon the time that |
| 13:08:50 | 16 | the loan is due. |
| 13:08:51 | 17 | Q   Okay. Well, let me -- let me get -- try to |
| 13:08:53 | 18 | get that clear in my mind. That the ultimate |
| 13:08:57 | 19 | purchase price at closing was how much? |
| 13:09:00 | 20 | A   It was, in my recollection, it was |
| 13:09:06 | 21 | approximately 18 million plus or minus subject to a |
| 13:09:14 | 22 | condition subsequent of a reduction of about 800,000 |
| 13:09:19 | 23 | if the issue with White Sands went towards the |
| 13:09:25 | 24 | direction of -- of a -- of a sale to your client. |

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 130

| | | |
|---|---|---|
| 13:09:32 | 1 | Q   Well, I'm going to -- was the 800,000 added |
| 13:09:37 | 2 | so that the contingent price was 18.8, specifically |
| 13:09:43 | 3 | 18.85 million, of which 800 or 850,000 might be |
| 13:09:48 | 4 | backed out depending on the White Sands -- |
| 13:09:50 | 5 | A   Yeah, yeah, something like that. |
| 13:09:52 | 6 | Q   What is your best memory?  You're here as |
| 13:09:55 | 7 | the -- |
| 13:09:55 | 8 | A   No, and I'm saying I said 18 plus or minus, |
| 13:09:58 | 9 | you know, with about 800, and you've just gotten more |
| 13:10:03 | 10 | specific, so I would probably go with your -- |
| 13:10:06 | 11 | Q   Please don't go with my suggestion. |
| 13:10:08 | 12 | A   Okay. |
| 13:10:08 | 13 | Q   Mine is a question to you whether that is |
| 13:10:10 | 14 | your understanding of the deal? |
| 13:10:11 | 15 | A   I will say again that it's 18 million plus or |
| 13:10:15 | 16 | minus including 800,000 plus or minus as a clawback |
| 13:10:21 | 17 | if the White Sands people prevail on their claim. |
| 13:10:28 | 18 | Q   Okay.  So if we assume for the moment that |
| 13:10:31 | 19 | the potential gross price is 18.85 million before any |
| 13:10:35 | 20 | of those contingencies come into play, the payment |
| 13:10:40 | 21 | that is being made is at what interest rate? |
| 13:10:46 | 22 | A   The -- not the -- paying the accrued, just |
| 13:10:50 | 23 | the pay. |
| 13:10:51 | 24 | Q   No, what is the face amount, the stated rate |

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 146

| | | |
|---|---|---|
| 13:30:33 | 1 | indemnify the Langan side of the table referred to as |
| 13:30:38 | 2 | Bar Pilot, Pilots Pointe, and those other LLCs? |
| 13:30:41 | 3 | A    Why did -- why did we indemnify? |
| 13:30:47 | 4 | Q    Yes -- |
| 13:30:49 | 5 | MR. SPEEGLE:  Object to the form. |
| 13:30:49 | 6 | BY MR. GILL: |
| 13:30:50 | 7 | Q    -- against potential claim? |
| 13:30:51 | 8 | MR. SPEEGLE:  Object to the form.  You can go |
| 13:30:53 | 9 | ahead and answer. |
| 13:30:53 | 10 | THE WITNESS:  Well, the only thing I'm -- that I |
| 13:30:57 | 11 | can recollect is that I don't understand the document |
| 13:31:05 | 12 | that says -- that has -- or the meaning of the 13 |
| 13:31:08 | 13 | million in terms of what liability and what that |
| 13:31:12 | 14 | relates to, but I do assume the 875 relates to the -- |
| 13:31:19 | 15 | the potential claim or the claim that may or may not |
| 13:31:23 | 16 | be valid of your clients, and that relates to what |
| 13:31:28 | 17 | ended up happening at the closing where -- and |
| 13:31:33 | 18 | shortly before it where Tom Langan and then his |
| 13:31:39 | 19 | uncles made the decision to sell the -- all of the |
| 13:31:49 | 20 | land including moving their lots, which heretofore |
| 13:31:52 | 21 | had been kept out, their ocean lots, and the lots |
| 13:31:59 | 22 | under dispute with your clients. |
| 13:32:02 | 23 | And I made provisions to say I'll stand in |
| 13:32:07 | 24 | your shoes, they said our -- we feel we're in good |

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 147

| | | |
|---|---|---|
| 13:32:12 | 1 | shape, you know, in terms of our dispute with White |
| 13:32:18 | 2 | Sands.  We want to you to take title to everything, |
| 13:32:23 | 3 | and I said I'll do that provided you -- and they said |
| 13:32:29 | 4 | we want you to handle any litigation, and I said |
| 13:32:34 | 5 | fine, but I want a reduction, a springing reduction |
| 13:32:40 | 6 | if they -- they win their position even though you |
| 13:32:44 | 7 | feel that it's not likely that they will, and I said |
| 13:32:48 | 8 | I will stand in your shoes, and I will -- I will do |
| 13:32:51 | 9 | that because understand it's not clear to me who's |
| 13:32:56 | 10 | going to win this. |
| 13:32:57 | 11 | BY MR. GILL: |
| 13:32:57 | 12 | Q   Okay.  Well, let's back up a minute.  When |
| 13:33:00 | 13 | you first saw the deal, you recognized, because we |
| 13:33:04 | 14 | went over it earlier, that there were 12 lots |
| 13:33:08 | 15 | withheld from the whole parcel, right, five of the -- |
| 13:33:12 | 16 | White Sands had asserted a claim to, five waterfront |
| 13:33:17 | 17 | lots that the Langans had, and two inland lots that |
| 13:33:21 | 18 | the Langans had, right? |
| 13:33:22 | 19 | A   Five, five, and two? |
| 13:33:24 | 20 | Q   Yeah.  Making 12. |
| 13:33:26 | 21 | A   Yes. |
| 13:33:26 | 22 | Q   Is that your recollection? |
| 13:33:27 | 23 | A   I don't remember. |
| 13:33:28 | 24 | Q   We can show you the document. |

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 157

| | | |
|---|---|---|
| 13:44:06 | 1 | the land including the White Sands lots and the |
| 13:44:10 | 2 | Langan lots to make the project really ideal or |
| 13:44:14 | 3 | viable? |
| 13:44:15 | 4 | MR. SPEEGLE:  Object to the form. |
| 13:44:17 | 5 | THE WITNESS:  No.  What they said was you got to |
| 13:44:20 | 6 | get all the ocean lots because that will obstruct the |
| 13:44:24 | 7 | view and the -- and the environment, especially if |
| 13:44:27 | 8 | you want to also do something vertical or mid-rise. |
| 13:44:31 | 9 | As far as the White Sands lots, it could be |
| 13:44:35 | 10 | good to get them, but if you don't, it's not fatal, |
| 13:44:39 | 11 | which is, by the way, reflected in how we closed, |
| 13:44:43 | 12 | meaning that I wouldn't let them keep the beach lots |
| 13:44:47 | 13 | even though they wanted to. |
| 13:44:49 | 14 | They wanted me to take the White Sands lots |
| 13:44:53 | 15 | because they said don't worry it -- the claim isn't |
| 13:44:56 | 16 | going to stand up, and I shoved it back on them and |
| 13:45:00 | 17 | said, but if you're wrong I'm not paying, but I will |
| 13:45:05 | 18 | at least step in your shoes and help you because I -- |
| 13:45:09 | 19 | I wasn't in a position to -- to make a judgment with |
| 13:45:16 | 20 | certainty, even though I had my own private opinions |
| 13:45:19 | 21 | about what -- what I thought about the claim.  I |
| 13:45:22 | 22 | didn't want to take a risk. |
| 13:45:25 | 23 | BY MR. GILL: |
| 13:45:25 | 24 | Q   What is the earliest date that you remember |

Page 158

| 13:45:27 | 1 | the Langans telling you that they thought that the |
| 13:45:30 | 2 | White Sands claim was not bad? |
| 13:45:36 | 3 | A    It was -- it's interesting, but it's about |
| 13:45:39 | 4 | the time of the hurricane, you know, whenever that |
| 13:45:41 | 5 | was in October, November, or September.  Here is -- |
| 13:45:46 | 6 | Q    This is '04? |
| 13:45:48 | 7 | A    Pardon? |
| 13:45:49 | 8 | Q    This is '04.  The hurricane -- no, this |
| 13:45:54 | 9 | was -- this was '04 when these documents -- |
| 13:45:57 | 10 | A    No, this is -- what I'm saying is wasn't |
| 13:46:00 | 11 | there a hurricane in '04 in September, October, that |
| 13:46:04 | 12 | general area? |
| 13:46:04 | 13 | Q    I believe there was.  I don't know the name |
| 13:46:06 | 14 | of it. |
| 13:46:07 | 15 | A    I don't either because there were -- |
| 13:46:09 | 16 | Q    Hurricane Ivan? |
| 13:46:11 | 17 | A    Yeah, I don't know the name either.  But |
| 13:46:14 | 18 | basically what -- what -- Tommy said to me, Peter, |
| 13:46:22 | 19 | and this is after the hurricane, I don't think this |
| 13:46:26 | 20 | claim is going to stand up, and it was end of -- it |
| 13:46:31 | 21 | was possibly in November at some point, whatever, and |
| 13:46:34 | 22 | I said well, tell me why you say that. |
| 13:46:37 | 23 | We sat down and he showed me some documents |
| 13:46:41 | 24 | and I'll try to tell you right now what I thought |

