# EXHIBIT C-1

Westlaw.

998 So.2d 1042
**(Cite as: 998 So.2d 1042)**

## H

Supreme Court of Alabama.
WHITE SANDS GROUP, L.L.C.; Jeff Valentine;
and Chris Rolison
v.
PRS II, LLC, et al.
**1070050.**

April 18, 2008.
Rehearing Denied June 13, 2008.

**Background:** Plaintiff purchaser of entire parcel for proposed residential subdivision brought quiet-title and declaratory-judgment claims against real estate developer, alleging that developer did not have an enforceable contract to purchase five lots within the proposed subdivision. Developer filed counter-complaint against plaintiff and plaintiff's vendor alleging breach of contract and tortious interference with business or contractual relations and alleging specific performance, brought breach-of-contract claim against new parties, and brought conspiracy claims against fictitiously named parties. The Circuit Court, Baldwin County, No. CV-05-923, Robert E. Wilters, J., dismissed the breach-of-contract counterclaim against new parties and the conspiracy counterclaim, and later entered summary judgment for plaintiff as to quiet-title and declaratory-judgment claims and remaining counterclaims. Developer appealed.

**Holdings:** The Supreme Court, Woodall, J., held that:
(1) letter agreement was too indefinite to constitute an enforceable contract;
(2) counterclaims could not be directed solely against new parties; and
(3) any error was invited error, as to dismissal, rather than severance, of counterclaims against fictitiously named parties.

Affirmed in part, reversed in part, and remanded.

West Headnotes

**[1] Contracts 95 ⊂⊃9(1)**

95 Contracts
95I Requisites and Validity
95I(A) Nature and Essentials in General
95k9 Certainty as to Subject-Matter
95k9(1) k. In General. Most Cited Cases
To be enforceable, the essential terms of a contract must be sufficiently definite and certain, and a contract that leaves material portions open for future agreement is nugatory and void for indefiniteness.

**[2] Contracts 95 ⊂⊃9(1)**

95 Contracts
95I Requisites and Validity
95I(A) Nature and Essentials in General
95k9 Certainty as to Subject-Matter
95k9(1) k. In General. Most Cited Cases
A lack of definiteness in an agreement, so that the agreement is not enforceable, may concern the time of performance, the price to be paid, work to be done, property to be transferred, or miscellaneous stipulations in the agreement.

**[3] Contracts 95 ⊂⊃9(1)**

95 Contracts
95I Requisites and Validity
95I(A) Nature and Essentials in General
95k9 Certainty as to Subject-Matter
95k9(1) k. In General. Most Cited Cases
A reservation in either party of a future unbridled right to determine the nature of the performance may cause a promise to be too indefinite for enforcement.

**[4] Contracts 95 ⊂⊃9(1)**

95 Contracts
95I Requisites and Validity
95I(A) Nature and Essentials in General

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

998 So.2d 1042
**(Cite as: 998 So.2d 1042)**

95k9 Certainty as to Subject-Matter
    95k9(1) k. In General. Most Cited Cases
The terms of a contract are reasonably certain, and therefore enforceable, if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.

**[5] Vendor and Purchaser 400 ⚖21**

400 Vendor and Purchaser
    400I Requisites and Validity of Contract
        400k20 Written Contracts
            400k21 k. Form and Contents. Most Cited Cases
Letter from real-estate developer to owner of parcel for proposed residential subdivision, which letter was signed by developer as putative purchaser and was initialed by parcel owner as putative vendor, lacked definiteness and therefore did not constitute an enforceable contract for developer to purchase five lots within proposed residential subdivision; while letter ostensibly offered $85,000 per lot, it expressly left open the financial impact of amenities on offering price, offer was made "contingent on" future construction of unspecified amenities, such as, "but not limited to [,] a swimming pool, community entertainment area, community access to the bay front with a possible pier, neighborhood to be gated, etc." and letter did not address whether any amenities were to be constructed by developer as part of purchase price or were to be constructed solely by parcel owner, and if constructed by parcel owner, whether cost of such construction would be reflected in adjustment of base offering price of $85,000 per lot.

**[6] Contracts 95 ⚖9(1)**

95 Contracts
    95I Requisites and Validity
        95I(A) Nature and Essentials in General
            95k9 Certainty as to Subject-Matter
                95k9(1) k. In General. Most Cited Cases
Whether a writing fails as an enforceable contract,

because of indefiniteness, is a question of law.

**[7] Evidence 157 ⚖448**

157 Evidence
    157XI Parol or Extrinsic Evidence Affecting Writings
        157XI(D) Construction or Application of Language of Written Instrument
            157k448 k. Grounds for Admission of Extrinsic Evidence. Most Cited Cases
A jury may resolve ambiguities in a contract through parol evidence.

**[8] Torts 379 ⚖214**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)1 In General
                379k214 k. Existence of Valid or Identifiable Contract, Relationship or Expectancy. Most Cited Cases
A claim of tortious interference with a contractual relationship presupposes the existence of an enforceable contract.

**[9] Torts 379 ⚖210**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)1 In General
                379k210 k. In General. Most Cited Cases
Tortious interference with a contractual relationship is a claim separate and distinct from tortious interference with a business relationship or expectancy.

**[10] Torts 379 ⚖214**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)1 In General
                379k214 k. Existence of Valid or Identifiable Contract, Relationship or Expectancy. Most

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

998 So.2d 1042
**(Cite as: 998 So.2d 1042)**

Cited Cases
The absence of a valid contract is not fatal to a claim of tortious interference with a business relationship.

**[11] Judgment 228 ⟲185(2)**

228 Judgment
   228V On Motion or Summary Proceeding
      228k182 Motion or Other Application
         228k185 Evidence in General
            228k185(2) k. Presumptions and Burden of Proof. Most Cited Cases

**Judgment 228 ⟲185(5)**

228 Judgment
   228V On Motion or Summary Proceeding
      228k182 Motion or Other Application
         228k185 Evidence in General
            228k185(5) k. Weight and Sufficiency.
Most Cited Cases
A defendant, as summary-judgment movant, has initial burden of making a prima facie showing that there is no genuine issue of material fact, and if defendant makes that showing, burden then shifts to plaintiff, as nonmovant, to present substantial evidence of each element of the claim challenged by defendant. Rules Civ.Proc., Rule 56(c).

**[12] Judgment 228 ⟲185(5)**

228 Judgment
   228V On Motion or Summary Proceeding
      228k182 Motion or Other Application
         228k185 Evidence in General
            228k185(5) k. Weight and Sufficiency.
Most Cited Cases
If the movant for summary judgment does not satisfy his initial burden of making a prima facie showing that there is no genuine issue of material fact, then he is not entitled to judgment, and no defense by the nonmovant to an insufficient showing, is required. Rules Civ.Proc., Rule 56(c).

**[13] Judgment 228 ⟲183**

228 Judgment
   228V On Motion or Summary Proceeding
      228k182 Motion or Other Application
         228k183 k. In General. Most Cited Cases
A motion for summary judgment that does not comply with civil-procedure rules does not require a response in defense from the nonmovant. Rules Civ.Proc., Rule 56(c).