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 159

| | | |
|---|---|---|
| 13:46:43 | 1 | they were, but he said look, here's the letters back |
| 13:46:47 | 2 | and forth, and we've given them their check back or |
| 13:46:51 | 3 | we're going to give it back, and we don't think it's |
| 13:46:54 | 4 | going to hold because they didn't move in time, and |
| 13:46:56 | 5 | there's too much uncertainty and cost in building the |
| 13:46:59 | 6 | infrastructure, so there's a non-deal. |
| 13:47:01 | 7 | And I said to them, look, whatever you do, |
| 13:47:04 | 8 | I'm not going to get stuck with buying it, paying for |
| 13:47:07 | 9 | it and then having to give it back. So just |
| 13:47:09 | 10 | remember, this dispute is going to go on. |
| | 11 | Q    Okay. |
| 13:47:12 | 12 | A    I'll stand in your shoes, I'll adjust, and |
| 13:47:15 | 13 | that's how it was. |
| 13:47:16 | 14 | Q    Well, the -- what was it about the hurricane |
| 13:47:21 | 15 | that caused -- or Mr. Langan said caused the White |
| 13:47:26 | 16 | Sands entitlement to the lots to not be binding? |
| 13:47:30 | 17 | A    I didn't say that that was a direct cause.  I |
| 13:47:33 | 18 | said it was coincidental at that time frame, and I |
| 13:47:37 | 19 | think what it was is that -- this is my |
| 13:47:39 | 20 | recollection -- that Tommy felt that they sat -- they |
| 13:47:45 | 21 | didn't act for a chunk of time to go forward and |
| 13:47:51 | 22 | define more specificity in the understanding that was |
| 13:47:57 | 23 | preliminary and, in his opinion, not concrete. |
| 13:48:04 | 24 | And I guess the hurricane got everybody |

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 166

| Time | Line | |
|---|---|---|
| 13:55:03 | 1 | Q   Okay.   Now -- but you knew of the existence |
| 13:55:15 | 2 | of the White Sands claim from back in October of '04, |
| 13:55:21 | 3 | didn't you? |
| 13:55:21 | 4 | A   Yes. |
| 13:55:22 | 5 | Q   All right.   And -- and at that time the |
| 13:55:30 | 6 | Langans were assuring you that you need not be |
| 13:55:34 | 7 | concerned about that, they didn't think that the |
| 13:55:36 | 8 | claim was valid right? |
| 13:55:38 | 9 | A   Well, I don't know if it was October, as I |
| 13:55:40 | 10 | said.   As the -- as the fall went on, Tommy started |
| 13:55:44 | 11 | to voice that opinion in the late fall or the winter. |
| 13:55:48 | 12 | Q   Well, when was it according to your best |
| 13:55:51 | 13 | recollection? |
| 13:55:51 | 14 | A   I don't remember the exact date, sir. |
| 13:55:52 | 15 | Q   What's your best recollection? |
| 13:55:54 | 16 | A   November, December, January.   I don't |
| 13:55:59 | 17 | remember.   I don't remember. |
| 13:56:00 | 18 | Q   Well, did you know it in October when you |
| 13:56:02 | 19 | formed the joint venture that there was the claim of |
| 13:56:05 | 20 | White Sands but that the Langans said you need not be |
| 13:56:08 | 21 | concerned about that? |
| 13:56:09 | 22 | A   What I knew in October was that the White |
| 13:56:16 | 23 | Sands land and the beach land was excluded and that |
| 13:56:20 | 24 | there was a relationship.   That's all I was made |

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 167

| | | |
|---|---|---|
| 13:56:23 | 1 | privy to. Okay. It wasn't until later, as I |
| 13:56:26 | 2 | testified before, that Tommy started to say I don't |
| 13:56:30 | 3 | think this is enforceable. And I don't remember |
| 13:56:33 | 4 | exactly when later it was. |
| | 5 | (Morris Exhibit No. 15 marked as requested.) |
| | 6 | BY MR. GILL: |
| 13:56:36 | 7 | Q   Okay. Show you, Mr. Morris, Plaintiff's |
| 13:57:08 | 8 | Exhibit 15, a letter from Mark Langan to Jeff |
| 13:57:13 | 9 | Valentine dated October 11th, 2004. Have you ever |
| 13:57:21 | 10 | seen this letter before? |
| 13:57:22 | 11 | A   I don't recall. This is October 11th, |
| 13:57:24 | 12 | Exhibit 15? |
| 13:57:24 | 13 | Q   Yes, the same day as your addendum, which |
| 13:57:27 | 14 | continues to exclude the White Sands lots? |
| 13:57:30 | 15 | A   Yes. |
| 13:57:31 | 16 | Q   You don't recall seeing it? |
| 13:57:33 | 17 | A   No. |
| 13:57:33 | 18 | Q   Did Mark Langan or Tommy Langan, who is |
| 13:57:36 | 19 | referenced in the first sentence of the letter, tell |
| 13:57:39 | 20 | you that they had gone to White Sands and asked them |
| 13:57:46 | 21 | to close on the five lots? |
| 13:57:48 | 22 | A   No. Did they? When? In October? |
| 13:57:51 | 23 | Q   At any point in time did they tell you that? |
| 13:57:53 | 24 | A   No. Asked them to close? |

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 169

| Time | Line | |
|---|---|---|
| 13:59:20 | 1 | Q    August. |
| 13:59:21 | 2 | A    No.  Again, not so.  What I expected was that |
| 13:59:26 | 3 | if it closed, we could do a combination of a |
| 13:59:29 | 4 | subdivision and we could do high-rise and mid-rise |
| 13:59:35 | 5 | condos, but that with 90 acres plus or close to 100 |
| 13:59:40 | 6 | acres as a canvas, and the development background |
| 13:59:43 | 7 | that we had, that we would figure that out at some |
| 13:59:45 | 8 | other point, some later point.  I didn't have a |
| 13:59:48 | 9 | definite idea, I still don't today. |
| 13:59:50 | 10 | Q    Well, you felt there would be high-rise or |
| 13:59:53 | 11 | mid-rise condos included? |
| 13:59:55 | 12 | A    On some of it, not all of it. |
| 13:59:57 | 13 | Q    How much of that 90 acres did you think was |
| 14:00:00 | 14 | actually available as building sites? |
| 14:00:02 | 15 | A    I thought it was roughly about 60 or 55.  I |
| 14:00:06 | 16 | thought there was 35 acres of wetlands or some |
| 14:00:09 | 17 | percentage like that.  Again, we -- we -- we intended |
| 14:00:12 | 18 | to have that redefined and that shifted again with |
| 14:00:17 | 19 | the hurricane. |
| 14:00:17 | 20 | Q    Well, how much developable land do you think |
| 14:00:22 | 21 | there is today? |
| 14:00:23 | 22 | A    As I speak, I think it's probably about 40 |
| 14:00:26 | 23 | acres -- |
| | 24 | Q    Maybe? |

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 192

```
14:36:19   1    dispute?

14:36:23   2        A   I honestly didn't know.  They -- Tommy had --

14:36:27   3    had basically verbally showed me the -- verbally

14:36:38   4    discussed the issues about this subdivision, showed

14:36:41   5    me this letter, showed me that he hadn't filed the

14:36:45   6    subdivision, he showed me that document, meaning the

14:36:49   7    drawings and how it was tentative, but to say that I

14:36:54   8    thought I saw all of it, I -- I didn't know whether I

14:36:58   9    saw all of it.  I just --

14:36:59  10        Q   Well --

14:37:00  11        A   I heard enough and saw enough to feel

14:37:03  12    comfortable that most likely it was not enough

14:37:07  13    specificity to be binding, and that there was not a

14:37:13  14    quick enough action and action of specificity by your

14:37:18  15    clients in the face of the uncertainty to qualify for

14:37:23  16    a contract, but I didn't do it as a lawyer.  I did it

14:37:28  17    as a layman and business person saying it doesn't

14:37:31  18    look like there's a meeting of the minds.

14:37:34  19        Q   Mr. Morris, the question was -- I would ask

14:37:37  20    you, please, we've been here a long time, the

14:37:39  21    question was did you expect the Langans gave you all

14:37:42  22    of the documents associated with the risk that you

14:37:44  23    were taking on about White Sands?  That's all I

14:37:47  24    asked, and you gave me this enormous answer.
```