**[14] Parties 287 ⟲50**

287 Parties
   287IV New Parties and Change of Parties
      287k49 Bringing in New Parties
         287k50 k. In General. Most Cited Cases

**Pleading 302 ⟲138**

302 Pleading
   302III Responses or Responsive Pleadings in General
      302III(E) Set-Off, Counterclaim, and Cross-Complaint
         302k138 k. Nature and Office of Pleading.
Most Cited Cases

**Pleading 302 ⟲149**

302 Pleading
   302III Responses or Responsive Pleadings in General
      302III(E) Set-Off, Counterclaim, and Cross-Complaint
         302k149 k. Cross-Complaint Against Codefendant or Third Parties. Most Cited Cases
Civil-procedure rule, stating that persons other than those made parties to the original action may be made parties to a counterclaim or cross-claim, only authorizes the court to join additional persons in order to adjudicate a counterclaim or cross-claim that already is before the court or one that is being asserted at the same time the addition of a nonparty is sought; thus, a counterclaim or cross-claim may not be directed solely against persons who are not already parties to the original action, but must involve at least one existing party. Rules Civ.Proc.,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

998 So.2d 1042
**(Cite as: 998 So.2d 1042)**

Rule 13(h).

**[15] Courts 106 ⚖️97(1)**

106 Courts
    106II Establishment, Organization, and Procedure
        106II(G) Rules of Decision
           106k88 Previous Decisions as Controlling or as Precedents
                106k97 Decisions of United States Courts as Authority in State Courts
                    106k97(1) k. In General. Most Cited Cases
Federal cases construing the Federal Rules of Civil Procedure are persuasive authority in construing the Alabama Rules of Civil Procedure because the Alabama Rules of Civil Procedure were patterned after the Federal Rules of Civil Procedure.

**[16] Appeal and Error 30 ⚖️169**

30 Appeal and Error
    30V Presentation and Reservation in Lower Court of Grounds of Review
        30V(A) Issues and Questions in Lower Court
           30k169 k. Necessity of Presentation in General. Most Cited Cases
The appellate court cannot reverse the judgment of the trial court based on an argument not made below and urged for the first time on appeal.

**[17] Appeal and Error 30 ⚖️882(1)**

30 Appeal and Error
    30XVI Review
        30XVI(C) Parties Entitled to Allege Error
           30k881 Estoppel to Allege Error
               30k882 Error Committed or Invited by Party Complaining
                    30k882(1) k. In General. Most Cited Cases
A party may not induce or invite an error by the trial court and then attempt to win a reversal based on that error.

**[18] Appeal and Error 30 ⚖️882(5)**

30 Appeal and Error
    30XVI Review
        30XVI(C) Parties Entitled to Allege Error
           30k881 Estoppel to Allege Error
               30k882 Error Committed or Invited by Party Complaining
                    30k882(5) k. Pleading in General. Most Cited Cases
Counterclaim plaintiffs invited any error as to trial court's dismissing, rather than severing, improperly joined counterclaim that asserted a breach-of-contract claim only against new parties, where counterclaim plaintiffs responded to counterclaim defendants' motion to dismiss or in the alternative to sever the counterclaim by arguing that there was no merit to severing the counterclaim. Rules Civ.Proc., Rule 13(h).

**[19] Action 13 ⚖️48(1)**

13 Action
    13III Joinder, Splitting, Consolidation, and Severance
        13k43 Joinder of Causes of Action Under Codes and Practice Acts
           13k48 Claims Arising Out of Same Transaction or Transactions Connected with Same Subject of Action
               13k48(1) k. In General. Most Cited Cases

**Parties 287 ⚖️25**

287 Parties
    287II Defendants
        287II(B) Joinder
           287k24 Persons Who May Be Joined
               287k25 k. In General. Most Cited Cases
Proper joinder requires satisfaction of both prongs for permissive joinder, i.e., first, a right to relief in respect of or arising out of same transaction, occurrence, or series of transactions or occurrences, and second, a question of law or fact common to all defendants will arise in the action. Rules Civ.Proc., Rule 20(a).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

998 So.2d 1042
**(Cite as: 998 So.2d 1042)**

**[20] Action 13 ☞48(1)**

13 Action
   13III Joinder, Splitting, Consolidation, and Severance
      13k43 Joinder of Causes of Action Under Codes and Practice Acts
         13k48 Claims Arising Out of Same Transaction or Transactions Connected with Same Subject of Action
            13k48(1) k. In General. Most Cited Cases

**Parties 287 ☞25**

287 Parties
   287II Defendants
      287II(B) Joinder
         287k24 Persons Who May Be Joined
            287k25 k. In General. Most Cited Cases
There is no absolute rule for determining what constitutes a series of transactions or occurrences, for purposes of permissive joinder, and, generally, that is determined on a case-by-case basis and is left to the discretion of the trial judge. Rules Civ.Proc., Rule 20(a).

**[21] Appeal and Error 30 ☞756**

30 Appeal and Error
   30XII Briefs
      30k756 k. Form and Requisites in General. Most Cited Cases

**Appeal and Error 30 ☞761**

30 Appeal and Error
   30XII Briefs
      30k761 k. Points and Arguments. Most Cited Cases

**Appeal and Error 30 ☞1079**

30 Appeal and Error
   30XVI Review
      30XVI(K) Error Waived in Appellate Court
         30k1079 k. Insufficient Discussion of Objections. Most Cited Cases
Appellants' argument, which essentially consisted of statement that dismissal of appellants' joined counterclaim alleging conspiracy against fictiously named parties was "nonsensical," without any attempt to define the transactional relationship or to identify the common legal or factual questions that, together, would be necessary to sustain the permissive joinder of fictitiously named parties, and without any citation to relevant caselaw and any factual analysis, did not satisfy appellate briefing requirements, and, thus, the argument was waived. Rules App.Proc., Rule 28(a)(10); Rules Civ.Proc., Rule 20(a).

**[22] Appeal and Error 30 ☞756**

30 Appeal and Error
   30XII Briefs
      30k756 k. Form and Requisites in General. Most Cited Cases

**Appeal and Error 30 ☞761**

30 Appeal and Error
   30XII Briefs
      30k761 k. Points and Arguments. Most Cited Cases

**Appeal and Error 30 ☞1079**

30 Appeal and Error
   30XVI Review
      30XVI(K) Error Waived in Appellate Court
         30k1079 k. Insufficient Discussion of Objections. Most Cited Cases
Arguments in appellate briefs must contain discussions of facts and relevant legal authorities that support the party's position, and, if they do not, the arguments are waived. Rules App.Proc., Rule 28(a)(10).

**[23] Appeal and Error 30 ☞756**

30 Appeal and Error
   30XII Briefs

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

998 So.2d 1042
**(Cite as: 998 So.2d 1042)**

30k756 k. Form and Requisites in General. Most Cited Cases

**Appeal and Error 30 ☞761**

30 Appeal and Error
   30XII Briefs
      30k761 k. Points and Arguments. Most Cited Cases

It is not the function of the appellate court to do a party's legal research or to make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument in the party's appellate brief. Rules App.Proc., Rule 28(a)(10).

**\*1044** George W. Walker III and C. Nelson Gill of Copeland Franco Screws & Gill, PA, Montgomery, for appellants.

Jerome E. Speegle, Anthony M. Hoffman, and Jennifer S. Holifield of Zieman, Speegle, Jackson & Hoffman, L.L.C., Mobile, for appellees PRS II, L.L.C., Langan Development Co., Bar Pilot Land, L.L.C., and Pilots Pointe Development, L.L.C.

J. Byron Brackin III of Brackin, McGriff & Johnson, P.C., Foley, for appellees Michael Asfour and Peter Sterling.

WOODALL, Justice.