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 213

| | | |
|---|---|---|
| 15:02:03 | 1 | were satisfied that you would get all the property |
| 15:02:07 | 2 | subject to this contention holdback of $875,000, |
| 15:02:11 | 3 | right? |
| 15:02:12 | 4 | MR. SPEEGLE:  Object to the form. |
| 15:02:13 | 5 | BY MR. GILL: |
| 15:02:13 | 6 | Q   In the event that the White Sands people |
| 15:02:16 | 7 | prevailed? |
| 15:02:16 | 8 | A   No. |
| 15:02:16 | 9 | MR. SPEEGLE:  Object to the form. |
| 15:02:17 | 10 | THE WITNESS:  I -- I was satisfied that I was |
| 15:02:21 | 11 | getting the pieces that were otherwise heretofore |
| 15:02:24 | 12 | missing that I was very concerned about, which was |
| 15:02:27 | 13 | all the Langan water lots, and I was satisfied that |
| 15:02:31 | 14 | we had a very good chance of prevailing on White |
| 15:02:36 | 15 | Sands, but that if we lost somehow and I reversed the |
| 15:02:40 | 16 | financial impact of it in terms of the purchase, that |
| 15:02:42 | 17 | it wouldn't be fatal to the project. |
| 15:02:45 | 18 | BY MR. GILL: |
| 15:02:45 | 19 | Q   Okay.  But you did agree to undertake to take |
| 15:02:49 | 20 | all the land and to attempt to defend against the |
| 15:02:54 | 21 | White Sands claims? |
| 15:02:55 | 22 | A   Yes. |
| 15:02:56 | 23 | Q   And you and Langan, the Langan entities, |
| 15:03:04 | 24 | arrived at a final decision to go forward with the |

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 214

| 15:03:08 | 1 | closing on that basis, is that right? |
| 15:03:10 | 2 | A   Yes. |
| 15:03:11 | 3 | Q   And to acquire the entire parcel including |
| 15:03:14 | 4 | the White Sands lots but subject to the fact that if |
| 15:03:18 | 5 | White Sands won, you got some money cut off? |
| 15:03:21 | 6 | A   And they got the lots, yes. |
| 15:03:23 | 7 | Q   I said if they won. |
| 15:03:25 | 8 | A   Yes, yes. |
|  | 9 | (Morris Exhibit No. 17 marked as requested.) |
|  | 10 | BY MR. GILL: |
| 15:03:26 | 11 | Q   Now, let me show you Exhibit No. 17.  Now, |
| 15:03:37 | 12 | let's get straight who is who.  Michelle Wiersema |
| 15:03:42 | 13 | W-I-E-R -- |
| 15:03:42 | 14 | A   My secretary. |
| 15:03:43 | 15 | Q   Just let me spell it for the court reporter, |
| 15:03:43 | 16 | please.  W-I-E-R-S-E-M-A. |
| 15:03:46 | 17 | Is that pronounced Wiersema? |
| 15:03:49 | 18 | A   Yes. |
| 15:03:49 | 19 | Q   Ms. Wiersema is your secretary, and this is |
| 15:03:53 | 20 | sent to Pete.  I take it that's Pete Sterling? |
| 15:04:01 | 21 | A   Yes. |
| 15:04:01 | 22 | Q   And it appears to have been forwarded to |
| 15:04:05 | 23 | Tommy, right? |
| 15:04:06 | 24 | A   For his comments, and I dictated it to |

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 247

| | | |
|---|---|---|
| 15:40:53 | 1 | THE VIDEOGRAPHER:  We're going off the record at |
| 15:40:55 | 2 | 3:37 p.m. |
| 15:48:15 | 3 | (Recess was taken.) |
| 15:52:37 | 4 | THE VIDEOGRAPHER:  And we are back on the record |
| 15:52:38 | 5 | at 3:49 p.m. |
| 15:52:40 | 6 | BY MR. GILL: |
| 15:52:44 | 7 | Q   Okay.  Got the March 17 memo in front of you? |
| 15:52:47 | 8 | A   Yes, I do. |
| 15:52:48 | 9 | Q   All right.  Let's go down to the next |
| 15:52:50 | 10 | paragraph, and you give your opinion about what the |
| 15:52:54 | 11 | Langans had discretion to do and not to do, and then |
| 15:52:59 | 12 | you state in about the fifth line that, quote, |
| 15:53:04 | 13 | Therefore, it, and that's referring to the |
| 15:53:07 | 14 | arrangement with White Sands, is not binding and more |
| 15:53:11 | 15 | an expression of intent.  Now, all of a sudden since |
| 15:53:15 | 16 | we have closed, mysteriously this guy and his partner |
| 15:53:20 | 17 | and lawyer surface acting as if there was a binding |
| 15:53:24 | 18 | contract with all of the facts fixed and no open |
| 15:53:27 | 19 | ended burials with demands for closing and threats to |
| 15:53:32 | 20 | sue, unquote.  Do you see that? |
| 15:53:35 | 21 | A   Yes. |
| 15:53:35 | 22 | Q   All right.  Now, of course, you knew the |
| 15:53:38 | 23 | existence of these people and the fact that they were |
| 15:53:40 | 24 | asserting a claim to these all along, and in fact, |

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 248

| | | |
|---|---|---|
| 15:53:43 | 1 | agreed to take on that dispute and wind it up |
| 15:53:48 | 2 | yourself, didn't you? |
| 15:53:49 | 3 | A    Absolutely. |
| 15:53:49 | 4 | Q    All right.  Now, it's not all of a sudden or |
| 15:53:54 | 5 | mysterious, it was indeed exactly what you told me |
| 15:53:58 | 6 | you already knew existed out there? |
| 15:54:02 | 7 | A    No, I disagree with your assertion, because |
| 15:54:05 | 8 | my reference to all of a sudden and mysterious is |
| 15:54:09 | 9 | that with Pete Sterling promising, in general, that, |
| 15:54:17 | 10 | for quite a while, that he would work with Chris and |
| 15:54:24 | 11 | get a reasonable settlement, that my comment about |
| 15:54:33 | 12 | mysterious and all of a sudden relates to the |
| 15:54:37 | 13 | flare-up of hostilities or actions immediately after |
| 15:54:43 | 14 | a closing when it was my understanding that Pete was |
| 15:54:51 | 15 | having some construc- -- this is through Pete of |
| 15:54:54 | 16 | course, that Pete was having constructive dialogue |
| 15:54:57 | 17 | with Chris, and that Chris had been willing to work |
| 15:54:59 | 18 | something out. |
| 15:55:00 | 19 | So I felt that Pete may not be as supportive |
| 15:55:08 | 20 | to his partners on this as I thought he would be even |
| 15:55:11 | 21 | on this issue as well.  I mean, that's the point. |
| 15:55:14 | 22 | Yes, I am aware, notwithstanding the above, that -- |
| 15:55:18 | 23 | Q    Is that what you said? |
| 15:55:19 | 24 | A    That they have a claim, that they have a |

Page 291

| | | | |
|---|---|---|---|
| 16:41:32 | 1 | A | I don't know who it was in my organization. |
| 16:41:34 | 2 | Q | But it was somebody at PRM? |
| 16:41:35 | 3 | A | Yes. |
| 16:41:36 | 4 | Q | Why -- why and when did Mr. Davenport depart? |
| 16:41:45 | 5 | A | He -- he wanted to go back to Western |

16:41:49  6   Pennsylvania and just work on deals.  He was a C --

16:41:54  7   COO or chief operating officer, and the commute

16:41:58  8   was -- was grading on him, and he also decided it

16:42:03  9   would be good for him to just be in Pennsylvania

16:42:05  10  because he was commuting on weekends -- I mean on the

16:42:09  11  weekday and going back, and it was a time he felt

16:42:12  12  to -- to do -- make that change and I supported that.

16:42:15  13  Q    It was mutual, also?

16:42:17  14  A    Yes, yes.

16:42:18  15  Q    Tell me about the status of the project

16:42:23  16  today.

16:42:24  17  A    The status of the project today is -- is

16:42:27  18  basically difficult because of the three-part lawsuit

16:42:35  19  over jurisdiction on planning between Baldwin County,

16:42:41  20  Gulf Shores, and the -- over the annexation that's

16:42:47  21  being protested by some environmental groups.

16:42:51  22       So in effect, you have Gulf Shore asserting

16:42:57  23  jurisdiction, you have a group of environmentalists

16:43:04  24  on behalf of Baldwin saying that the annexation was

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 292

| | | |
|---|---|---|
| 16:43:11 | 1 | improper and it should be in Baldwin County, and at |
| 16:43:15 | 2 | the moment, there's no clear direction as to which |
| 16:43:18 | 3 | jurisdiction will prevail in hearing an application |
| 16:43:22 | 4 | for increased density or -- or any master plan to be |
| 16:43:27 | 5 | proposed.  So -- |
| 16:43:27 | 6 | Q   Is it pending in court somewhere? |
| 16:43:30 | 7 | A   That's my understanding.  I haven't read the |
| 16:43:32 | 8 | papers, but there's -- there is a litigation in court |
| 16:43:36 | 9 | in Alabama. |
| 16:43:37 | 10 | Q   Is PRS II a party to that or an intervenor |
| 16:43:43 | 11 | since it affects your right to build? |
| 16:43:45 | 12 | A   We are -- we are watching it carefully at |
| 16:43:48 | 13 | this time. |
| 16:43:48 | 14 | Q   No formal party? |
| 16:43:50 | 15 | A   I don't think we're formally involved, but |
| 16:43:52 | 16 | we're tracking the suit, and we've been talking to -- |
| 16:43:56 | 17 | to other people affected by it. |
| 16:43:58 | 18 | Q   You represented in that suit? |
| 16:44:00 | 19 | A   We are not an intervenor and we're not |
| 16:44:06 | 20 | amicus, we're not represented in the suit.  We're |
| 16:44:09 | 21 | following it. |
| 16:44:09 | 22 | Q   Who's monitoring it for you? |
| 16:44:13 | 23 | A   Pardon? |
| 16:44:14 | 24 | Q   Who is monitoring it for you? |