This appeal is brought by Jeff Valentine, Chris Rolison, and White Sands Group, L.L.C. ("White Sands")-a real-estate developer whose members include Valentine **\*1045** and Rolison (hereinafter referred to collectively as "the Group")-following the entry of a summary judgment in favor of PRS II, LLC, and others in a quiet-title action commenced by PRS II against White Sands and Valentine. We affirm in part, reverse in part, and remand.

*I. The Case*

This action began on August 3, 2005, when PRS II filed a complaint against White Sands and

Valentine. The complaint sought a judgment declaring that PRS II owned an undivided fee interest in approximately 96 acres known as "Pilot Town" in Baldwin County, and that White Sands and Valentine had no valid interest in or claim to any portion of the property. In September 2005, White Sands and Rolison filed a five-count counter-complaint against PRS II and numerous additional entities and individuals. At the motions of the counterclaim defendants, the trial court dismissed counts four and five of the counter-complaint and entered a summary judgment against White Sands and Rolison on the remaining counts of the counter-complaint, as well against White Sands and Valentine on PRS II's complaint. This appeal challenges the propriety of the summary judgment, as well as the dismissal of counts four and five.

*II. Factual Background*

Viewed in a light most favorable to the Group, the evidence tends to show the following. The dispute underlying this litigation arose out of the proposed development of Pilot Town and the purported purchase by White Sands of a portion of the property within the Pilot Town development. The property on which Pilot Town was to be developed was owned by Thomas Langan, Jr. (also referred to as "Tommy Langan"), and other members of the Langan family, either individually or through various business entities hereinafter described. By May 2004, the Langans had begun contemplating the platting and subdivision of that property for sale as single-family residences. Indeed, on December 4, 2002, the Baldwin County Planning and Zoning Commission granted "Preliminary Plat Approval" for the development and subdivision of Pilot Town.

The Langans' real-estate operations, and the Pilot Town project in particular, involved various business entities owned by one or more of the Langans. One such entity was Langan Development Company, Inc. ("Langan Development"), a corporation wholly owned by Thomas Langan, Jr. Other entities included Bar Pilot Land, L.L.C. ("Bar Pilot"), and

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

998 So.2d 1042
**(Cite as: 998 So.2d 1042)**

Pilots Pointe Development, L.L.C. ("Pilots Pointe"). These three entities will be referred to collectively herein as "the Langan entities."

In May 2004, Valentine and Rolison met with Langan to discuss a possible purchase by White Sands of property within Pilot Town. Subsequently, on May 12, 2004, Valentine, on behalf of White Sands, addressed a letter to "Thomas J. Langan, Jr.," and "Langan Development Company." The letter stated, in pertinent part:

"I'm writing to make a formal offer on lots in the Pilot Town subdivision at mile marker 3 off hwy 180 in Fort Morgan.

"We are making the offer thru our development company, White Sands Group, L.L.C. in the amount of $85,000 cash on (5) lots 23-27. We are agreeable to making a deposit to show good faith in the project.

"We are in contact with potential buyers of some of your waterfront lots as well. We propose a 5% compensation to White Sands Group for any successful purchasers of additional lots in the neighborhood.

**\*1046** "*This offer is contingent* on amenities described and discussed previously. They are inclusive of but not limited to a swimming pool with waterfall, community entertainment area, community access to the bay front with a possible pier, neighborhood to be gated, etc.

"*The offer is also contingent* on successful subdivision of lots and completion of roadways. It was also expressed that environmental, wetlands delineation, archeological, beach mouse, and all other issues have been addressed which will provide these lots to be buildable thru the normal permitting process. The offer is also subject to our ability to obtain reasonable financing at the completion of the neighborhood.

"I look forward to hearing from you promptly. Please call me if you have any questions."

(Emphasis added.) The letter was signed by Valentine as the purchaser.

Langan "penciled in" some changes in the third paragraph, and struck out the words "with waterfall" in the fourth paragraph. These changes were reflected in a letter addressed to "Thomas J. Langan, Jr.," and "Langan Development Co.," dated May 17, 2004, which stated, in pertinent part:

"I'm writing to make a formal offer on lots in the Pilot Town subdivision at mile marker 3 off hwy 180 in Fort Morgan.

"We are making the offer thru our development company, White Sands Group, L.L.C. in the amount of $85,000 cash on (5) lots 23-27. We will place a deposit of $2,000.00 per lot until the subdivision is complete and we can proceed with closing. Upon closing, we agree to pull building permits and begin construction on one of the lots within 2 months. Any delays in the permitting process will be in addition to the 2 month projected start.

"White Sands Group will receive 5% compensation for purchasers of waterfront lots, in the amount of $210,000.00 or greater. These buyers will be introduced by us, and this commission option expires on 6/11/2004.

"*This offer is contingent* on amenities described and discussed previously. They are inclusive of but not limited to a swimming pool, community entertainment area, community access to the bay front with a possible pier, neighborhood to be gated, etc.

"*The offer is also contingent* on successful subdivision of lots and completion of roadways. It was also expressed that environmental, wetlands delineation, archeological, beach mouse, and all other issues have been addressed which will provide these lots to be buildable thru the normal permitting process. The offer is also subject to our ability to obtain reasonable financing at the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

998 So.2d 1042
**(Cite as: 998 So.2d 1042)**

completion of the neighborhood.

"I look forward to hearing from you promptly. Please call me if you have any questions."

(Emphasis added.) The letter (hereinafter referred to as "the Valentine letter") was signed by Valentine as the purchaser and initialed by Thomas Langan as the seller.

On July 8, 2004, Langan accepted an "offer to purchase" Pilot Town ("the Pilot Town contract") from Peter Sterling and Michael Asfour, members of P & M Builders, LLC ("P & M"), an entity based in New York. The contract expressly excluded lots 23-27, as well as several lots reserved by various members of the Langan family. It contemplated the construction on the remainder of the property of "five condominium structures" and a "full service marina," consisting of at least 275 "boat slips." On July 22, 2004, Sterling and Asfour contracted with Rolison ("the **1047** Rolison contract") for Rolison to perform construction services on the facilities to be built under the Pilot Town contract.

Sterling and Asfour sought financing through Peter Morris of PRM Realty, Inc. ("PRM"), in Chicago. In August 2004, Morris, Sterling, Asfour, and Langan viewed the property. At that time, they discussed White Sands' interest in Pilot Town. Also at that time, Morris and Sterling expressed an interest in acquiring Pilot Town *in its entirety* for the construction of *condominiums.* In that connection, P & M hired Volkert & Associates, Inc. ("Volkert"), "to perform certain professional surveying, planning, environmental, and engineering services for improvements" to Pilot Town.

Subsequently, Tommy Langan and Morris began to discuss whether the Valentine letter was an enforceable contract. Morris wanted the purchase of Pilot Town to include the property in its entirety, and he began, in his words, to "put pressure on" the Langans to include in the sale some or all of the lots excluded from the Pilot Town contract.