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 293

| | | |
|---|---|---|
| 16:44:16 | 1 | A    Two people, Logan Gray, who is a consultant |
| 16:44:21 | 2 | from Alabama, and then -- that I mentioned before, |
| 16:44:26 | 3 | and then in our office, our director of development |
| 16:44:30 | 4 | now, Alice Rebechini. |
| 16:44:33 | 5 | Q    Spell that for the court reporter. |
| 16:44:33 | 6 | A    R-E-B-E-C-C-I-N-I.  Hold on.  I'll tell you |
| 16:44:40 | 7 | in a minute if that's not correct. |
| 16:44:43 | 8 | MS. CASS:  R-E-B-E-C-H-I-N-I. |
| 16:44:48 | 9 | THE WITNESS:  Correction. |
| 16:44:53 | 10 | (Morris Exhibit No. 22 marked as requested.) |
| 16:44:53 | 11 | BY MR. GILL: |
| 16:45:05 | 12 | Q    Let me show you Exhibit 22, and it's a |
| 16:45:11 | 13 | handwritten document dated February the 25th of '05, |
| 16:45:15 | 14 | and the question is simply is that your document in |
| 16:45:18 | 15 | your handwriting? |
| 16:45:19 | 16 | A    Yes, it is. |
| 16:45:20 | 17 | Q    You didn't ask Ms. Wiersema to type that? |
| 16:45:33 | 18 | A    I was -- I was, as I recall, I think I was in |
| 16:45:40 | 19 | Alabama -- |
| 16:45:40 | 20 | MR. SPEEGLE:  He just asked you if you asked |
| 16:45:44 | 21 | Ms. Wiersema to type it for you? |
| 16:45:45 | 22 | THE WITNESS:  I don't think so.  I don't recall |
| 16:45:47 | 23 | so. |
| 16:45:47 | 24 | BY MR. GILL: |

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

# EXHIBIT C

Re Ft. Morgan                    2/25/05      195

Tom-

The following is my proposal (subject to my Partner approval and, obviously your partners approval) re pending acquisition financing to facilitate a closing of the acquisition of the Ft. Morgan property from Bay First Land to the PRS Joint Venture. This proposal is intended to outline what we discussed in terms of my proposal last night and should be substantially consistent — where any slight modifications they are in terms of practicality for both groups — not change in economics. I will include any additional as of go forward — Please excuse in advance.

#1. Current modification agreement calls for automatic extension from March 1, 2005 for payment of $25,000 per month — to be applied toward the project (per para 14 of the final signature page of the addendum) We have paid March $25,000 payment early. At the note of $300,000 per annum — $450,000 for 18 months. This has an implied interest rate of approx. 1.85% on the $16,000,000 purchase price.

#2. We propose to close @ $16 million, with full non-recourse financing from the selling group — with a limited recourse guarantee of the first, if any, loss of principal and/or interest on this loan of up to USD $1,000,000. — guaranteed by the partners of PRS, with TRM/Morris having the significant front-line guarantee — information of which financials resides with Tom Lanfan, JR.

· PRS-250

5

— 71

#3. Instead of the current 1.85% rate, we propose an enhanced rate, but a two term loan for the $16,000,000 purchase money financing. Term one is for 18 months, with one automatic (Buyer option only) renewal for an additional 18 months of the same $16,000,000 loan. In consideration for this extended period option, PRS proposes to substantially increase rate for first 18 months vs. current rate equivalent — whether second 18 month term is elected by us or not.

**PRS-251**

#4. The current rate on the $16 million will be 5% — per annum (vs. 1.85% currently) with 3% pay and 2% accrue simple for this first 18mo period — irrespective of whether the 3rd term is elected. With 3% pay, we propose for first 18 mo — payment to remain at $25,000 per month. 3% pay rate on $16 mill = 480,000 per 1 year plus $240,000 in next 6 months = $720,000 of interest paid. current $25,000 per mo for 18 months is $450,000 — leaving a gap of $270,000. That gap will be paid $100,000 cash at end of 1st 12 months, bringing a remaining gap of $170,000 due at 18th month, assuming each and every $25,000 monthly payment is current, which it will be.

There will be a non-compound accrual of 2% on the $16 million face per annum — which will add up to an accrual of $480,000 at end of 1st 18 mo term. Thus, at end of 1st 18 month term, $16 million will be due — plus $170,000 cash interest catch up plus $480,000 accrual — for total of $650,000 — if loan is

7)

paid off at that time — Balance will be $16,650,000.
If loan is extended for 2nd optional (at purchaser option
only) 18 mo term — the $170,000 cash must be paid
and the new recast loan will be $16,480,000.

#5  If the second 18mo term is elected - it will also be
non-recourse, but the $1.0 million recourse per the
first term will grow to $1.480 in recourse to cover
the interest accrual; this recourse number will
remain constant thru the 2nd 18 month term even tho
accrual will continue to rise somewhat.

#6  The total interest rate on the 2nd 18 month term
will remain 5% - But it will be against the higher
base loan of $16,480,000. Pay rate is 3% -
accrue rate is 2% - But pay and accrue will
go up slightly and proportionately in relation to
new principal balance. Simply extrapolate forward
for next 18 months to port the $25,000 per month
payments, the timing and amount of the cash catch up
and milestone payments (same as phase I) — and the
accrual which will add on to the balloon balance
at end of second 18 month term — which will then
bring the balance of the loan close to $17 million.

#7  The effective interest rate - pay and accrue - on the
$16 million purchase money financing goes from a total
return of $932,000 for the first 18 months under
the current contract option agreement to $1,200,00
under this proposal - with $720,000 of that
$1,200,000 as current cash, balance accrual.

PRS-252

#8  The second 18 months has similar interest
     cash and accrued and Solvon yield parameters

#9  If we only use 1st 18 mo term - in addition to the
     substantial yield enhancement, there will be a
     one time price increase pay off, exit fee of $500,000
     additional to the increased interest. That exit fee
     will be paid in full even if the 16 mill. loan is
     paid off in full prior to the end of the first
     18 mo term. If the 2nd 18 month term is
     used in full, there will be an increase in the exit
     fee from $500,000 to a total of $1,500,000
     paid at end of 36th month. If loan is paid off
     in 2nd 18 month term, earlier than 9 months into the
     term, the total exit fee will be $1,000,000 instead
     of $1,500,000 as incentive for early payment - if paid off
     after the 9 months, full $1.5 million exit fee is
     due in addition to new adjusted mortgage balance.

#10  All lots on non-water location will be sold to
      purchase group for $175,000 per lot with full 5% ann
      financing in place - and due in full co-terminus with
      pay-off date of 16 mill + mortgage. It is stipulated
      that unenforcable contract to Rollins will be vended on
      5 of these lots and the other 2 which are non-water
      and owned by seller et al for total of 7 such
      lots will be sold in a bundle to purchaser all
      at $175,000 per lot - it is stipulated that all non-
      water lots will be sold to purchaser to the extent
      that any lots have been omitted from this phase of the
      plan.

PRS-253

PRS-254

5/5
Dhole

#11. With respect to 5 water front lots that
have been held back by the family - the
remainder lots have been transferred
permant to the overall contract of purchase
and sale - we place a value of $500,000 per
lot - we agree to pay as follows - we
will grant to upper floor (not penthouse)
1,200 Ft units - 2 per each of the four towers
for a total of (eight) condo units spread over the
first four buildings - it being understood that these
eight units will be transferred at cost - with
cost being conservatively $750,000 per unit and market
being $360,000 - for a spread of $250,000 per unit
clearly term profit. 8 x 250 = 2,000,000 value -
probably tax free - plus $500,000 cash paid pro-
rata $125,000 cash per building (4 buildings) on
issuance of C.O. of each building.

#12 It is rep. and demanded that all parcels in this
contiguous development property known as Pt Morgan
to be sold by Bay Pilot Land Inc to PRS Venture
will be included in this Venture and no parcels
will be carved out or sold to other parties.

#13 Up to $8,000,000 can be refinanced by buyer
at any time after entitlmts at market rates
with a $6,000,000 pay off to the sellers -
leaving $2,000,000 in the buying partnership to
not take out in pocket by buyer - to be kept in
partnership for working capital. Said $8,000,000
new first (of which $2 mill will be w/ capital
to buyer) will then leave a $10 million

6

Second in behalf of seller at same rate
for the +10,000 00 2nd remaining – this can only
be accomplished after entitlements when overall value
has gone up substantially so loan to value ratio
is conservatively low in favor of seller – if such
refinance occurs, it must be no later than 2 years
from now, and this would allow the recast, reduced
seller 2nd which would have 1 year remaining, to
provide a 2 year extension at same rates. There
Should also be a pro rata release of the mortgage
By hi rise lot - assume 4 lots — pro rata is
@ 4 million per lot — we will give 150% release –
so each lot will get +6 million pay down
release.

PRS will indemnify seller for legal fees re any
disputes amongst Buyers/partners.