On October 11, 2004, the Langans sent Valentine a letter, stating, in pertinent part:

"Per your conversation the other day with Tommy Langan, I am writing about *your option* dated 5/[17]/04 to Langan Development Company. Due to [damage inflicted by Hurricane Ivan] we are having to *add some additional cost to the lots* to cover the damage, interest and fee delays, and clean-up to name just a few items. At this point we also are not able to complete the swimming pool, community entertainment area, community access to bay or the front wall and gates and are not sure when they will be complete. However once the roadways and base utilities are in we will give you the *total cost change per lot* and at that time you will need to close on the lots in your *option letter. Any additional environmental, wetlands delineation, archeological, or other issues will also have to be taken into consideration as to the total lot cost.* Also as previously agreed we are adding the *pro-rata share per lot the cost of the proposed pier/marina, bulkhead* (time frame for construction not yet determined) and sewer and water cost."

(Emphasis added.) On October 21, 2004, after receiving this letter, Valentine sent a letter to Mark Langan, stating, in pertinent part:

"I'm writing to express that we are *still interested in our reserved* lots in Pilot Town. I am enclosing our deposits on lots 23 thru 27. I'm sending the agreed upon $2,000.00 per lot (total $10,000).

"I understand there will be delays due to the storm, and we will patiently await the completion of the neighborhood. If there is anything we can be of assistance with, please contact me."

(Emphasis added.)

Meanwhile, on October 14, 2004, Morris, individually, and on behalf of PRM; Sterling, individually, and on behalf of P & M; and another entity based in New York executed a joint-venture agreement. The joint venture was conducted "under the name and

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

998 So.2d 1042
**(Cite as: 998 So.2d 1042)**

style PRS." The stated purpose of PRS was, among other things, to "acquire, hold, improve, develop, sell, lease, or manage developed or undeveloped properties," and Pilot Town in particular.

Eventually, Volkert drew maps and alternative plans of the proposed project. At least one of the maps displayed condominiums on the entire property. During a planning meeting attended by Rolison, Rolison expressed concern to Sterling regarding any plans to place condominiums on the lots White Sands had expressed an ***1048** interest in. In response, Sterling told Rolison: "*[W]e'll take care of you* if we go [to condominiums on the whole property]; we're not choosing to go that direction right now." (Emphasis added.)

In January 2005, PRS II was formed to assume essentially the same functions and purposes as PRS. PRS II was composed of the same entities as PRS, except that Thomas Langan was added as a member.

In February 2005, Morris submitted to Tommy Langan a written proposal to purchase "*[a]ll lots*" at Pilot Town with the "stipulat[ion] that [the] *unenforceable contract to [White Sands would] be voided* on five of th[o]se lots," and that "*no parcels* [would] be carved out and sold to other parties." (Emphasis added.) In a letter to Valentine dated February 11, 2005, the Langans returned White Sands' check for the $10,000 deposit, which had never been cashed, stating, in pertinent part: "At this point the company has decided not to pursue the subdivision, for a variety of reasons. If plans change White Sands will be notified." On March 1, 2005, PRS II received a warranty deed for Pilot Town-which included the excluded lots-in exchange for approximately $19 million.[FN1]

> FN1. According to the Group, "the closing was directly linked to the original [Pilot Town] contract." Group's brief, at 25.

Two days later, on March 3, Valentine filed an affidavit in the Baldwin Probate Court. The affidavit

stated, in pertinent part:

> "2. On behalf of White Sands Group, L.L.C., I negotiated a purchase contract for the sale of certain lands located in Baldwin County, Alabama, with Thomas J. Langan, Jr. acting in the line and scope of his authority with BAR PILOT LAND, L.L.C. and PILOT'S [sic] POINTE DEVELOPMENT, L.L.C. [description followed].

> "....

> "4. The negotiations for the purchase of the real property resulted in the entry into a contract for the sale of Lots 23, 24, 25, 26 and 27 of the property owned by Bar Pilot Land, L.L.C. and being developed by Pilot's Pointe Development, L.L.C. ..."[FN2]

> > FN2. Considerable confusion exists regarding the precise Langan entity, or entities, that actually owned Pilot Town. Disposition of this appeal, however, does not depend on resolution of this confusion.

Subsequently, Morris sent Sterling an e-mail, stating, in pertinent part:

"Tommy [Langan] received a very hostile lawyer letter from Chris [Rolison] and his partner regarding the five lots on which they ( [Rolison] and partner) had conditionally entered into an understanding to acquire said lots on a very advantageous basis a little while ago. I have read the documents carefully and am very comfortable with the fact that there were so many conditions which we unilaterally imposed upon Tommy and his family regarding condition of land, subdivision, achievement along with subdivision restrictions, and other items (all which were exclusively in [Rolison] and partner's domain) to accept or walk away from the deal-none of which had been accomplished by Tommy or his family at the time of, what I consider, a non-binding statement of facts and understanding to try to agree to go forward.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

998 So.2d 1042
**(Cite as: 998 So.2d 1042)**

"In my opinion, the Langans have total discretion to make the subdivision and to create whatever conditions they want and, obviously, this would not be considered a one-way option for [Rolison] and his partner to cherry-pick their visions and get in or out. In my mind, the **\*1049** understanding has so much ambiguity in open trading yet to go that it never roles [sic] through level specificity. Therefore, it is not binding and more an expression of intent. Now, all of a sudden since we have closed, mysteriously, this guy and his partner and lawyer surface, acting as if there was a binding contract with all of the facts fixed and no open-ended variables, with demands of a closing and threats to sue. You have repeatedly told Tommy, and several times told me, that *you can handle Mr. [Rolison] and his partner and move him into another direction,* as it makes no sense for a guy, who turns out to have very little pull with Volkert, very little standing in the community, and has provided no real palpable service or benefit, to somehow potentially hijack a $500 million project, with five misapplied, misdesigned, mismarketed, and misplaced, out of context units, with a tail to wag the proverbial dog of our master planned project. *It is demonstrably not in your interest to allow this to happen* and you have repeatedly reflected and represented to Tommy and to me that you can control the situation. I think it would be a show of good faith to intervene, prior to an unnecessary lawsuit-which, in my opinion, this gentleman and his partner will lose-and move this forward so we don't have this level of contention with a bunch of third parties .... I think this would avoid messy litigation, which, of course, none of us are afraid [of] and will take in stride, but is truly not necessary for anyone's relationship or for the Venture on these deals we do have."

(Emphasis added.)

In August 2005, when it appeared to Morris that an action by White Sands was imminent, PRS II sued White Sands and Valentine, seeking a judgment quieting title to Pilot Town in PRS II and declaring that White Sands and Valentine have no legal or equitable interest in the property. The counter-complaint subsequently asserted against PRS II added Rolison as a counterclaim plaintiff and added (1) Langan Development, (2) Pilots Pointe, and (3) Bar Pilot as counterclaim defendants. It also added as counterclaim defendants P & M, Sterling, and Asfour. Finally, the style of the counter-complaint listed "fictitious defendants 11-23" (hereinafter referred to as "the fictitiously named parties"), described as "those individuals and/or entities who conspired with any of the named defendants in the commission of the wrongs alleged herein."

More specifically, count one of the counter-complaint asserted a breach-of-contract claim by White Sands against *the Langan entities.* Count two was asserted by White Sands against *PRS II* and the *Langan entities,* seeking specific performance of the contract. Count three alleged that White Sands "had a valid and existing contract *and business relation* with [the Langan entities]" and asserted that *Sterling, Asfour, and PRS II* had "separately and/or collectively intentionally and wrongfully interfered with said business and/or contractual relations." (Emphasis added.) Count four was a breach-of-contract claim asserted by Rolison. He averred that he had "a contract with [*Sterling, Asfour, and P & M* ] ... for the payment of $800,000.00 for the performance of certain services," and that they had breached that contract. (Emphasis added.) Count five was asserted by White Sands against the *fictitiously named parties* and alleged conspiracy to "intentionally interfere with the contract and business relations of [the Group]."