PRS-255

## EXHIBIT D

## INDEMNIFICATION AGREEMENT

This Indemnification Agreement, dated as of March __/__, 2005, between PRS II, L.L.C., a Delaware limited liability company, PRM Realty Group, L.L.C., an Illinois limited liability company and Peter R. Morris (the "Indemnitors") and Bar Pilot Land, L.L.C., Pilots Pointe Development, L.L.C. and each of the members of Bar Pilot Land, L.L.C. and Pilots Pointe Development, L.L.C., , (Bar Pilot Land, L.L.C., Pilots Pointe Development, L.L.C. and each of the members of Bar Pilot Land, L.L.C. and Pilots Pointe Development, L.L.C. being collectively referered to as, the "Indemnitees").

### WITNESSETH:

WHEREAS, the Indemnitor desires to acquire certain rights which the Indemnitee has with respect to certain real property located in Baldwin County, Alabama and described on Exhibit A (the "Property"); and

WHEREAS, the Indemnitor has required as a condition of acquiring the rights with respect to the Property from the Indemnitee that the Indemnitor enter into this agreement (the "Indemnification Agreement") whereby the Indemnitor shall indemnify the Indemnitee from and against any liabilities, losses, costs and expenses incurred by the Indemnitee by reason of the Indemnitee having to defend or litigate any claim, suit or action against the Indemnitee with respect to its rights to the Property;

NOW, THEREFORE, the parties hereto agree as follows:

1.      Indemnification. The Indemnitor shall indemnify and hold harmless the Indemnitee from and against all liabilities, losses, costs and expenses, including, without limitation, reasonable attorneys' fees and disbursements, asserted against or incurred by Indemnitee by reason of, arising out of, or in connection with Indemnitee having to defend or litigate any claim, suit or action against Indemnitee by a member of Indemnitor.

2.      Notices. Indemnitee shall give the Indemnitor prompt written notice of the incurrence of any liability, loss, cost or expense under, in connection with this Indemnification Agreement, and any dispute or claim which, in the opinion of Indemnitee, may give rise to a claim by Indemnitee against the Indemnitor under this Indemnification Agreement. With respect to any matters giving rise to a claim for indemnification, the Indemnitor shall have the right to participate in the defense of any such matter asserted against the Indemnitee or may assume the defense of the Indemnitee retaining legal counsel of its choice. No settlement for any such matter giving rise to a claim for indemnification under this Agreement shall be made without the prior written consent of the Indemnitor, which consent shall not be unreasonably withheld.

3.      Confidentiality. This Indemnification Agreement shall be kept strictly confidential by the Indemnitee and the contents of this Indemnification Agreement shall not be disclosed to any person or entity except as may be required by court order or in connection with the enforcement of the Indemnitee's rights hereunder.

NEWYORK_507988.3

PRS 746

4.    Attorneys' Fees. In the event of a dispute over the terms and conditions of this Indemnification Agreement, the party prevailing in said dispute shall be entitled to receive from the non-prevailing party all costs and expenses of the dispute and the reasonable fees and disbursements (including attorneys' fees and disbursements) incurred by the prevailing party in connection therewith.

5.    Cooperation. The Indemnitee agrees to cooperate with the Indemnitor to the fullest extent possible to facilitate the fulfillment of this Indemnification Agreement by the Indemnitee, including, as applicable, allowing and, where determined appropriate by the Indemnitor, assisting the Indemnitee to prosecute any applicable claim with the Indemnitee may have with respect to the possible claims which may arise with respect to the subject matter of this Indemnification Agreement.

6.    Notices. All notices and communications hereunder shall be given by hand delivery, with a receipt being obtained therefor, by United States certified or registered mail, or by telegram, telex, telecopier or by other telecommunication device capable of creating written record of such notice and its receipt. To the extent that any telecommunication notice is permitted hereunder, the parties hereto shall provide appropriate telex and, to the extent available, facsimile numbers. Notices and communications hereunder shall be effective when received and shall be sent to the following addresses or numbers (or to such other addresses or numbers) of which either party hereto shall notify the other party in accordance with:

If to the Indemnitor, to:

PRS II, L.L.C.
c/o PRM Realty Group, L.L.C.
Attention: Nancy J. Cass, Esq.,
Special Legal Counsel
150 North Wacker Drive
Suite 1120
Chicago, IL 60606-1611

with a copy to:

Salans
Attention: Todd J. Peterson, Esq.
        James T. Hughes, Esq.
620 Fifth Avenue
New York, NY 10020


Jerome B. Speegle , Esq.
Zieman, Speegle, Jackson & Hoffman, L.L.C.
P.O. Box 11
Mobile, AL 36601

If to the Indemnitee, to:

With copy to:
Bar Pilot Land, L.L.C.
Pilots Pointe Development, L.L.C.
c/o Thomas J. Langan, Jr.
3380 Hurricane Bay Drive
Theodore, AL 36582

With copy to:
Michael D. Langan, Esq.
267 Houston Street
Mobile, AL 36606

7.    Successors and Assigns:  This Agreement shall be binding upon and inure to the benefit of the successors and assigns of Indemnitee and the Indemnitor may not assign any portion of its obligations hereunder without the prior written consent of Indemnitee.

8.    Severability.  In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.  The parties shall negotiate in good faith to replace any invalid, illegal or unenforceable provision with a valid provision, which, to the extent possible, will preserve the economic effect of the invalid, illegal or unenforceable provisions.

9.    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall constitute an original but both or all of which, when taken together, shall constitute but one document.

10.    Separate from Guaranties.  This Indemnification Agreement is in addition to, and is a separate agreement from, the other Guaranties executed by one or more of the Indemnitors.

11.    Survival of Provisions; No Merger.  The provisions of this Agreement shall survive the closing and delivering of the deed, mortgage, note and other loan documents and this Agreement shall not merger into any other loan document but rather survive and may be separately enforceable.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the
date first written above.

PRS II, L.L.C.

By:    PRM Management of Illinois, Inc.

By    _____
Name: Peter R. Morris
Title:   Chairman

_____
Peter R. Morris

BAR PILOT LAND L.L.C.

By: _____
J. Patrick Langan, Member

By: _____
Thomas J. Langan, Member

By: _____
Michael D. Langan, Member

By: _____
Thomas J. Langan, Jr., Member

By: _____
Mark S. Langan, Member


PILOTS POINTE DEVELOPMENT, L.L.C.

By: _____
J. Patrick Langan, Member

By: _____
Thomas J. Langan, Member

By: _____
Michael D. Langan, Member

By: _____
Thomas J. Langan, Jr., Member

By: _____
Mark S. Langan, Member

Indemnification Agreement $875,000.doc.

PRM Realty Group, L.L.C.

By: PRM Management of Illinois, Inc.

By:_____
Name:  Peter R. Morris
Title:  Chairman

PRS 750



PRS 751

## PROMISSORY NOTE

$875,000.00                                                    March ___/___, 2005

·For value received, the undersigned, PRS II, L.L.C. (the "Maker"), promises to pay to the order of Pilots Pointe Development, L.L.C. (the "Payee"), the principal sum of EIGHT HUNDRED SEVENTY-FIVE THOUSAND DOLLARS AND NO/100 ($875,000.00) DOLLARS, with no interest. Maker shall deduct from the amount due under this Note all amounts which are paid by the Maker in settlement (but not including attorneys fees or litigation expenses) in order for the Maker to obtain clear and marketable title to the property described in the Mortgage which is executed on this same date between the Maker and the Payee.

In the event that the Maker has not been able to obtain clear and marketable title to the property described in the Mortgage within three (3) years from the date of this Note, then the Payee, at the Payee's sole election, may terminate and discharge the Maker from liability under this Note, shall cancel the Mortgage, and the Maker shall re-convey the property described in the Mortgage. In the event that the Maker cannot obtain clear and marketable title to the Property because all or any portion of the Property described in the Mortgage has been determined in a final non-appealable order to be owned by, or should be conveyed to, another party, then this Note shall be cancelled and the Maker shall have no further obligation to the Payee; provided, however that the Maker shall remain obligated to the Payee to the extent that the Payee does not receive $425,000 as a result of any court order or court ordered transaction related to the mortgaged property.

ˇ1ˇ

PRS-182

In the event the Maker is in default under that certain Purchase Money Loan Agreement of this same date, or any of the other loan documents, the Maker may, at its sole discretion, terminate its liability under this Note, the Payee shall cancel the mortgage and the Maker shall convey to Payee the property subject to the mortgage. The failure of title as to this Property conveyed by this Promissory Note and Purchase Money Mortgage shall not excuse maker's obligations on other transactions with Payee of even date.

Said payments shall be payable at 3380 Hurricane Bay Drive, Theodore, Alabama 36582, or such other place as a holder of this Note may designate.

This Note is secured by the mortgage executed this same date.

The parties to this instrument, whether maker, endorser, surety or guarantor, each hereby severally agree to pay all costs of collection or securing or attempting to collect or secure this Note, including a reasonable attorney's fee, whether the same be collected or secured by any attorney consulted, with reference to suit or otherwise. Each maker, endorser, surety and guarantor of this Note severally waives demand, presentment, protest, notice of protest, suit and all other requirements necessary to hold them or any of them liable and they severally agree that time of payment may be extended or a renewal note taken or other indulgence granted without notice of, or consent to, such action, without release of liability of any such party. This note may be declared due and payable with interest computed or abated to date at any time by notation hereon by the holder in the event of the insolvency of, general assignment by, or petition in bankruptcy by or against, any such party liable hereunder.