Motions were filed by all the named counterclaim defendants to dismiss the counter-complaint on the ground that the **\*1050** Alabama Rules of Civil Procedure do not authorize the joinder of the new parties or claims or, in the alternative, to *sever* the counterclaims, pursuant to Ala. R. Civ. P. 21. White Sands and Rolison expressly *opposed severance,* as well as dismissal, and specifically argued

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

998 So.2d 1042
**(Cite as: 998 So.2d 1042)**

that the "severance position [had] no merit."

On January 11, 2006, the trial court dismissed counts four and five of the counter-complaint. On May 18, 2007, PRS II and the Langan entities moved for a partial summary judgment as to counts one, two, and three of the counter-complaint. On June 27, 2007, Asfour and Sterling filed a motion for a summary judgment as to count three, the only counterclaim that remained against them. That motion stated, *in toto:*

> "Come now the counterclaim Defendants, Michael Asfour and Peter Sterling ... by and through undersigned counsel and will make this their motion for summary judgment as to all counts asserted against Asfour and Sterling as there are no genuine issues of material fact a judgment as a matter of law is due to be granted.

> *"In support of their motion, Asfour and Sterling, Counterclaim Defendants, incorporate by reference the Motion for Partial Summary Judgment filed on May 18, 2007, by [PRS II and the Langan entities], as well as all exhibits and documents filed simultaneously therewith, including but not limited to the Narrative Summary of Undisputed Facts; Brief in Support of Motion for Summary Judgment; and Notice of Filing in Support of Partial Summary Judgment."*

(Emphasis added.) In other words, Sterling and Asfour filed no supporting argument, brief, or narrative summary of undisputed facts, apart from those filed by PRS II and the Langan entities. On August 6, 2007, PRS II moved for a summary judgment on the claims in its complaint against White Sands and Valentine.

On September 12, 2007, the trial court entered a summary judgment in favor of PRS II on the two claims in its complaint and against White Sands and Rolison on the three remaining claims of the counter-complaint. On October 3, 2007, the Group appealed, challenging the adverse summary judgments, as well as the dismissals of counts four and

five of the counter-complaint.

### III. Summary Judgments

This appeal presents issues regarding two aspects of the summary judgments. The first concerns title to Pilot Town, which, in turn, implicates the two claims asserted in the PRS II complaint and counts one and two of the counter-complaint. The second concerns the claims of interference with a contractual or business relationship, which were asserted by White Sands in count three of the counter-complaint.

### A. Title to Pilot Town

The Group concedes that the resolution of its breach-of-contract and specific-performance counterclaims, as well as the resolution of the quiet-title and declaratory-judgment claims of PRS II, turns on the validity and enforceability of the Valentine letter. The issue, as framed by the parties, is whether the Valentine letter constitutes an enforceable contract for the purchase of lots 23-27.

In that connection, PRS II and the Langan entities argued in the trial court, and contend again here, that the Valentine letter is not a contract, because, they say, it fails for lack of definiteness. They allude specifically to the various *contingencies* described in that letter, such as the construction by the sellers of certain **\*1051** specified "amenities," as well as other *unspecified* amenities. This contingency, they argue, *leaves open* the total *price* to be paid for the lots. They also refer to the fact that the purchase "offer [was] contingent on successful subdivision of lots and completion of roadways," and that there is "nothing in the [Valentine letter] that even required the Langans *to affirmatively proceed* ... with the subdivision." Brief of PRS II and the Langan entities, at 35 n. 3 (emphasis added). They characterize the letter as a nonbinding "letter of intent."

In response, the Group argues that "the contract for

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

998 So.2d 1042
**(Cite as: 998 So.2d 1042)**

the sale of the lots was absolutely definite and clear," as indicated by the statement: "We are making the offer ... in the amount of $85,000 cash on (5) lots 23-27." The Group's brief, at 55. The Group contends that the proposals added by Tommy Langan to the offer preceding the Valentine letter constituted a *counteroffer,* thus evidencing Langan's understanding of the meaning of the amenities contingency. These factors, according to the Group, present at least a jury question as to "the intent of [the] parties to enter into a contract, or concerning mutual assent." *Id.* at 52. We disagree.

[1][2][3] "To be enforceable, the [essential] terms of a contract must be sufficiently definite and certain, *Brooks v. Hackney,* 329 N.C. 166, 170, 404 S.E.2d 854, 857 (1991), and a contract that ' "leav[es] material portions open for future agreement is nugatory and void for indefiniteness" ' ...." *Miller v. Rose,* 138 N.C.App. 582, 587-88, 532 S.E.2d 228, 232 (2000) (quoting *MCB Ltd. v. McGowan,* 86 N.C.App. 607, 609, 359 S.E.2d 50, 51 (1987), quoting in turn *Boyce v. McMahan,* 285 N.C. 730, 734, 208 S.E.2d 692, 695 (1974)). "A lack of definiteness in an agreement may concern the time of performance, the price to be paid, work to be done, property to be transferred, or miscellaneous stipulations in the agreement." 1 Richard A. Lord, *Williston on Contracts* § 4:21, at 644 (4th ed.2007). "In particular, a reservation in either party of a future unbridled *right to determine the nature of the performance* ... has often caused a promise to be too indefinite for enforcement." *Id.* at 644-48 (emphasis added). See also *Smith v. Chickamauga Cedar Co.,* 263 Ala. 245, 248-49, 82 So.2d 200, 202 (1955) (" 'A reservation to either party to a contract of an unlimited right to determine the nature and extent of his performance, renders his obligation too indefinite for legal enforcement.' ") (quoting 12 Am.Jur. *Contracts* § 66). Cf. *Beraha v. Baxter Health Care Corp.,* 956 F.2d 1436, 1440 (7th Cir.1992) (an indefinite term may "render[ ] a contract void for lack of mutuality" of obligation).

[4] "Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain." 17A Am.Jur.2d *Contracts* § 183 (2004). "The terms of a contract are reasonably certain if they provide a basis for *determining the existence of a breach and for giving an appropriate remedy." Id.* (emphasis added). See also *Smith,* 263 Ala. at 249, 82 So.2d at 203.

We may, therefore, state the dispositive question in this case as whether the parties have "so [definitely] expressed their intentions [in the Valentine letter] that the court [can] enforce their agreement?" *Beraha,* 956 F.2d at 1440-41. The plaintiff bears the burden on this question. *State Farm Fire & Cas. Co. v. Williams,* 926 So.2d 1008, 1013 (Ala.2005); *DeVenney v. Hill,* 918 So.2d 106, 116 (Ala.2005). We answer it in the negative.

***1052** [5] Indefiniteness infects the Valentine letter in at least two fundamental respects. The first uncertainty is the *price* ultimately to be paid for the five lots. Although the letter ostensibly offers $85,000 per lot, it expressly leaves open the financial impact of the amenities on the offering price. The offer was made "contingent on" the future construction of *unspecified* amenities, such as, "but *not limited to* [,] a swimming pool, community entertainment area, community access to the bay front with a *possible* pier, neighborhood to be gated, etc." (Emphasis added.)