[Remainder of this page left intentionally blank.]

⌄2⌄

PRS-183

IN WITNESS WHEREOF, the undersigned caused its duly authorized officer to execute this instrument on the day and year first above written.

PRS II, LLC

By: PRM Management of Illinois, Inc.

By: Peter R. Morris
Chairman

STATE OF _New York_ )
COUNTY OF _New York_ )

I, the undersigned authority, in and for said County in said State, hereby certify that PETER R. MORRIS, whose name as Chairman of PRM Management of Illinois, Inc., a corporation, a managing member of PRS II, LLC, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand this the _28th_ day of _February_ , 2005.

_Chaya R. Shafran_
NOTARY PUBLIC

My Commission Expires: _March 30, 2006_

CHAYA R. SHAFRAN
NOTARY PUBLIC, State of New York
No. 41-4719116
Qualified in Queens County
Commission Expires March 30, ____2006

THIS INSTRUMENT PREPARED BY:

Jerome E. Speegle
Zieman, Speegle, Oldweiler & Jackson, L.L.C.
Post Office Box 11
Mobile, Alabama 36601

PRS-184

## FACTUAL BACKGROUND

PRS II purchased 97+ acres on the Fort Morgan peninsula on March 1, 2005.  On March
3, 2005, Jeff Valentine ("Valentine"), a member of White Sands Group, L.L.C. ("White Sands"),
filed an affidavit in the Probate Court of Baldwin County claiming that White Sands had
previously purchased five lots (1+ acre) in a proposed subdivision – a subdivision that is
unrecorded and never obtained final plat approval – from Langan Development.  The proposed
subdivision was to be located on a portion of the 97+ acres.  At no time has this proposed
subdivision ever obtained final plat approval from a governmental authority; nor has a final plot
owner ever been recorded.

In the fall of 2005, PRS II filed a "quiet title" action seeking to clear the title to the
subject property.  Upon receipt of the lawsuit, White Sands filed a counterclaim alleging that
PRS II, Langan Development, Bar Pilot, and Pilots Pointe breached a contract for the sale of the
five lots.  The Counterclaim also asserted a claim for specific performance and alleged that PRS
II wrongfully interfered with a contract in which White Sands had entered related to the five lots.

### A.    The Alleged Contract

White Sands' claims are based on a letter dated May 17, 2004, which was drafted and
signed by White Sands and also signed by Thomas J. Langan, on behalf of Langan Development
(the letter is hereinafter referred to as the "May 17 Letter").  The May 17 Letter was prepared by
Valentine after White Sands was provided with the Preliminary Plat for Pilots' Pointe Phase I.

At the time the May 17 Letter was drafted, Chris Rolison, the managing member of
White Sands, understood and was aware of the codes and regulations related to subdivisions.
However, despite this knowledge and after having only been provided with a copy of a
preliminary plat for the proposed subdivision, White Sands prepared the May 17 Letter.  The

2

## EXHIBIT E



IN THE CIRCUIT COURT OF BALDWIN COUNTY, ALABAMA

| | | |
|---|---|---|
| PRS II, L.L.C., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CASE NO. CV-2005-923 |
| | * | |
| WHITE SANDS GROUP, L.L.C. and | * | |
| JEFF VALENTINE, | * | |
| | * | |
| Defendants. | * | |

WHITE SANDS GROUP, LLC; and *
CHRIS ROLISON,
            *
  Counterclaim Plaintiffs,  *
             *
             *
v.              *
             *
LANGAN DEVELOPMENT COMPANY; *
BAR PILOT LAND, LLC; PILOTS  *
POINTE DEVELOPMENT, LLC;  .*
STEVE CANTOR; PETER STERLING; *
MICHAEL ASFOUR; P&M BUILDERS, *
LLC; PRS II, LLC; ET AL    *
             *
  Counterclaim Defendants.  *

## PRS II, L.L.C., LANGAN DEVELOPMENT COMPANY, BAR PILOT LAND, L.L.C., AND PILOTS POINTE DEVELOPMENT L.L.C.'S NOTICE OF SUPPLEMENTAL FILING IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

COMES NOW Plaintiff and Counterclaim Defendants, by and through their attorney of

record, and submits this Notice of Supplemental Filing the following in support of their Motion

for Summary Judgment:

  H.  Affidavit of Noel Edward Hand dated May 24, 2007

1 .

JEROME E. SPEEGLE (SPE011)
speegle@ziemanspeegle.com
ANTHONY M. HOFFMAN (HOF007)
thoffman@ziemanspeegle.com
Attorneys for Plaintiffs-Counterclaim Defendants

Address of Counsel:
Zieman, Speegle, Jackson & Hoffman, L.L.C.
Post Office Box 11
Mobile, AL  36601
(251) 694-1700

## CERTIFICATE OF SERVICE

I do hereby certify that on May 24, 2007, I electronically filed the foregoing with the Clerk of the Court using the AlaFile system which will send notification of such filing to the following listed persons:

Richard H. Gill, Esq.
George W. Walker, III, Esq.
Copeland, Franco, Screws, & Gill, P.A.
P. O. Box 347
Montgomery, AL  36101-0347
gill@copelandfranco.com
walker@copelandfranco.com

C. Britton Bonner, Esq.
Richard O' Kingrea, Esq.
Bonner Landreau Kingrea, LLC
350 N. Alston Street
Foley, Alabama  36535
bbonner@blklawyers.com

Julian B. Brackin, Jr., Esq.
Post Office Box 998
Foley, Alabama  36536
jbbrackinir@aol.com
buddy@bmjlawyers.com

George R. Irvine, III, Esq.
Stone, Granade & Crosby, P.C.
7133 Stone Drive
Daphne, Alabama  36526
sta@sgclaw.com

2



# EXHIBIT H

STATE OF ALABAMA

COUNTY OF BALDWIN        AFFIDAVIT

Before me, the undersigned authority, appeared NOEL EDWARD HAND, and did testify as follows:

1.    My name is Noel Edward Hand. I am over the age of 19 years and am competent to give this Affidavit.

2.    I am currently employed by Volkert & Associates as a surveyor in the Foley, Alabama office.

3.    I have personal knowledge regarding the property which is identified in the Complaint. Volkert was engaged to perform certain services on behalf of the previous owners and current owners of the Pilot Town property located on Fort Morgan peninsula.

4.    In my work at Volkert, I have personal knowledge of the City of Gulf Shores' subdivision regulations. I also have knowledge as it relates to the location of the Pilot Town property in relations to the city limits of the City of Gulf Shores.

5.    As of May 12 and May 17, 2004, the Pilot Town property was within 5 miles of the corporate limits of the City of Gulf Shores. Additionally, the Pilot Town property was not located within the jurisdiction of another municipality. As a result, the Pilot Town property was subject to the subdivision regulations of the City of Gulf Shores in May of 2004.

6.    In late 2004, Pilot Town began the process of being annexed into the City of Gulf Shores. It has subsequently been annexed into the City of Gulf Shores. As such, since it is currently within the corporate limits of the City of Gulf Shores, it remains subject to the subdivision regulations of the City of Gulf Shores.

Further, Affiant sayeth naught.

_Noel Edward Hand_
Noel Edward Hand

Date: _5/24/07_

STATE OF ALABAMA      )

COUNTY OF Baldwin )

Personally appeared before me Noel Edward Hand on this the 24th day of
May , 2007, who after being first duly sworn deposes and says that he has
read the foregoing Affidavit and that the facts contained therein are true and correct.

Notary Public
My Commission Exp NOTARY PUBLIC STATE OF ALABAMA AT LARGE
                    MY COMMISSION EXPIRES: Feb. 14, 2011
                    Bonded thru Notary Public Underwriters

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Feb. 14, 2011
Bonded thru Notary Public Underwriters.

**EXHIBIT F**

Apr. 6. 2005  9:45AM                                              No. 1614  PP.  8t of 2

Subj:       **(no subject)**
Date:       3/17/2005 1:32:59 P.M. Central Standard Time
From:       MWiersema@prmrealty.com
To:         Developer65@aol.com

TOMMY - Your thoughts?

Michelle

Pete,

Thank you for the letter. I appreciate your thoughts. We do have a difficult road ahead as we try to put things together. I am also hurt and confused and need a lot of answers like you do. Nonetheless, I appreciate the fact there is an effort to bring this stuff out into the open.

In that regard, Tommy received a very hostile lawyer letter from Chris Rollins and his partner regarding the five lots on which they (Rollins and partner) had conditionally entered into an understanding to acquire said lots on a very advantageous basis a little while ago. I have read the documents carefully and am very comfortable with the fact that there were so many conditions which we unilaterally imposed upon Tommy and his family regarding condition of land, subdivision, achievement along with subdivision restrictions, and other items (all which were exclusively in Rollins and partner's domain) to accept or walk away from the deal - none of which had been accomplished by Tommy or his family at the time of, what I consider, a non-binding statement of facts and understanding to try to agree to go forward.