Even were we to assume, as the Group insists we do, that the entire catalog of amenities could properly be ascertained by parol evidence, more difficult questions remain, such as whether any of the amenities were to be constructed by the prospective *buyers* as part of White Sands' purchase price, or *solely by the sellers,* and, if by the sellers, whether the cost of such construction would be reflected in an adjustment of the base offering price of $85,000. The difficulty is illustrated in the October 11, 2004, letter from the Langans to Valentine, which expressly contemplated "some additional cost to the lots" and an adjustment of the "total lot cost," due,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

998 So.2d 1042
**(Cite as: 998 So.2d 1042)**

in part, to the unexpected damage from Hurricane Ivan in September 2004. Thus, the total price for the lots is effectively left open in the Valentine letter.

The second uncertainty presented by the Valentine letter is even more difficult and fundamental. The problem is that *no party* involved in this transaction has, at any time, unequivocally committed-in writing or otherwise-to perform *any* of its essential terms. White Sands agreed to pay *only after* the construction of various amenities and after the "successful subdivision of lots and completion of roadways." However, the letter contains no commitment by anyone to *build* any amenities or roadways. It is undisputed that the Langans never submitted a final subdivision plat to the Baldwin County Planning and Zoning Commission for approval, but the Valentine letter contains no commitment by the Langans to do so or to proceed at all with plans to subdivide Pilot Town. Because the Valentine letter left essential aspects of the transaction "open for future agreement" and negotiation, *Miller,* 138 N.C.App. at 588, 532 S.E.2d at 232, and left to the Langans an "unbridled right to determine the nature of [their] performance," it was "too indefinite for enforcement." *Williston,* supra, at 647-48.

The proposals penciled into the initial offer by Tommy Langan, whether or not they are considered a "counteroffer" as the Group contends, did not transform the Valentine letter into an enforceable contract. Even if the proposals were intended to be a counteroffer, they could not have formed the basis for an enforceable contract. This is so because simply proposing modifications to the largely immaterial third paragraph and deleting the words "with waterfall" from the fourth paragraph did nothing to eliminate the indefiniteness that is fatal to the Valentine letter. 17A Am.Jur.2d *Contracts* § 183 (2008) ("Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.").

More specifically, they did nothing to resolve issues surrounding the financial impact of the amenities on the offering price and certainly did not amount to a definite commitment by the Langans to proceed with plans to subdivide Pilot Town. We hold, therefore, that the Valentine letter is unenforceable for lack of definiteness.

[6] Although there is authority to the contrary, whether a writing fails for indefiniteness is properly a question of law. *1053 Beraha,* 956 F.2d at 1440; *Richter, S.A. v. Bank of America Nat'l Trust & Sav. Ass'n,* 939 F.2d 1176, 1196 (5th Cir.1991) ("whether a contract fails [for indefiniteness] is a question of law"); *Armstrong v. Rohm & Haas Co.,* 349 F.Supp.2d 71, 78 (D.Mass.2004) ("Whether an alleged contract is legally enforceable in light of indefinite terms is a question of law for the court."); *America's Favorite Chicken Co. v. Samaras,* 929 S.W.2d 617, 622 (Tex.App.1996) ("[T]he issue of whether an agreement fails for indefiniteness is a question of law to be determined by the court."). FN3

> FN3. But see *Burlington Constr. Co. v. R.C. Equip. & Constr., Inc.,* 13 Conn.App. 505, 537 A.2d 534 (1988) (question of fact).

This view is in accord with Alabama law and practice. For example, in *Smith v. Chickamauga Cedar Co.,* supra, this Court affirmed a judgment of *nonsuit* sustaining a demurrer to the complaint, holding that an agreement by one party to an alleged contract to " 'furnish logs at such location for cutting by [the other party] in such quantities as [the first party] deems feasible and economical,' " 263 Ala. at 247, 82 So.2d at 201, was "so indefinite and uncertain as to be unenforceable." 263 Ala. at 248, 82 So.2d at 202. More recently, in *Drummond Co. v. Walter Industries, Inc.,* 962 So.2d 753 (Ala.2006), we affirmed a *summary judgment,* holding that an open-ended clause in an agreement purporting to modify the terms of existing coal leases " 'by extending them "to the extent necessary for plaintiffs to mine the strippable coal" ' " was unenforceable

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

998 So.2d 1042
**(Cite as: 998 So.2d 1042)**

for lack of definiteness and was "void as a matter of law." 962 So.2d at 766.

[7] Although the Group argues that the indefiniteness issue was "inappropriate for summary judgment," the Group's brief, at 52, the cases it cites, namely, *Ex parte W.Y.,* 605 So.2d 1175 (Ala.1992); *Wadsworth House Movers, Inc. v. Salvage One Demolition, Inc.,* 474 So.2d 686 (Ala.1985) (alleged oral agreement); *Johnson-Rast & Hays, Inc. v. Cole,* 294 Ala. 32, 310 So.2d 885 (1975); and *Big Thicket Broad. Co. of Alabama v. Santos,* 594 So.2d 1241 (Ala.Civ.App.1991) (alleged oral agreement), are distinguishable and unpersuasive. None of those cases involved an issue similar to the one presented here–whether the parties have made reciprocal commitments of performance sufficiently definite to be judicially enforceable. Although a jury may resolve ambiguities in a contract through parol evidence, *Cole,* 294 Ala. at 35, 310 So.2d at 889, it is no part of a jury's role to decide whether language in a letter reputed to be a contract for the purchase of real estate is sufficiently definite for a court to enforce.

For these reasons, the trial court did not err in entering a summary judgment on the breach-of-contract and quiet-title claims. That judgment disposed of PRS II's complaint in a manner favorable to PRS II and disposed of counts one, two, and a portion of count three of the counter-complaint in a manner adverse to White Sands and Rolison, effectively resolving all issues regarding title to Pilot Town.

*B. Interference with Contractual or Business Relations*

Count three of the counter-complaint was a counterclaim by White Sands against Sterling, Asfour, PRS II, and certain fictitiously named parties, averring that White Sands "had a valid and existing contract and business relationship" with the Langan entities and that Sterling, Asfour, and PRS II knowingly, intentionally, and wrongfully "interfered

with **\*1054** said business and/or contractual relations." The trial court's summary judgment disposed of this count. According to PRS II, Sterling, and Asfour, affirmance of the summary judgment as to the breach-of-contract claims asserted in the counter-complaint *ipso facto* resolves count three of the counter-complaint against White Sands.[FN4] With regard to the claim for interference with a *contractual* relationship, we agree.

> FN4. Sterling, Asfour, and PRS II do not challenge the joinder of the counterclaim defendants to the interference-with-contractual-and-business-relations claim, which is count three of the counter-complaint.

[8] A claim of tortious interference with a contractual relationship presupposes the existence of an enforceable contract. *Alexander v. Petroleum Installation Co.,* 695 So.2d 30 (Ala.Civ.App.1996); *Birmingham Television Corp. v. DeRamus,* 502 So.2d 761 (Ala.Civ.App.1986). As the Group points out, however, there was *another* claim asserted in count three, namely, interference with a *business relationship.*

[9] It is widely recognized that tortious interference with a contractual relationship is a claim separate and distinct from interference with a business relationship or expectancy. See *Gross v. Lowder Realty Better Homes & Gardens,* 494 So.2d 590 (Ala.1986); see also *Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal.4th 1134, 1157, 63 P.3d 937, 952, 131 Cal.Rptr.2d 29, 48 (2003); *Cochran v. Mullinax,* 276 Ga.App. 81, 86, 622 S.E.2d 455, 459 (2005) (interference with contract and interference with business relations are two "separate and distinct" torts); *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.,* 268 Mich.App. 83, 89, 706 N.W.2d 843, 848 (2005); *Trau-Med of America, Inc. v. Allstate Ins. Co.,* 71 S.W.3d 691, 701 (Tenn.2002).