In my opinion, the Langans have total discretion to make the subdivision and to create whatever conditions they want and, obviously, this would not be considered a one-way option for Rollins and his partner to cherry-pick their visions and get in or out. In my mind, the understanding has so much ambiguity in open trading yet to go that it never roles through level specificity. Therefore, it is not binding and more an expression of intent. Now, all of a sudden since we have closed, mysteriously, this guy and his partner and lawyer surface, acting as if there was a binding contract with all of the facts fixed and no open-ended variables, with demands of a closing and threats to sue. You have repeatedly told Tommy, and several times told me, that you can handle Mr. Rollins and his partner and move him into another direction, as it makes no sense for a guy, who turns out to have very little pull with Volkert, very little standing in the community, and has provided no real palpable service or benefit, to somehow potentially hijack a $500 million project, with five misapplied, misdesigned, mismarketed, and misplaced, out of context units, with a tall to wag the proverbial dog of our master planned project. It is demonstrably not in your interest to allow this to happen and you have repeatedly reflected and represented to Tommy and to me that you can control the situation. I think it would be a show of good faith to intervene, prior to an unnecessary lawsuit - which, in my opinion, this gentleman and his partner will lose - and move this forward so we don't have this level of contention with a bunch of third parties, who bring very little to the table - that certainly also relates to the "$800,000 brokerage fee" that is going to Beau, who has, by your own admission, been totally unavailable to you for over two months, left the scene, and left us all high and dry with deals that were promised and now are not closed, and with Rollins, who is supposed to be a consultant and who, admittedly by Tommy and through Tommy's discussions with Volkert, has no portfolio, no sway, and no contribution on the project. I think this would avoid messy litigation, which, of course, none of us are afraid and will take in stride, but is truly not necessary for anyone's relationship or for the Venture on those deals we do have. Whether we continue business or not, we have some substantial interests together that we need to protect as gentlemen and fiduciaries for our respective interests.

I much appreciate, in advance, your constructive intervention.

Peter

**Michelle Wiersema**
PRM Realty Group, LLC
150 North Wacker Drive

Thursday, March 17, 2005 America Online: Developer65

PRS-214

## EXHIBIT G

**B.      The Purchase of Property by PRS II**

On March 1, 2005, PRS II purchased 97+ acres of property on Fort Morgan from two

separate entities – Bar Pilot and Pilots Pointe – two separate entities in which the Langans were

the sole shareholders. The purchase included the five lots claimed by White Sands in its

affidavit filed on March 3, 2005.

Prior to the purchase, PRS II was informed by the sellers of the property of the existence of

the May 17 Letter. PRS II was also informed that White Sands had previously been advised that

the subdivision was not going to be pursued – thereby exercising the seller's contingency related

to moving forward with the subdivision. After determining that the May 17 Letter was not

binding (and, even if it was the contingency not to pursue the subdivision was exercised), PRS II

purchased the property.

### SUMMARY OF THE ARGUMENT

There are no genuine issues as to any material fact involved in this litigation, and,

therefore, the Counterclaim Defendants are entitled to partial summary judgment on Counts I, II,

and III as a matter of law. As established herein, under Alabama law, White Sands is not entitled

to recover from the Counterclaim Defendants for the following reasons:

**A.      The Breach of Contract and Specific Performance Claims (Counts I and II)**

Summary judgment should be entered in favor of the Counterclaim Defendants as to

Counts I and II of the Counterclaim for the foregoing reasons:

1. Illegality. In the event that the May 17 Letter is deemed to be a contract, the

subject matter of the letter is illegal and, therefore, the May 17 Letter should not be

enforced. The laws of the State of Alabama, Baldwin County and the Town of Gulf

Shores all make sales of lots in an unrecorded subdivision illegal. In the present case, it

is undisputed that there was no final plat approval for the proposed subdivision and it is unrecorded. White Sands was provided a copy of the preliminary plat related to the proposed subdivision (and never a final plat) at a time when it knew about the codes and regulations related to subdivisions and at a time when it understood that the word "preliminary" meant that changes could be made.

Additionally, the May 17 Letter includes in it a provision wherein White Sands would receive a "commission" of 5% for the purchase of lots by buyers introduced by White Sands. However, no one with White Sands has ever had a license to sell real estate. Alabama law is clear that it is illegal to assist in procuring potential buyers of real estate in expectation of compensation without a real estate license.

2. Indefiniteness. The May 17 Letter is indefinite as to the alleged terms. As a result, it is invalid. In particular, the May 17 Letter does not specify a time for performance since there is no date for closing and no requirement that the subdivision be completed. The May 17 Letter also does not specify what the subdivision is to include – instead it includes language such as "inclusive of but not limited to" and "etc." The nature of what Mr. Langan was supposed to provide is too indefinite for judicial enforcement.

Additionally, there was no "meeting of the minds." As noted, Mr. Langan understood that the May 17 Letter always contemplated that the subdivision might not be completed – and, therefore, there would be no lots to sell. The members of White Sands agree that the contingency related to "successful completion of lots" could benefit the seller and that the seller could pursue that argument. White Sands also agrees that it could have drafted the contract to make it clear that this contingency did not favor the

seller, but did not do so. Finally, White Sands admitted in responses to interrogatories that the May 17 Letter included "seller's contingencies" – contingencies to this day that have not been waived by the proposed seller. As such, if White Sands now argues that there were no such "seller's contingencies," then there was no meeting of the minds as to the terms in the May 17 Letter.

3. No Contract. Valentine, in his deposition, admitted that the May 17 Letter was the only document which White Sands claimed was a contract. He further admitted that White Sands did not have a contract with anyone except those listed on the May 17 Letter – namely, Thomas J. Langan and Langan Development Company. Since White Sands admits that it did not have a contract with anyone other then Mr. Langan and Langan Development Company, summary judgment should be entered in favor of PRS II, Pilots Pointe and Bar Pilot on the breach of contract related claims.

4. Rule Against Perpetuities. As noted previously, the May 17 Letter did not include any affirmative requirement to move forward with the subdivision or that it would be built by a specific time. Likewise, the May 17 Letter did not specify when the five lots would be sold. In fact, according to the terms of the May 17 Letter, the sale did not have to occur until after the subdivision was complete – and that may not be within 21 years of a "life in being" (since no date is specified). As such, even if for arguments' sake the May 17 Letter is an enforceable contract, the letter violates the rule against perpetuities, and is unenforceable.

**B.    The Wrongful Interference Claims (Count III)**

Although White Sands alleges in its Complaint that PRS II breached the contract it had with White Sands to sell the five lots, White Sands also alleges that PRS II wrongfully interfered

existence of any such contract, if it were a party to such a contract as alleged by White

Sands, then PRS II could not have interfered with the contract.

Alabama Law is clear that:

A party to a business relation cannot be held liable for interference with that relation. *Cobb v. Union Camp Corp.*, 786 So. 2d 501, 506 (Ala. Civ. App. 2000). *Bama Budweiser of Montgomery, Inc. v. Anheuser-Busch, Inc.*, 611 So. 2d 238 (Ala. 1992); *Williams v. A.L. Williams & Assocs., Inc.*, 555 So. 2d 121 (Ala. 1989).

Thus, if PRS II, as alleged by White Sands, is a party to the alleged contract, then Count

III must necessarily fail as against PRS II.

## CONCLUSION

White Sands' claims for breach of contract, specific performance and wrongful

interference are due to be dismissed. No contract existed between White Sands and the

Counterclaim Defendants; and, even if one did, the subject of the contract drafted by White

Sands is illegal and unenforceable. Since there is no valid, enforceable contract, the claims

should be dismissed.

For the foregoing reasons, the Counterclaim Defendants respectfully request that this

Court enter partial judgment as to Counts I, II, and III, of the Counterclaim, and grant such other,

further and different relief as this Court deems fair and just.

Respectfully submitted,

JEROME E. SPEEGLE (SPE011)
jspeegle@ziemanspeegle.com
ANTHONY M. HOFFMAN (HOF007)
thoffman@ziemanspeegle.com
Attorneys for Plaintiffs-Counterclaim Defendants

22

## EXHIBIT H

IN THE SUPREME COURT OF ALABAMA

SUPREME COURT NO. 1070050

---

WHITE SANDS GROUP, L.L.C., JEFF VALENTINE AND CHRIS ROLISON

APPELLANTS,

v.

PRS II, L.L.C., LANGAN DEVELOPMENT COMPANY, BAR PILOT LAND,

L.L.C., PILOTS POINTE DEVELOPMENT, L.L.C., STEVE CANTOR,

PETER STERLING, MICHAEL ASFOUR AND P&M BUILDERS, L.L.C.

APPELLEES.

CIRCUIT COURT NUMBER:   CV-2005-923

ON APPEAL FROM THE CIRCUIT COURT OF BALDWIN COUNTY, ALABAMA

---

BRIEF OF APPELLEES PRS II, L.L.C., LANGAN DEVELOPMENT

COMPANY, BAR PILOT LAND, L.L.C. AND PILOTS POINTE

DEVELOPMENT, L.L.C.