[10] The Group further argues correctly that the absence of a valid contract is not fatal to their claim

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

998 So.2d 1042
**(Cite as: 998 So.2d 1042)**

of tortious interference with a business relationship. See *Britt/Paulk Ins. Agency, Inc. v. Vandroff Ins. Agency. Inc.,* 952 F.Supp. 1575, 1581 (N.D.Ga.1996) ("Proof of a valid and enforceable contract is not required as an element of a cause of action for tortious interference with business relations."), *aff'd, Britt/Paulk v. Vandroff Ins.,* 137 F.3d 1356 (11th Cir.1998); see also *IBP, Inc. v. Hady Enters., Inc.,* 267 F.Supp.2d 1148, 1164 (N.D.Fla.); *Tamiami Trail Tours, Inc. v. Cotton,* 463 So.2d 1126 (Fla.1985); *O'Brien v. State Street Bank & Trust Co.,* 82 Ill.App.3d 83, 401 N.E.2d 1356, 37 Ill.Dec. 263 (1980); *United Educ. Distribs., LLC v. Educational Testing Serv.,* 350 S.C. 7, 564 S.E.2d 324 (Ct.App.2002) (the protectable business "expectation need not be based on an enforceable contract").

"The two torts are initially distinguished by their primary elements-one tort deals with the interference with a fixed-term contract that is already in existence; the other tort deals with 'mere expectancies.' The latter element determines *which interests along the continuum of business dealings are protected."* Orrin K. Ames III, *Tortious Interference with Business Relationships: The Changing Contours of this Commercial Tort,* 35 Cumb. L.Rev. 317, 330 (2004-2005) (footnote omitted) (emphasis added).

[11][12][13] "The [summary-judgment] movant has the initial burden of making a prima facie showing that there is no genuine issue of material fact; if the movant makes that showing, the burden then shifts to the nonmovant to present substantial evidence of each element of the ***1055** claim *challenged by the movant."* *Harper v. Winston County,* 892 So.2d 346, 349 (Ala.2004) (emphasis added). However, if the movant does not satisfy his initial burden, "then he is not entitled to judgment. *No defense to an insufficient showing is required."* *Ray v. Midfield Park, Inc.,* 293 Ala. 609, 612, 308 So.2d 686, 688 (1975) (emphasis added). "A motion that does not comply with Rule 56(c)[, Ala. R. Civ. P.,] does not require a response in defense from the nonmovant."

*Horn v. Fadal Machining Ctrs., LLC,* 972 So.2d 63, 70 (Ala.2007). Simply stated, " '[a] summary judgment is not proper if the movant has not complied with the requirements of Rule 56.' " 972 So.2d at 70 (quoting *Northwest Florida Truss, Inc. v. Baldwin County Comm'n,* 782 So.2d 274, 277 (Ala.2000)).

The brief in support of the summary-judgment motion in this case included an argument under the following heading: "PRS II did not wrongfully interfere with a *contractual* relationship of White Sands." (Emphasis added.) The entire thrust of the subsequent 2 1/2 -page analysis was that the absence of a "valid enforceable contract" barred recovery. The motion also argued that White Sands could not recover because it had named PRS II in the specific-performance claim, stating: "If PRS II is a party to the contract, as alleged, there could be no wrongful interference."

Moreover, in this Court, PRS II and the Langan entities attempt to discount the Group's interference-with-a-business-relationship claim, stating: "White Sands attempts to argue that even if there is no contract, there is ... interference with business relations. *Such a theory stretches the imagination.* The only business relation between Langan Development and White Sands was the [Valentine] Letter. Because the [Valentine] Letter is not a contract, there can be no interference." Appellees' brief, at 37-38 (emphasis added). Nowhere in their motion for a partial summary judgment-or in their brief to this Court-do these appellees acknowledge interference with a business relationship or expectancy as a *distinct* tort. A summary-judgment movant does not discharge his initial burden to challenge the sufficiency of the evidence of a nonmovant's claim by simply *ignoring* the claim.

For these reasons, the burden never shifted to the Group to present evidence or an argument in support of their interference-with-a-business-relationship claim. Because PRS II did not satisfy its burden under Rule 56, Ala. R. Civ. P., the trial court erred in entering a judgment

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

998 So.2d 1042
**(Cite as: 998 So.2d 1042)**

in its favor on count three of the counter-complaint to the extent it disposed of the interference-with-a-business-relationship claim against PRS II.

Likewise, to the extent that the summary judgment disposed of the interference-with-a-business-relationship claim against Sterling and Asfour, the trial court also erred. Sterling and Asfour moved for a summary judgment on count three of the counter-complaint. In so doing, however, they merely "incorporat[ed] by reference the Motion for Partial Summary Judgment filed on May 18, 2007, by [PRS II and the Langan entities], ... including but not limited to [their] ... Brief in Support of Motion for Summary Judgment." In other words, Sterling and Asfour confined themselves to the arguments made by PRS II and the Langan entities. Because those arguments were insufficient to shift the burden to White Sands as to PRS II, they similarly failed to shift the burden to White Sands to present evidence or arguments in support of their interference-with-a-business-relationship claim against Asfour and Sterling. Thus, the Group correctly argues that the judgment is due to *1056 be reversed insofar as it relates to the interference-with-a-business-relationship claim against Asfour and Sterling.

### IV. The Dismissal of Counts Four and Five

The trial court dismissed counts four and five of the counter-complaint based on the counterclaim defendants' arguments that the counter-complaint improperly joined Rolison, Sterling, Asfour, P & M, and the Langan entities, who were not parties to the complaint.

### A. Count Four-Rolison's Claim

In count four, Rolison, as a new counterclaim plaintiff, averred that he had entered into a contract with Sterling, Asfour, and P & M "for the payment of $800,000.00 for the performance of certain services," and that they had breached that contract. It was the Rolison contract that allegedly contemplated Rolison's construction of facilities called for in the Pilot Town contract. Count four was, therefore, a breach-of-contract claim against Sterling, Asfour, and P & M, none of whom was a party to the original action.

The Group contends that the joinder of the new parties and claims is authorized by Ala. R. Civ. P. 13(h). We disagree. Rule 13(h) states: "Persons other than those made parties to the original action may be made parties to a counterclaim or cross-claim in accordance with the provisions of Rules 19 and 20."

[14] It is well settled that *Fed.* R. Civ. P. 13(h) "only authorizes the court to join additional persons in order to adjudicate a counterclaim or cross-claim that already is before the court or one that is being asserted at the same time the addition of a nonparty is sought." *FDIC v. Bathgate,* 27 F.3d 850, 873 (3d Cir.1994). "This means that a counterclaim or cross-claim *may not be directed solely against persons who are not already parties to the original action, but must involve at least one existing party.*" *Id.* (emphasis added). See also *Various Markets, Inc. v. Chase Manhattan Bank, N.A.,* 908 F.Supp. 459 (E.D.Mich.1995); 6 Charles A. Wright, Arthur R. Miller, & Mary K. Kane, *Federal Practice and Procedure* § 1435, at 271 (1990) (under Rule 13(h), "a counterclaim or cross-claim may not be directed solely against persons who are not already parties to the original action, but must involve at least one existing party").