---

JEROME E. SPEEGLE
ANTHONY M. HOFFMAN
JENNIFER S. HOLIFIELD
ZIEMAN, SPEEGLE, JACKSON & HOFFMAN, L.L.C.
5 DAUPHIN STREET, SUITE 301
MOBILE, ALABAMA  36602
251-694-1700

## SUMMARY OF THE ARGUMENT

The Appellants do not raise any issues with regards to the disposition of the claims of the Complaint. Instead, the Appellants only argue that the five counts of the Counterclaim were improperly dismissed.

Counts I and II of the Counterclaim were properly dismissed pursuant to a grant of summary judgment. Both Counts deal with a breach of an alleged contract. However, the "contract" was illegal. It was also ambiguous and so indefinite it was not capable of judicial enforcement.

The "contract" was a letter of intent ("Letter") between Lagan Development and White Sands drafted by White Sands. Two illegal aspects of the Letter cause the Letter to be unenforceable. First, there are regulatory provisions that prevent lots in a subdivision from being sold prior to governmental approval of a final plat and prior to recordation of the plat. Neither of these conditions has ever been met. Second, the Letter recites part of the consideration as a 5% real estate commission to White Sands for the sale of lots. Because White Sands does not hold a real estate brokers license, the consideration

11

was based on payment for an illegal act.  Therefore the
"contract" is unenforceable.

Further, the Letter was wrought with missing terms.
From the Letter, it is unclear what, if any, amenities are
to be added, how the cost of proposed amenities will be
borne and when the sale will take place.  There was no
meeting of the minds on countless essential terms.  As
such, the contract was too vague and indefinite to be
judicially enforced.

Moreover, the contract violates the Rule of
Perpetuities.  The Letter does not fix a time for
performance.  Where an interest does not vest within
twenty-one (21) years of a life in being, the grant of the
interest is void.  Therefore, Counts I and II were without
merit and the trial court properly granted summary
judgment.

Count III of the Counterclaim was dismissed pursuant to
the trial court's grant of summary judgment.  Count III
alleged an interference with a contractual or business
relationship.  The only relationship alleged was the
alleged "contract" (the Letter).  Because the trial court
ruled that the Letter was not an enforceable contract,

12

## ARGUMENT

**I.   The trial court properly granted summary judgment as to
Counts I and II of the Counterclaim.**

**A.   The alleged contract sought to be enforced in
Counts I and II is illegal; and, therefore,
unenforceable.**

The Appellees maintain that the Letter is not a
contract; nevertheless, even if the Letter were considered
to be a contract, the terms of the Letter are illegal —
and, as such, they cannot be enforced.

It is hornbook law that an illegal contract cannot be
enforced since such contracts are void as against public
policy.  In *Taylor v. Martin*, 466 So. 2d 977 (Ala. Civ.
App. 1985), the Court of Civil Appeals noted that illegal
contracts are void against public policy.  Likewise, in
*Robinson v. Boohaker, Schillaci & Co., P.C.*, 767 So. 2d
1092 (Ala. 2000), the Alabama Supreme Court noted that "a
party to an illegal contract cannot come into a court of
law and ask to have his illegal objects carried out; nor
can he set up a case in which he must necessarily disclose
an illegal purpose as the groundwork of his claim . . . in
short, **[the law] will not aid either party to an illegal
agreement; it leaves the parties where it finds them**." *Id.*
at 1094 (emphasis added).

15

**B.    The Letter is too indefinite to be judicially enforced.**

The Appellees allege that the Letter is not a contract since it is indefinite and there was no meeting of the minds.   The Letter includes the following language:

- "contingent upon amenities described and discussed previously"

- "inclusive but not limited to"

- "They are inclusive but not limited to a swimming pool, community entertainment area, community access to the bay front with a possible pier, neighborhood to be gated, ect. [sic]"

- "contingent upon the successful subdivision of lots"

The inclusion of such language is indicative of the indefiniteness in the alleged contract and does not evidence a "meeting of the minds."   In particular, the Letter is conditioned on certain amenities.   Langan Development is potentially required to provide unlimited amenities of indeterminate price and quality.   Language like "inclusive of but not limited to," "possible pier" and

25

## CONCLUSION

Counts I and II of the Counterclaim were properly dismissed pursuant to a grant of summary judgment. Both Counts deal with a breach of an alleged contract. The "contract" contained contingencies in favor of the sellers, including a requirement of successful completion of the subdivision as a condition to closing. The sellers, after Hurricane Ivan, decided not to complete the subdivision, terminated the deal with White Sands, and returned the earnest money in full. Nonetheless, the "contract" was illegal and ambiguous and not capable of judicial enforcement. Moreover, the "contract" violates the Rule of Perpetuities. Therefore, Counts I and II were without merit and the trial court properly granted summary judgment.

Count III of the Counterclaim dismissed pursuant to the trial court granting summary judgment. Count III alleged an interference with a contractual or business relationship. The only relationship alleged was the alleged "contract." Because the trial court ruled that there was no enforceable contract, there could be no interference with a contractual relationship. Therefore,

## STATEMENT OF THE FACTS

This Court accurately and succinctly described the facts as they relate to the underlying case in its Opinion at White Sands Group, LLC, et. al. v. PRSII, LLC, et. al., 10070050 at pp. 3-16 (Ala. April 18, 2008) (hereinafter referred to as White Sands I). (C.39-52). Very briefly, White Sands, with the Langans or Langan-controlled entities (hereinafter collectively referred to as "the Langans"), executed a letter ("the May 17 Letter") containing various open-ended terms purportedly crafted for White Sands to buy five proposed lots in a undeveloped and only preliminarily approved subdivision (hereinafter the "Property"). Id. Not only was the May 17 Letter deemed indefinite, this Court ruled there was no obligation placed on either party to complete the transaction. Id. at p. 21. (C.57.)

PRSII became interested in the Property owned by the Langans, but envisioned using the whole Property (including the five proposed lots) for a condominium development. Id. at p. 7. (C.43). The Langans notified White Sands that it did not intend to subdivide the land and would not proceed with negotiations regarding the five proposed lots White Sands wanted. Id. at p. 10. (C.46). PRSII and the

2

Langans, comfortable with the unenforceability of May 17
Letter, closed on the Property. _Id._ Within days, Jeff
Valentine ("Valentine") filed an Affidavit in Baldwin
County Probate Court alleging White Sands had a claim to a
portion of the Property. _Id._ PRSII sued both Valentine
and White Sands on three counts: Quiet Title, Declaratory
Relief and Slander of Title. _White Sands I_, Record on
Appeal, (C.30-34). Various additional parties were added
and dismissed along the way. Five Counterclaims were also
added. _White Sands I_ affirmed the trial court's
disposition of each claim and counterclaim except White
Sands' claim for intentional interference with a business
relationship.

The case is back before this Court after being remanded
to the trial court. Notably, this Court held that White
Sands' claim against PRSII for tortious interference with a
contractual relationship was correctly dismissed because no
valid contract existed between White Sands and the Langans.
Only White Sands' claim for tortious interference with a
business relationship was remanded. In doing so, this
Court carefully, and with significant detail, explained
that two separate torts exist: (1) the tort of interference

3

# EXHIBIT I

## Craig Knight

| | |
|---|---|
| **From:** | michael asfour [webmaster@pmdevelopersllc.com] |
| **Sent:** | Wednesday, February 23, 2005 3:48 PM |
| **To:** | Craig Knight |
| **Cc:** | Chris Rolison; peter sterling; Michelle Wiersema; James Giordano; Craig Knight; Tommy Langan; Ryann Mccarthy |
| **Subject:** | Meeting Volkert |

Partners,

An update on the application process for Fort Morgan. On Feb. 17th Craig Knight, Myself, and James Giordano met with our team at Volkert Engineering. Ed Hand from Volkert had David Bodenhamer (The ex mayor of Gulf Shores) there and an attorney Sam Irby. These are two of the three people that we will be hiring to help move the process along.

David Bodenhammer explained to us that in his opinion the zoning should be in place within the next 90 days. However no guarantees. When the zoning is in we should get between 20 to 25 units per acre, and a building height from 20 to 25 stories. He would not put the application in without having what we are giving back to the community in the application.

Sam Irby the attorney, is very familiar with Alabama Law, and how it pertains to high rise development. The partners need to discuss Sam, he wants all the work or he does not want to be involved in the project. Allan Chasen was not there, he is another attorney who Ed Hand thinks should be on the team. He specializes in Litigation, and will make sure that Gulf Shores treats the application fairly.

Craig and I decided to wait for Hart Howerton to catch up with the master planning, and give their input on all facets of the development. We will be meeting them on Feb. 24th, then hope to meet with Volkert on March 3rd with everyone.

We hope to have the applications in no later than three weeks from now.

There is way to much info to put in an e-mail on this project. So if you have any questions bring them up in our conference call.

Craig, I believe we left off that we were hiring the firm for the market analysis?
Mike

7

PRS-817

**EXHIBIT J**

We peter sterling and Michael As four from p and m builders LLC, who are the
purchasers of the Ft. Morgan property in Alabama, agree that 1.2million will be divided
as follows.

Chris Rolison will be paid the amount of $800,000 or pro-rata to completion of
contingencies listed on attached prior agreement. Investors Realty will be paid the
balance of $400,000 for a commission, on the sale of the above property.

Peter Sterling

Michael Asfour

Chris Rolison

David Lutz

Date:

7-22-04

PRS-213

** TOTAL PAGE.02 **