[15] These interpretations of Fed.R.Civ.P. 13(h) were generated at a time when that rule read exactly as the Alabama version of the rule reads, i.e., the federal rule "provid[ed] that 'persons other than those made parties to the original action may be made parties to a counter-claim or cross-claim in accordance with the provisions of Rule 19 and 20.'" Fed.R.Civ.P. 13(h), *quoted in* Wright, Miller, & Kane, supra, § 1434, at 263.[FN5] "Federal cases construing the Federal Rules of Civil Procedure are persuasive authority in construing the Alabama Rules of Civil Procedure because the Alabama

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

998 So.2d 1042
**(Cite as: 998 So.2d 1042)**

Rules of Civil Procedure were patterned after the Federal Rules of Civil Procedure." *Ex parte BASF Corp.,* 957 So.2d 1104, 1107 n. 2 (Ala.2006).

> FN5. The Federal Rules of Civil Procedure were amended on April 30, 2007, to be effective December 1, 2007. Rule 13(h) now reads: "Rules 19 and 20 govern the addition of a person as a party to a counterclaim or crossclaim." According to the Advisory Committee Notes, "[t]he language of Rule 13 [was] amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only."

**\*1057** Rule 13(h) does not authorize the joinder of Rolison's breach-of-contract claim against Sterling, Asfour, and P & M, because none of them was a party to the original action and because Rolison does not assert his breach-of-contract claim against any of the original parties, namely, White Sands, Valentine, and PRS II. In other words, Rolison's claim fails because it does not "involve at least one *existing* party." *Bathgate,* 27 F.3d at 873 (emphasis added).

[16] For the *first time on appeal,* the Group argues alternatively that "even if the [joinder] was improper ..., the only proper remedy would be to *sever* the actions, and not to randomly dismiss [the] two counts." Reply brief, at 31 (emphasis added). It is well known that "we cannot reverse the judgment of the trial court based on an argument not made below and urged for the first time on appeal." *Singleton v. State Farm Fire & Cas. Co.,* 928 So.2d 280, 285 (Ala.2005).

[17][18] It is equally well settled "that a party may not induce an error by the trial court and then attempt to win a reversal based on that error. 'A party may not predicate an argument for reversal on "invited error," that is, "error into which he has led or lulled the trial court." ' " *Mobile Infirmary Med.*

*Ctr. v. Hodgen,* 884 So.2d 801, 808 (Ala.2003) (quoting *Atkins v. Lee,* 603 So.2d 937, 945 (Ala.1992), quoting in turn *Dixie Highway Express, Inc. v. Southern Ry.,* 286 Ala. 646, 651, 244 So.2d 591, 595 (1971)). If there was error in dismissing count four, it was *invited* when White Sands and Rolison responded to the counterclaim defendants' motions to dismiss or, in the alternative, to sever the counterclaims, with the argument that the "severance position [had] no merit." For these reasons, we refuse to reverse the judgment dismissing count four of the counter-complaint.

### B. Count Five-Conspiracy Claim Against Fictitiously Named Parties

Count five of the counter-complaint represents a claim by White Sands against "*fictitious counterclaim defendants 11-23,* " averring that they "conspired with each other and/or with" other counterclaim defendants, including PRS II, "to intentionally interfere with the contract and business relations of [White Sands]." (Emphasis added.)

To be sure, the fictitiously named parties share the interference claim in count three with PRS II, an original party. However, Rule 13(h) authorizes joinder only where the requirements of Rule 19 or Rule 20 are also satisfied. It is unclear which of these rules the Group regards as a basis for joinder. The Group does not contend that all, or any, of the fictitiously named parties are "persons needed for just adjudication," as required by Rule 19. Nor does the Group attempt to demonstrate how the requirements of Rule 20 are satisfied.

[19] More specifically, Rule 20(a) authorizes joinder of all persons "in one action as defendants if there is asserted against them ... any right to relief in respect of or arising out of the same transaction, occurrence or series of transactions or occurrences *and if* any question of law or fact common to all defendants will arise in the action." (Emphasis added.) Proper joinder requires satisfaction of *both* prongs of Rule 20(a). *Ex parte Novartis Pharms.*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

998 So.2d 1042
**(Cite as: 998 So.2d 1042)**

*Corp.,* 975 So.2d 297 (Ala.2007).

[20] "This Court has previously stated that 'there is no absolute rule for determining what constitutes "a series of transactions or occurrences" under Rule 20 . Generally, that is determined on a *case by case basis* and is left to the *discretion of *1058 the trial judge.*' " *Novartis,* 975 So.2d at 300 (quoting *Ex parte Rudolph,* 515 So.2d 704, 706 (Ala.1987) (emphasis added)). See also 7 Charles A. Wright, Arthur R. Miller, & Mary K. Kane, *Federal Practice and Procedure* § 1652, at 396 (3d ed.2001).

[21] However, the Group offers no such analysis. It does not attempt to define the transactional relationship or to identify the common legal or factual questions that, together, would be necessary under Rule 20(a) to sustain the joinder of the fictitiously named parties in count five. Its discussion of count five contains no citation to relevant caselaw and no factual analysis. Indeed, its argument essentially consists of the statement that the dismissal of the count was "nonsensical." Group's brief, at 36. Consequently, the Group's briefs do not contain the legal and factual analysis necessary to comply with Ala. R.App. P. 28(a)(10).

[22][23] Rule 28(a)(10) requires that arguments in briefs contain discussions of facts and relevant legal authorities that support the party's position. If they do not, the arguments are waived. *Moore v. Prudential Residential Servs. Ltd. P'ship,* 849 So.2d 914, 923 (Ala.2002); *Arrington v. Mathis,* 929 So.2d 468, 470 n. 2 (Ala.Civ.App.2005); *Hamm v. State,* 913 So.2d 460, 486 (Ala.Crim.App.2002). "This is so, because ' "it is not the function of this Court to do a party's legal research or to make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument." ' " *Jimmy Day Plumbing & Heating, Inc. v. Smith,* 964 So.2d 1, 9 (Ala.2007) (quoting *Butler v. Town of Argo,* 871 So.2d 1, 20 (Ala.2003), quoting in turn *Dykes v. Lane Trucking, Inc.,* 652 So.2d 248, 251 (Ala.1994) ). Because we do not address the Group's arguments regarding the dismissal of count five, the trial

court's judgment of dismissal as to that count is affirmed.

### V. Conclusion

In conclusion, the judgment dismissing counts four and five of the counter-complaint is affirmed. The summary judgment in favor of the Langan entities is affirmed. The summary judgment in favor of PRS II is affirmed as it relates (1) to the complaint, (2) to count two of the counter-complaint, and (3) to the interference-with-contractual-relations claim in count three of the counter-complaint. The summary judgment in favor of Sterling and Asfour is affirmed as it relates to the interference-with-contractual-relations claim in count three of the counter-complaint. However, the summary judgment in favor of Sterling, Asfour, and PRS II as it relates to the interference-with-a-business-relationship claim in count three of the counter-complaint is reversed, and the case is remanded for further proceedings consistent with this opinion.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

COBB, C.J., and SEE, SMITH, and PARKER, JJ., concur.
Ala.,2008.
White Sands Group, L.L.C. v. PRS II, LLC
998 So.2d 1042

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.