# EXHIBIT C-2

Westlaw.

Page 1

--- So.3d ----, 2009 WL 2841114 (Ala.)
(Cite as: 2009 WL 2841114 (Ala.))

**H**

Only the Westlaw citation is currently available.

NOT YET RELEASED FOR PUBLICATION.

Supreme Court of Alabama.
WHITE SANDS GROUP, L.L.C.
v.
PRS II, LLC, et al.
White Sands Group, L.L.C., and Jeff Valentine
v.
Michael Asfour and Peter Sterling.
**1080312 and 1080673.**

Sept. 4, 2009.

**Background:** Plaintiff purchaser of entire parcel for proposed residential subdivision brought quiet-title and declaratory-judgment claims against real estate developer, alleging that developer did not have an enforceable contract to purchase five lots within the proposed subdivision. Developer filed counter-complaint against plaintiff and plaintiff's vendor alleging breach of contract and tortious interference with business or contractual relations and alleging specific performance, brought breach-of-contract claim against new parties, and brought conspiracy claims against fictitiously named parties. The Circuit Court, Baldwin County, No. CV-05-923,Robert E. Wilters, J., dismissed the breach-of-contract counterclaim against new parties and the conspiracy counterclaim, and later entered summary judgment for plaintiff as to quiet-title and declaratory-judgment claims and remaining counterclaims. Developer appealed, and the Supreme Court, 998 So.2d 1042, affirmed in part, reversed in part, and remanded. On remand, the Circuit Court granted plaintiff purchaser summary judgment on tortious interference counterclaim and in a separate order granted purchaser's motion to tax costs. Developer appealed from both orders.

**Holdings:** Upon consolidation, the Supreme Court,

Woodall, J., held that:
(1) absence of justification is no part of prima facie case in proving wrongful interference with business relationship, overruling *Ex parte Awtrey Realty Co.,* 827 So.2d 104, *Colonial Bank v. Patterson,* 788 So.2d 134, *Folmar & Assocs.LLP v. Holberg,* 776 So.2d 112, *Mutual Sav. Life Ins. Co. v. James River Corp. of Virginia,* 716 So.2d 1172, *Sevier Ins. Agency, Inc. v. Willis Corroon Corp. of Birmingham,* 711 So.2d 995, *Soap Co. v. Ecolab, Inc.,* 646 So.2d 1366, *Underwood v. South Cent. Bell Tel. Co.,* 590 So.2d 170, *Betts v. McDonald's Corp.,* 567 So.2d 1252, *Valley Props., Inc. v. Stahan,* 565 So.2d 571, and *Gross v. Lowder Realty Better Homes & Gardens,* 494 So.2d 590;
(2) elements of the tort of wrongful interference with business relationship do not include a showing of fraud, force, or coercion, overruling *Barber v. Business Prods. Ctr., Inc.,* 677 So.2d 223 and *Joe Cooper & Assocs., Inc. v. Central Life Assurance Co.,* 614 So.2d 982; and
(3) genuine issues of material fact existed precluding summary judgment on tortious interference claim.

Summary judgment reversed and remanded; order taxing costs vacated.

Murdock, J., concurred in the result.

West Headnotes

**[1] Appeal and Error 30 ☞893(1)**

30 Appeal and Error
   30XVI Review
      30XVI(F) Trial De Novo
         30k892 Trial De Novo
           30k893 Cases Triable in Appellate Court
              30k893(1) k. In General. Most Cited Cases
Supreme Court reviews a summary judgment de novo, applying the same standard of review as the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- So.3d ----, 2009 WL 2841114 (Ala.)
**(Cite as: 2009 WL 2841114 (Ala.))**

trial court applied.

**[2] Judgment 228 ⇌185(2)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k182 Motion or Other Application
            228k185 Evidence in General
                228k185(2) k. Presumptions and Burden of Proof. Most Cited Cases

If the movant meets its burden of production by making a prima facie showing that it is entitled to a summary judgment, then the burden shifts to the nonmovant to rebut the prima facie showing of the movant.

**[3] Judgment 228 ⇌185(5)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k182 Motion or Other Application
            228k185 Evidence in General
                228k185(5) k. Weight and Sufficiency. Most Cited Cases

**Judgment 228 ⇌185.2(3)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k182 Motion or Other Application
            228k185.2 Use of Affidavits
                228k185.2(3) k. Showing to Be Made on Supporting Affidavit. Most Cited Cases

If the summary judgment movant has the burden of proof at trial, the movant must support his motion with credible evidence, using any of the material specified in rule regarding summary judgment; when the movant has the burden of proof at trial, its own submissions in support of the summary judgment motion must entitle it to judgment as a matter of law. Rules Civ.Proc., Rule 56(c).

**[4] Appeal and Error 30 ⇌934(1)**

30 Appeal and Error
    30XVI Review
        30XVI(G) Presumptions
            30k934 Judgment
                30k934(1) k. In General. Most Cited Cases

In reviewing grant of summary judgment, Supreme Court reviews the evidence in the light most favorable to the nonmovant.

**[5] Judgment 228 ⇌185(5)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k182 Motion or Other Application
            228k185 Evidence in General
                228k185(5) k. Weight and Sufficiency. Most Cited Cases

In order to overcome a defendant's properly supported summary-judgment motion, the plaintiff bears the burden of presenting substantial evidence as to each disputed element of its claim.

**[6] Torts 379 ⇌217**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)1 In General
                379k217 k. Absence of Justification or Privilege. Most Cited Cases

**Torts 379 ⇌220**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)1 In General
                379k220 k. Defense, Justification or Privilege in General. Most Cited Cases

**Torts 379 ⇌255**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)3 Actions in General
                379k255 k. Pleading. Most Cited Cases

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- So.3d ----, 2009 WL 2841114 (Ala.)
(Cite as: 2009 WL 2841114 (Ala.))

**Torts 379 €⇒258**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)4 Evidence
                379k258 k. Burden of Proof. Most Cited Cases

The absence of justification is no part of a plaintiff's prima facie case in proving wrongful interference with a business or contractual relationship; justification is an affirmative defense to be pleaded and proved by the defendant, overruling *Ex parte Awtrey Realty Co.*, 827 So.2d 104, *Colonial Bank v. Patterson*, 788 So.2d 134, *Folmar & Assocs.LLP v. Holberg*, 776 So.2d 112, *Mutual Sav. Life Ins. Co. v. James River Corp. of Virginia*, 716 So.2d 1172, *Sevier Ins. Agency, Inc. v. Willis Corroon Corp. of Birmingham*, 711 So.2d 995, *Soap Co. v. Ecolab, Inc.*, 646 So.2d 1366, *Underwood v. South Cent. Bell Tel. Co.*, 590 So.2d 170, *Betts v. McDonald's Corp.*, 567 So.2d 1252, *Valley Props., Inc. v. Stahan*, 565 So.2d 571, and *Gross v. Lowder Realty Better Homes & Gardens*, 494 So.2d 590.

[7] **Torts 379 €⇒211**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)1 In General
                379k211 k. Business Relations or Economic Advantage, in General. Most Cited Cases

The elements of the tort of wrongful interference with a business relationship do not include a showing of fraud, force, or coercion, overruling *Barber v. Business Prods. Ctr., Inc.*, 677 So.2d 223 and *Joe Cooper & Assocs., Inc. v. Central Life Assurance Co.*, 614 So.2d 982.

[8] **Torts 379 €⇒222**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)1 In General
                379k222 k. Tortfeasor as Stranger to Contract or Relationship, in General. Most Cited Cases

One of the elements of the tort of wrongful interference with a business relationship is that the defendant be a stranger to the relationship.

[9] **Torts 379 €⇒211**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)1 In General
                379k211 k. Business Relations or Economic Advantage, in General. Most Cited Cases

The elements of the tort of wrongful interference with a business relationship are: (1) the existence of a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage.

[10] **Torts 379 €⇒213**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)1 In General
                379k213 k. Prospective Advantage, Contract or Relations; Expectancy. Most Cited Cases

**Torts 379 €⇒214**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)1 In General
                379k214 k. Existence of Valid or Identifiable Contract, Relationship or Expectancy. Most Cited Cases

For purposes of a claim of wrongful interference with a business relationship, protection is appropriate against improper interference with reasonable expectancies of commercial relations even when an existing contract is lacking. Restatement (Second)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- So.3d ----, 2009 WL 2841114 (Ala.)
(Cite as: 2009 WL 2841114 (Ala.))

of Torts § 766 cmt. c (1979).

[11] Torts 379 ⟶211

379 Torts
   379III Tortious Interference
      379III(B) Business or Contractual Relations
         379III(B)1 In General
            379k211 k. Business Relations or Economic Advantage, in General. Most Cited Cases
Tort of wrongful interference with a business relationship protects the right to do business in a fair setting.

[12] Judgment 228 ⟶181(33)

228 Judgment
   228V On Motion or Summary Proceeding
      228k181 Grounds for Summary Judgment
         228k181(15) Particular Cases
            228k181(33) k. Tort Cases in General. Most Cited Cases
Genuine issues of material fact existed as to whether developer had a relationship with vendor based on a reasonable expectation of a commercial benefit in regards to prospective property purchase, precluding summary judgment on developer's claim against property purchaser for wrongful interference with a business or contractual relationship.

[13] Judgment 228 ⟶181(33)

228 Judgment
   228V On Motion or Summary Proceeding
      228k181 Grounds for Summary Judgment
         228k181(15) Particular Cases
            228k181(33) k. Tort Cases in General. Most Cited Cases
Genuine issues of material fact existed as to whether property purchaser interfered with developer's business relationship with vendor in regards to prospective property purchase, precluding summary judgment on developer's claim for wrongful interference with a business relationship.

[14] Damages 115 ⟶39

115 Damages
   115III Grounds and Subjects of Compensatory Damages
      115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
         115III(A)1 In General
            115k35 Pecuniary Losses
               115k39 k. Loss of or Injury to Property. Most Cited Cases

Damages 115 ⟶57.7

115 Damages
   115III Grounds and Subjects of Compensatory Damages
      115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
         115III(A)2 Mental Suffering and Emotional Distress
            115k57.7 k. Nature of Conduct in General. Most Cited Cases

Damages 115 ⟶89(1)

115 Damages
   115V Exemplary Damages
      115k88 Injuries for Which Exemplary Damages May Be Awarded
         115k89 In General
            115k89(1) k. In General. Most Cited Cases
In Alabama, one who wrongfully interferes with the business relationship of another is subject to liability for: (1) the pecuniary loss of the benefits of the relation; (2) consequential losses for which the interference is a legal cause; (3) emotional distress or actual harm to reputation if either is reasonably to be expected to result from the interference; and (4) punitive damages.

[15] Torts 379 ⟶219

379 Torts
   379III Tortious Interference
      379III(B) Business or Contractual Relations
         379III(B)1 In General

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- So.3d ----, 2009 WL 2841114 (Ala.)
(Cite as: 2009 WL 2841114 (Ala.))

379k219 k. Injury and Causation. Most Cited Cases
The damage resulting from wrongful interference with a business relationship can occur regardless of the fact that the plaintiff would not have been awarded the contract, and it can also take other forms.

[16] Judgment 228 ⇌181(33)

228 Judgment
    228V On Motion or Summary Proceeding
        228k181 Grounds for Summary Judgment
            228k181(15) Particular Cases
                228k181(33) k. Tort Cases in General. Most Cited Cases
Genuine issues of material fact existed as to whether developer was damaged by property purchaser's alleged interference with developer's business relationship with vendor in regards to prospective property purchase, precluding summary judgment on developer's claim for wrongful interference with a business relationship.

[17] Torts 379 ⇌271

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)5 Questions of Law or Fact
                379k271 k. Business Relations or Economic Advantage, in General. Most Cited Cases
Justification as an affirmative defense to claim of wrongful interference with a business relationship is generally a jury question.

[18] Torts 379 ⇌221

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)1 In General
                379k221 k. Competition. Most Cited Cases
The competitor's privilege defense to claim of wrongful interference with a business relationship is merely a special application of the justification factors considered in determining whether the defendant's conduct is not justified or improper; it directly involves at least six of those seven factors, namely, (1) the nature of the defendant's conduct, (2) the defendant's motive, (3) the interests with which the defendant's conduct interferes, (4) the interests sought to be advanced by the defendant, (5) the respective social interests affected, and (6) the relations between the parties. Restatement (Second) of Torts § 768 (1979).

[19] Judgment 228 ⇌181(33)

228 Judgment
    228V On Motion or Summary Proceeding
        228k181 Grounds for Summary Judgment
            228k181(15) Particular Cases
                228k181(33) k. Tort Cases in General. Most Cited Cases
Genuine issues of material fact existed as to whether property purchaser concealed its true intentions toward purchase of lots from vendor, precluding summary judgment in favor of purchaser on developer's claim of wrongful interference with a business relationship based on affirmative defense of justification.

[20] Judgment 228 ⇌183

228 Judgment
    228V On Motion or Summary Proceeding
        228k182 Motion or Other Application
            228k183 k. In General. Most Cited Cases

**Judgment 228 ⇌185.2(9)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k182 Motion or Other Application
            228k185.2 Use of Affidavits
                228k185.2(9) k. Effect of Failure to File Affidavit. Most Cited Cases
Although individual defendants in counterclaim by developer alleging interference with business relationship with vendor incorporated by reference the arguments set forth in corporate defendant's re-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- So.3d ----, 2009 WL 2841114 (Ala.)
(Cite as: 2009 WL 2841114 (Ala.))

newed summary-judgment motion, that motion did not refer to them, and thus, they did not meet their initial burden by reliance on the filings of other defendant, and the burden never shifted to developer to oppose the summary judgment motion, where individual defendants filed no supporting evidentiary material with their renewed motion for summary judgment. Rules Civ.Proc., Rule 56(c).

[21] Costs 102 &#x21DD;195

102 Costs
    102IX Taxation
        102k195 k. Nature of Proceeding. Most Cited Cases

**Costs 102 &#x21DD;209**

102 Costs
    102IX Taxation
        102k209 k. Determination of Taxing Officer. Most Cited Cases
The assessment of costs is incidental to the final judgment. Rules Civ.Proc., Rule 54(d).

Appeals from Baldwin Circuit Court (CV-05-923).

WOODALL, Justice.

*1 These appeals are brought by Jeff Valentine and White Sands Group, L.L.C. ("White Sands"), a real-estate development company whose members include Valentine and others, from a summary judgment for PRS II, LLC, Peter Sterling, and Michael Asfour, on White Sands' counterclaim against them alleging tortious interference with a business relationship and from subsequent orders awarding costs.[FN1] In case no. 1080312, we reverse and remand; in case no. 1080673, we vacate the trial court's orders awarding costs and remand.

*I. Procedural Background*

This is the second time this case has been before us. See *White Sands Group, L.L.C. v. PRS II, LLC*, 998 So.2d 1042 (Ala.2008), for the procedural back-

ground of this dispute and a more detailed description of the identity of the parties. At the core of the dispute in that case was correspondence between Valentine and Thomas J. Langan, Jr., dated May 17, 2004 (hereinafter "the Valentine letter"), contemplating the purchase by White Sands of five lots, which were owned by members of the Langan family, including Thomas J. Langan, Jr., in conjunction with Langan Development Company, Inc.; Bar Pilot Land, L.L.C.; and Pilots Pointe Development, L.L.C. (hereinafter collectively referred to as "the Langan entities"). The five lots were a portion of a larger undeveloped tract known as "Pilot Town." The transaction failed when the Langan entities sold Pilot Town in its entirety, including the five lots, to PRS II.

Litigation ensued. In that litigation, White Sands asserted counterclaims alleging breach of contract and tortious interference with a business or contractual relationship. "More specifically, count one of the counter-complaint asserted a breach-of-contract claim ... against the Langan entities." 998 So.2d at 1049 (emphasis omitted). Count one alleged that the Valentine letter was a valid purchase contract, which the Langan entities breached by refusing to complete the sale of the five lots to White Sands. Count three alleged that White Sands " 'had a valid and existing contract *and* business relationship' with the Langan entities" and that "Sterling, Asfour, and PRS II ... wrongfully 'interfered with said business *and/or* contractual relations.' " 998 So.2d at 1053-54 (emphasis added).

In *White Sands,* we first affirmed the summary judgment for the Langan entities, holding that "the parties [had] 'so [indefinitely] expressed their intentions [in the Valentine letter] that the court [could not] enforce their agreement.' " 998 So.2d at 1051. Next, we affirmed the summary judgment in favor of PRS II, Sterling, and Asfour (hereinafter collectively referred to as "the counterclaim defendants") insofar as it related to the interference-with-contractual-relations claim in count three of White Sands' counter-complaint. However, we re-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- So.3d ----, 2009 WL 2841114 (Ala.)
(Cite as: 2009 WL 2841114 (Ala.))

versed in part the summary judgment for the counterclaim defendants and remanded the cause for further proceedings insofar as it related to the interference-with-a-business-relations claim in count three of the counter-complaint. 998 So.2d at 1058. Our reversal was based on the incomplete arguments of the counterclaim defendants in their summary-judgment motion. Specifically, they had offered as the *sole ground* for summary judgment the fact that the Valentine letter was not an enforceable *contract,* thus ignoring the body of Alabama caselaw also protecting business relationships or expectancies. 998 So.2d at 1054-56. Based on the inadequacy of the counterclaim defendants' arguments as to that issue, we concluded that they had failed to "discharge [their] initial burden[s] to challenge the sufficiency of the evidence of [White Sands' interference-with-a-business-relations claim]" and, therefore, were only entitled to a partial summary judgment as to count three of the counterclaim. 998 So.2d at 1055.

*2 On remand, PRS II filed a renewed motion for a summary judgment, addressing, for the first time, the legal basis for a claim of tortious interference with a noncontractual business relationship. In conjunction with its motion and accompanying brief, PRS II filed the affidavit of Thomas J. Langan, Jr., and the affidavit of Peter Morris, a member of one of the business entities that constitute PRS II. Sterling and Asfour also renewed their summary-judgment motion and filed a brief. However, they filed no evidentiary material in support of their motion, and, although their brief purported to contain a "narrative summary of undisputed facts," it contained no citation to any supporting material. For an argument, they relied almost exclusively on the arguments in PRS II's brief, which they incorporated by reference.

On October 28, 2008, the trial court granted the motions. White Sands filed its notice of appeal in case no. 1080312 on December 1, 2008. Meanwhile, on November 6, 2008, PRS II filed a "motion to tax costs" against not only White Sands, but also Valentine, in the amount of $28,401.72. On January 15, 2009, the trial court issued an order granting that motion (hereinafter referred to as "the PRS II costs order"). Because Valentine was not involved in the summary-judgment proceedings, Valentine and White Sands filed a second notice of appeal on January 27, 2009, *in case no. 1080312.* Case no. 1080312 thus involves the merits of the tortious-interference-with-a-business-relations claim, as well as the propriety of the PRS II costs order.

On January 28, 2009, Sterling and Asfour filed a motion to assess costs against White Sands and Valentine in the amount of $4,019.37. On February 27, 2009, the trial court granted that motion (hereinafter referred to as "the Sterling/Asfour costs order"). On March 9, 2009, White Sands and Valentine appealed from the Sterling/Asfour costs order; that appeal is designated as case no. 1080673. This Court consolidated the two appeals for disposition by one opinion.

It is undisputed that a resolution in favor of White Sands of the substantive issues presented by the summary judgment will necessarily resolve the issues regarding the taxation of costs against White Sands and Valentine. Therefore, we first address the substantive aspect of case no. 1080312.

*II. The Summary Judgment*

[1][2][3][4] "The role of this Court in reviewing a summary judgment is well established-we review a summary judgment *de novo,* " 'apply [ing] the same standard of review as the trial court applied .' " ' *Horn v. Fadal Machining Ctrs., LLC,* 972 So.2d 63, 69 (Ala.2007) (quoting *Stokes v. Ferguson,* 952 So.2d 355, 357 (Ala.2006), quoting in turn *Dow v. Alabama Democratic Party,* 897 So.2d 1035, 1038 (Ala.2004)). " 'If the movant meets [its] burden of production by making a prima facie showing that [it] is entitled to a summary judgment, "then the burden shifts to the nonmovant to rebut the prima facie showing of the movant." " ' *Horn,* 972 So.2d

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- So.3d ----, 2009 WL 2841114 (Ala.)
(Cite as: 2009 WL 2841114 (Ala.))

at 69 (quoting *American Gen. Life & Accident Ins. Co. v. Underwood*, 886 So.2d 807, 811-12 (Ala.2004), quoting in turn *Lucas v. Alfa Mut. Ins. Co.*, 622 So.2d 907, 909 (Ala.1993)).

*3 " " '[T]he manner in which the [summary-judgment] movant's burden of production is met depends upon which party has the burden of proof ... at trial." ' *Ex parte General Motors Corp.*, 769 So.2d 903, 909 (Ala.1999) (quoting *Berner v. Caldwell*, 543 So.2d 686, 691 (Ala.1989) (Houston, J., concurring specially)). If ... " 'the movant has the burden of proof at trial, the movant must support his motion with credible evidence, using any of the material specified in Rule 56(c), [Ala.] R. Civ. P. ('pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits')." ' 769 So.2d at 909. " 'The movant's proof must be such that he would be entitled to a directed verdict [now referred to as a judgment as a matter of law, see Rule 50, Ala. R. Civ. P.] if this evidence was not controverted at trial." ' *Id.* In other words, 'when the movant has the burden [of proof at trial], its *own submissions* in support of the motion must entitle it to judgment as a matter of law.' *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 618 (2d Cir.1998) (emphasis added). See also *Equal Employment Opportunity Comm'n v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49 (1st Cir.2002); *Rushing v. Kansas City Southern Ry.*, 185 F.3d 496 (5th Cir.1999); *Fontenot v. Upjohn Co.*, 780 F.2d 1190 (5th Cir.1986); *Calderone v. United States*, 799 F.2d 254 (6th Cir.1986)."

*Denmark v. Mercantile Stores Co.*, 844 So.2d 1189, 1195 (Ala.2002). Moreover, we review the evidence in the light most favorable to the nonmovant. *Wilson v. Brown*, 496 So.2d 756, 758 (Ala.1986).

A. Elements of the Claim

[5] "In order to overcome a defendant's properly supported summary-judgment motion, the plaintiff bears the burden of presenting substantial evidence as to each disputed element of [its] claim." *Ex parte Harold L. Martin Distrib. Co.*, 769 So.2d 313, 314 (Ala.2000). The arguments of the parties reveal considerable confusion as to the elements of a cause of action for tortious interference with a business relationship.

According to the counterclaim defendants, White Sands

"must establish by substantial evidence the following:

"1. the existence of a business relation;

"2. the defendant's knowledge of the business relation;

"3. intentional interference with the business relation;

"4. the absence of justification for the defendant's interference;

"5. damage to [White Sands] as a result of the interference; and,

"6. fraud, force or coercion on the defendant's part."

PRS II's brief, at 22-23. For these elements, PRS II cites *Barber v. Business Products Center, Inc.*, 677 So.2d 223, 227 (Ala.1996), and *Teitel v. Wal-Mart Stores, Inc.*, 287 F.Supp.2d 1268, 1279, 1282-83 (M.D.Ala.2003).

However, citing *Parsons v. Aaron*, 849 So.2d 932, 946 (Ala.2002), White Sands contends that justification for the defendant's interference is an affirmative defense to be proven by the defendant. White Sands' brief, at 24 n. 8. Moreover, citing *Thomas v. Williams*, [Ms. 2070512, November 21, 2008] --- So.3d ---- (Ala.Civ.App.2008), White Sands contends that "the requirement to prove fraud, force or coercion is not an element of the tort of intentional

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- So.3d ----, 2009 WL 2841114 (Ala.)
(Cite as: 2009 WL 2841114 (Ala.))

interference." White Sands' brief, at 39. Thus, as a preliminary matter, we must clarify Alabama law as to the elements of a claim alleging wrongful interference with a business relationship.

*4 In *Gross v. Lowder Realty Better Homes & Gardens*, 494 So.2d 590 (Ala.1986), the progenitor of the modern rule in Alabama, this Court listed *both* justification and the *absence* of justification as requiring proof by the defendant and the plaintiff, respectively. 494 So.2d at 597 n. 3. For many years after *Gross*, this Court was similarly ambiguous as to the elements of the claim. The Court listed-seemingly at random-either four or five elements of the claim. Cases citing *five* elements made the "absence of justification" an element of the plaintiff's *prima facie* case. See, e.g., *Ex parte Awtrey Realty Co.*, 827 So.2d 104 (Ala.2001); *Colonial Bank v. Patterson*, 788 So.2d 134 (Ala.2000); *Folmar & Assocs. LLP v. Holberg*, 776 So.2d 112 (Ala.2000); *Mutual Sav. Life Ins. Co. v. James River Corp. of Virginia*, 716 So.2d 1172 (Ala.1998); *Sevier Ins. Agency, Inc. v. Willis Corroon Corp. of Birmingham*, 711 So.2d 995 (Ala.1998), *overruled on other grounds, Ex parte Howell Eng'g & Surveying, Inc.*, 981 So.2d 413 (Ala.2006); *Soap Co. v. Ecolab, Inc.*, 646 So.2d 1366 (Ala.1994); *Underwood v. South Cent. Bell Tel. Co.*, 590 So.2d 170 (Ala.1991); *Betts v. McDonald's Corp.*, 567 So.2d 1252 (Ala.1990); and *Valley Props., Inc. v. Stahan*, 565 So.2d 571 (Ala.1990).

In theory, at least, the five-element scheme placed the burden on the plaintiff to produce evidence of the absence of justification for the wrongful interference in order to go forward with its case. See Andrew P. Campbell, *Interference with Business Relations: the Unified Tort since Gross v. Lowder Realty*, 50 Ala. Law. 86, 88 (1989) ("In subsequent decisions after *Gross*, the Alabama courts have tended to place the burden on the plaintiff to prove absence of justification"). But see *Creel v. Davis*, 544 So.2d 145, 151 n. 3 (Ala.1989) (Maddox, J., concurring specially) ("Those decisions should not be read as shifting the burden of proof to the plaintiff, but should be read as holding that the defendant proved, as a matter of law, justification.").

Simultaneously, the Court was describing the tort as comprising only *four* elements, thus *omitting* the absence of justification as an element of the tort. See, e.g., *Serra Chevrolet, Inc. v. Edwards Chevrolet, Inc.*, 850 So.2d 259 (Ala.2002); *Ex parte Alabama Dep't of Transp.*, 764 So.2d 1263 (Ala.2000); *Ex parte Henderson*, 732 So.2d 295 (Ala.1999); *Wehby v. Turpin*, 710 So.2d 1243 (Ala.1998); *Pegram v. Hebding*, 667 So.2d 696 (Ala.1995); *McCluney v. Zap Prof'l Photography, Inc.*, 663 So.2d 922 (Ala.1995); *Spring Hill Lighting & Supply Co. v. Square D Co.*, 662 So.2d 1141 (Ala.1995); *Bama Budweiser of Montgomery, Inc. v. Anheuser-Busch, Inc.*, 611 So.2d 238 (Ala.1992); *Public Sys., Inc. v. Towry*, 587 So.2d 969 (Ala.1991); *Utah Foam Prods., Inc. v. Polytec, Inc.*, 584 So.2d 1345 (Ala.1991); *Century 21 Academy Realty, Inc. v. Breland*, 571 So.2d 296 (Ala.1990); *Henderson v. Early*, 555 So.2d 130 (Ala.1989); *Williams v. A.L. Williams & Assocs.*, 555 So.2d 121 (Ala.1989); and *Fossett v. Davis*, 531 So.2d 849 (Ala.1988).

*5 [6] In more recent cases, however, this Court expressly departed from the curious position of placing the burden of the same proof on *both* the plaintiff and the defendant. In *BellSouth Mobility, Inc. v. Cellulink, Inc.*, 814 So.2d 203 (Ala.2001), we stated clearly that the absence of justification was *not* an element of the plaintiff's *prima facie* case; rather, justification was an affirmative defense. 814 So.2d at 212 n. 5 (" '[W]e recognize today that it is illogical to continue to list an absence of justification as one of the elements of the plaintiff's cause of action and then to place the burden on the defendant to disprove it." ' (quoting *Breland*, 571 So.2d at 298)). In *Parsons v. Aaron*, 849 So.2d at 946, we said: "We agree with the language quoted in *BellSouth Mobility*. We reiterate that justification for interference with contractual or business relations is an affirmative defense to be pleaded and proved by the defendant." We quoted

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- So.3d ----, 2009 WL 2841114 (Ala.)
(Cite as: 2009 WL 2841114 (Ala.))

this language with approval in *Waddell & Reed, Inc. v. United Investors Life Insurance Co.,* 875 So.2d 1143, 1153 (Ala.2003), and again, most recently, in *Tom's Foods, Inc. v. Carn,* 896 So.2d 443, 454 (Ala.2004). Thus, we consider it now to be well settled that the absence of justification is no part of a plaintiff's *prima facie* case in proving wrongful interference with a business or contractual relationship. Justification is an affirmative defense to be pleaded and proved by the defendant.

It would be equally illogical to require the plaintiff, as a part of its *prima facie* case, to produce evidence of fraud, force, or coercion. This is so, because such conduct is subsumed by the "nature of the actor's conduct," which is one of the factors to be considered in determining whether the interference is *justified* as stated in *Gross.* In adopting *Restatement (Second) of Torts* § 767 (1979), pertaining to justification, the Court said:

"Whether a defendant's interference is justified depends upon a balancing of the importance of the objective of the interference against the importance of the interest interfered with, taking into account the surrounding circumstances. *Restatement (Second) of Torts* § 767 (1979), and Comments. The restatement utilizes the term 'improper' to describe actionable conduct by a defendant. Non-justification is synonymous with 'improper.' If a defendant's interference is unjustified under the circumstances of the case, it is improper. The converse is also true. Section 767 of the *Restatement* lists, and the Comments explain, several items that we consider to be among the important factors to consider in determining whether a defendant's interference is justified:

" '(a) the *nature of the actor's conduct,*

" '(b) the actor's motive,

" '(c) the interests of the other with which the actor's conduct interferes,

" '(d) the interests sought to be advanced by the actor,

" '(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

*6 " '(f) the proximity or remoteness of the actor's conduct to the interference, and

" '(g) the relations between the parties.'

"*Restatement (Second) of Torts* § 767 (1979)."

494 So.2d at 597 n. 3 (hereinafter referred to as "the justification factors").

Comment c to *Restatement (Second) of Torts* § 767 (1979) states, in pertinent part:

"*Nature of actor's conduct.* The nature of the actor's conduct is a chief factor in determining whether the conduct is improper or not, despite its harm to the other person. The variety of means by which the actor may cause the harm are stated in § 766, Comments *k* to *n.* Some of them, like *fraud and physical violence,* are tortious to the person immediately affected by them; others, like persuasion and offers of benefits, are not tortious to him. Under the same circumstances interference by some means is not improper while interference by other means is improper; and, likewise, the same means may be permissible under some circumstances while wrongful in others. The issue is not simply whether the actor is justified in causing the harm, but rather whether he is justified in causing it *in the manner in which he does cause it.* The propriety of the means is not, however, determined as a separate issue unrelated to the other factors. On the contrary, the propriety is determined in the light of all the factors present. Thus *physical violence, fraudulent misrepresentation and threats of illegal conduct* are ordinarily wrongful means and subject their user to liability even though he is free to accomplish the same result by more suitable means.... The nature of the means is, however, only one factor in determining whether the interference is im-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- So.3d ----, 2009 WL 2841114 (Ala.)
(Cite as: 2009 WL 2841114 (Ala.))

proper. Under some circumstances the interference is improper even though innocent means are employed.

"*Physical violence.* Threats of physical violence were the means employed in the very early instances of liability for intentional interference with economic relations; and *interference by physical violence is ordinarily improper....* The issue is simply whether the actor induces the third person's conduct or prevents the injured party's performance of his own contract by putting him in fear of physical violence.

" *Misrepresentations. Fraudulent misrepresentations are also ordinarily a wrongful means of interference and make an interference improper.* A representation is fraudulent when, to the knowledge or belief of its utterer, it is false in the sense in which it is intended to be understood by its recipient. (See § 527).... The tort of intentional interference ... overlaps other torts. But it is not coincident with them. One may be subject to liability for intentional interference even when his fraudulent representation is not of such a character as to subject him to liability for the other torts."

(Emphasis added.)

[7] Thus, the elements of the tort of wrongful interference with a business relationship do *not* include a showing of fraud, force, or coercion. Indeed, only two of our post-*Gross* cases have taken the illogical contrary position. See *Barber v. Business Prods. Ctr ., Inc.,* 677 So.2d 223 (Ala.1996), and *Joe Cooper & Assocs., Inc. v. Central Life Assurance Co.,* 614 So.2d 982 (Ala.1992). Neither opinion, however, contains any discussion or analysis of the proposition that the species of improper conduct represented by fraud, force, or coercion is an element of a plaintiff's *prima facie* case. The only cases cited for that proposition in *Joe Cooper* are pre-*Gross* cases, 614 So.2d at 986-87, and *Barber* merely cited *Joe Cooper,* 677 So.2d at 227.

*7 Because that proposition is contrary to the *Restatement* rule as adopted in *Gross, Barber* and *Joe Cooper* are, to that extent, overruled. Also overruled are cases cited above, namely, *Ex parte Awtrey Realty Co.; Colonial Bank v. Patterson; Folmar & Assocs. LLP v. Holberg; Mutual Sav. Life Ins. Co. v. James River Corp.; Sevier Ins. Agency, Inc. v. Willis Corroon Corp.; Soap Co. v. Ecolab, Inc.; Underwood v. South Cent. Bell Tel. Co.; Betts v. McDonald's Corp.; Valley Props., Inc. v. Stahan;* and *Gross v. Lowder Realty Better Homes & Gardens,* to the extent those cases list the absence of justification as an element of the plaintiff's *prima facie* case.

[8][9] In the process of defining the tort of wrongful interference with a business relationship, we deem it prudent to reiterate that one of the elements is that the defendant be a *stranger* to the relationship. See *Tom's Foods, Inc. v. Carn,* 896 So.2d at 454; *Waddell & Reed, Inc. v. United Investors Life Ins. Co.,* 875 So.2d at 1153-56; *Parsons v. Aaron,* 849 So.2d at 946-47; and *BellSouth Mobility, Inc. v. Cellulink, Inc.,* 814 So.2d at 212; see also *Colonial Bank v. Patterson,* 788 So.2d at 137-38. Thus, properly stated, the elements of the tort are (1) the existence of a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage. In its summary-judgment motion, PRS II challenged the sufficiency of White Sands' evidence of the first, fourth, and fifth elements. We first address White Sands' *prima facie* case against PRS II as it concerns those elements.

B. *White Sands' Burden-Prima Facie Case Against PRS II*

1. *Evidence of a Business Relationship*

White Sands argues that the evidence "conclusively establishes both an existing business relationship [and the] expectation of a future relationship,"

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

--- So.3d ----, 2009 WL 2841114 (Ala.)
(Cite as: 2009 WL 2841114 (Ala.))

White Sands' brief, at 35, while PRS II contends that negotiations over the purchase of the five Langan lots had not reached "a level of maturity" sufficient to support an "interference claim [that] is cognizable." PRS II's brief, at 23.

[10][11] In Alabama, " 'protection is appropriate against improper interference with reasonable expectancies of commercial relations even when an existing contract is lacking.' " *Ex parte Alabama Dep't of Transp.,* 764 So.2d at 1270 (citing *Restatement (Second) of Torts* § 766 cmt. c (1979)). Indeed, "[i]t is not necessary that the prospective relation be expected to be reduced to a formal, binding contract." *Restatement* § 766B cmt. c. "It is the right to do business in a fair setting that is protected." *Utah Foam,* 584 So.2d at 1353.

However, "greater protection is given to the interest in an existing contract than to the interest in acquiring prospective contractual relations." *Restatement* § 767 cmt. j. The existence of a binding contract is one factor for consideration in the "determination of whether the actor's conduct is improper." *Id.* Thus, the inquiry in this tort is "which interests along the *continuum* of business dealings are protected." Orrin K. Ames III, *Tortious Interference with Business Relationships: The Changing Contours of this Commercial Tort,* 35 Cumb. L.Rev. 317, 330 (2004-2005) (emphasis added). The question, in other words, is when has "an expectancy ... matured to the stage that it is deemed worthy of protection from interference." *Id.* at 331.

*8 [12] Despite our holding in *White Sands* that the Valentine letter did not contain all the necessary elements of a contract for the effective conveyance of real estate, the relationship between White Sands and the Langan entities had progressed far along the continuum. The Valentine letter, which was signed by Jeff Valentine as the purchaser and initialed by Thomas J. Langan, Jr., as the seller, revealed a late-stage negotiation process for the purchase of real estate. It purported to be a "formal offer" to purchase five specifically identified lots. A base price of $85,000 was stated. It indicated agreement as to the disposition of a number of intricate details, including "environmental, wetlands delineation, archeological, beach mouse, and ... other issues." *White Sands,* 998 So.2d at 1046. On May 18, 2004, the day after the date of the Valentine letter, Thomas J. Langan, Jr., sent Valentine a facsimile message explaining that he had that day paid a $2,500-per-lot assessment for water and sewer service on the five lots, and he invited Valentine to telephone him with any questions.

The relationship between White Sands and the Langan entities was further evidenced by a letter to Valentine from the Langans, dated October 11, 2004 ("the Langan letter"), which referred to the Valentine letter as " 'your *option letter.*' " 998 So.2d at 1047. The Langan letter advised White Sands that, following installation of "the roadways" contemplated in the Valentine letter, White Sands would "need to *close* on the lots." 998 So.2d at 1047 (emphasis added).

In this Court, the Langan entities characterized the Valentine letter as a " 'letter of intent.' " 998 So.2d at 1051. Such a characterization buttresses White Sands' argument that it was engaged with the Langan entities "in an ongoing business relationship" and that the parties had negotiated a "prospective contract." White Sands' brief, at 26-27. Indeed, "letters of intent *may be binding,* [and] authorities are quick to warn parties of the risks involved with their use." *Gurley v. King,* 183 S.W.3d 30, 36 (Tenn.Ct.App.2005) (emphasis added). See Andrew R. Klein, *Devil's Advocate: Salvaging the Letter of Intent,* 37 Emory L.J. 139, 143 (1988) ("A well-drafted letter of intent should explicitly state that the parties do not intend to be bound.").

On October 21, 2004, in response to the Langan letter, White Sands sent the Langan entities a $10,000 "deposit" on the five Langan lots. By affidavit, Chris Rolison, the "managing member of White Sands," testified:

"In conjunction with purchasing the lots, White Sands agreed to be involved in the development

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- So.3d ----, 2009 WL 2841114 (Ala.)
(Cite as: 2009 WL 2841114 (Ala.))

of the property and agreed to build structures on the lots as soon as feasible to help market the entirety of the Langan property. Based upon this relationship, White Sands decided to devote its full attention to Pilot Town and to not seek any other business at that time. I had complete expectation that the Langans would complete their business deal with White Sands, sell the lots to White Sands, and that White Sands needed to devote its full attention to this project."

*9 However, on February 11, 2005, after accepting PRS II's offer to purchase Pilot Town in its entirety, the Langan entities returned White Sands' deposit, stating that they had "decided not to pursue the subdivision." 998 So.2d at 1048.

These facts sufficiently evidence a relationship based on a reasonable expectation of a commercial benefit. Consequently, White Sands carried its burden of production as to the first element of its claim.

2. *Interference with the Relationship*

White Sands contends that PRS II places undue reliance on this Court's holding that the Valentine letter was unenforceable and on the statement that the Langan entities had the "unbridled right to determine the nature of [their] performance." *White Sands,* 998 So.2d at 1052. According to White Sands, this position is essentially a rehash of the one-dimensional argument this Court rejected in *White Sands,* namely, that there was no *contract,* thus, *ipso facto,* no tort. We agree.[FN2]

[13] In fact, there is substantial evidence of interference. In *White Sands,* we quoted an e-mail from Morris to Sterling that stated, in pertinent part:

" 'Tommy [Langan] received a very hostile lawyer letter from Chris [Rolison] and his partner regarding the five lots on which they ( [Rolison] and partner) had conditionally entered into an understanding to acquire said lots on a *very advantageous basis* a little while ago. I have read the documents carefully and am very comfortable with the fact that there were *so many conditions which we unilaterally imposed upon Tommy and his family* regarding condition of land, subdivision, achievement along with subdivision restrictions, and other items (all which were exclusively in [Rolison] and partner's domain) to accept or walk away from the deal-none of which had been accomplished by Tommy or his family at the time of, what I consider, a non-binding statement of facts and understanding to try to agree to go forward.

" 'In my opinion, the Langans have total discretion to make the subdivision and to create whatever conditions they want and, obviously, this would not be considered a one-way option for [Rolison] and his partner to cherry-pick their visions and get in or out. In my mind, the understanding has so much ambiguity in open trading yet to go that it never roles [sic] through level specificity. Therefore, it is not binding and more an expression of intent. Now, all of a sudden since we have closed, mysteriously, this guy and his partner and lawyer surface, acting as if there was a binding contract with all of the facts fixed and no open-ended variables, with demands of a closing and threats to sue. You have repeatedly told Tommy, and several times told me, that *you can handle Mr. [Rolison] and his partner and move him into another direction,* as it makes no sense for a guy, who turns out to have very little pull with Volkert [ & Associates, Inc., an engineering firm hired to perform services for improvements to Pilot Town], very little standing in the community, and has provided no real palpable service or benefit, to somehow potentially hijack a $500 million project, with five misapplied, misdesigned, mismarketed, and misplaced, out of context units, with a tail to wag the proverbial dog of our master planned project. *It is demonstrably not in your interest to allow this to happen* and you have repeatedly reflected and represented to Tommy and to me that you can control the situation. I think it would be a show of good faith to intervene, prior

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- So.3d ----, 2009 WL 2841114 (Ala.)
(Cite as: 2009 WL 2841114 (Ala.))

to an unnecessary lawsuit-which, in my opinion, this gentleman and his partner will lose-and move this forward so we don't have this level of contention with a bunch of third parties .... I think this would avoid messy litigation, which, of course, none of us are afraid [of] and will take in stride, but is truly not necessary for anyone's relationship or for the Venture on these deals we do have." '

*10 998 So.2d at 1048-49 (some emphasis added).

The e-mail evidences interference with various aspects of the relationship between White Sands and the Langan entities. Moreover, Morris conceded that he " 'put pressure on' the Langans to include in the sale of Pilot Town some or all of the [five lots]," *id.* at 1047, to the destruction of the relationship between White Sands and the Langan entities. Also, Michael Langan, a member of two of the Langan entities, testified that, as far as he knew, the only reason the Langan entities-White Sands transaction did not close as anticipated was because the Langan entities accepted PRS II's offer to buy Pilot Town. White Sands has thus carried its burden as to this element.

*3. Damage*

[14][15] In Alabama, one who wrongfully interferes with the business relationship of another is subject to liability for "(1) the pecuniary loss of the benefits of the ... relation; (2) consequential losses for which the interference is a legal cause; ... (3) emotional distress or actual harm to reputation if either is reasonably to be expected to result from the interference," *KW Plastics v. United States Can Co.,* 131 F.Supp.2d 1265, 1268 (M.D.Ala.2001); and (4) punitive damages. *Restatement (Second) of Torts* § 774A cmt. a (1979). White Sands need not "establish that 'but for' the interference [it] would have been awarded [a] contract." *Utah Foam,* 584 So.2d at 1353. "The damage resulting from interference can occur regardless of the fact that the [plaintiff] would not have been awarded the contract, and it can also take other forms." *Id.*

[16] In his e-mail to Sterling, Morris acknowledged that the Valentine letter evidenced an understanding for the acquisition by White Sands of the five Langan lots on a basis "very advantageous" to White Sands. In addition, Rolison testified that "[d]ue to the loss of business relation, White Sands lost all investment opportunities from 2004 to 2005, which just preceded the decline of the real estate market." He also stated that "White Sands had planned to build residential structures on the lots and had an expectation to make at least 20% profit on each lot" and that "White Sands' business and reputation [have] been damaged greatly on account of the" loss of the business relationship with the Langan entities. White Sands thus carried its burden as to the element of damage.

*C. Justification-PRS II's Burden*

White Sands contends that "[j]ustification is a question for the jury, and summary judgment could not be appropriate [on that basis] under the facts of this case." White Sands' brief, at 41. More specifically, White Sands argues that PRS II's actions cannot be justified as "legitimate business competition." White Sands' reply brief, at 22.

[17] Because justification is an affirmative defense, PRS II bore the burden of "present[ing] evidence in the nature of 'the material specified in Rule 56(c), [Ala.] R. Civ. P.,' such as depositions and affidavits, that would entitle it to a judgment as a matter of law 'if this evidence was not controverted at trial.' " *Jones-Lowe Co. v. Southern Land & Exploration Co.,* [Ms. 1071575, March 6, 2009] --- So.3d ----, ---- (Ala.2009) (quoting *Denmark v. Mercantile Stores Co.,* 844 So.2d at 1195) (emphasis omitted). In other words, PRS II had to "affirmatively show that it is entitled to a judgment as a matter of law on its [affirmative defense of justification]." *Jones-Lowe Co.,* --- So.3d at ----. Justification is generally a jury question. *Specialty Container Mfg., Inc. v. Rusken Packaging, Inc.,* 572

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- So.3d ----, 2009 WL 2841114 (Ala.)
(Cite as: 2009 WL 2841114 (Ala.))

So.2d 403, 408 (Ala.1990); *Gross,* 494 So.2d at 597 n. 3.

*11 PRS II neither discusses nor cites any of the justification factors set forth in *Restatement* § 767 and adopted in *Gross.* Instead, it relies entirely on the so-called "competitor's privilege defense," *Restatement (Second) of Torts* § 768 (1979), which this Court adopted in *Soap Co. v. Ecolab, Inc.,* 646 So.2d at 1370. However, the justification factors are not so easily dismissed.

Under the competitor's privilege defense:

" 'One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue in an existing contract terminable at will does not interfere improperly with the other's relation if

" '(a) the relation concerns a matter involved in the competition between the actor and the other, and

" '(b) *the actor does not employ wrongful means* and

" '(c) his action does not create or continue an unlawful restraint of trade and

" '(d) his purpose is at least in part to advance his interest in competing with the other." '

646 So.2d at 1369 (quoting *Restatement* § 768) (emphasis added).

[18] " 'The rule stated in [*Restatement* § 768] is a *special application* of the factors determining whether an interference is *improper or not,* as stated in § 767." ' 646 So.2d at 1369 (quoting *Restatement* § 768 cmt. b) (emphasis added). In other words, the competitor's privilege defense is merely a "special application" of the justification factors considered in determining whether the defendant's conduct is not justified or improper. It directly involves at least six of those seven factors, namely,

(1) the nature of the defendant's conduct, (2) the defendant's motive, (3) the interests with which the defendant's conduct interferes, (4) the interests sought to be advanced by the defendant, (5) the respective social interests affected, and (6) the relations between the parties.

White Sands challenges the contention that it was a competitor of PRS II's. Assuming, without deciding, that PRS II and White Sands are competitors, "chief" among the factors to be considered in this affirmative defense is "the nature of the defendant's conduct." *Restatement* § 767 cmt. c. Although " 'competitors and their allies are not necessarily [expected to be] gentlemen,' " 646 So.2d at 1370 (quoting *Great Escape, Inc. v. Union City Body Co.,* 791 F.2d 532 543 (7th Cir.1986)), "[t]here is no privilege for self-enrichment by devious and improper means." *Kinco, Inc. v. Schueck Steel, Inc.,* 283 Ark. 72, 77, 671 S.W.2d 178, 181 (1984).

In this case, Rolison testified, in pertinent part:

"Later in 2004, I was at a planning meeting for the development of Pilot Town, when I noticed a proposal that provided for condominiums to be built on the entire property, inclusive of the lots covered in the [Valentine letter]. This was a departure from any prior plans. I immediately asked Peter Sterling about this, and, in response, Mr. Sterling informed me that the plan was currently just a proposal, but that if they (PRS II) decided to continue with that plan, White Sands would be taken care of. Sterling made multiple representations to me that should anything happen, White Sands would be compensated for its loss in regard to Pilot Town. Based upon Sterling's assurances, I believed that White Sands' business relation with the Langans was not going to be interfered with.

*12 "However, by the end of 2004 and the beginning of 2005, it became increasingly difficult to get in touch with either Sterling or Asfour. I left telephone messages and emails, but I was left out of meetings and generally excluded from the pro-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- So.3d ----, 2009 WL 2841114 (Ala.)
(Cite as: 2009 WL 2841114 (Ala.))

gress of the development. Then, suddenly, in February ... 2005, White Sands received a letter from the Langans stating that they would not complete the business transaction for the [five Langan lots]."

White Sands contends that "Sterling's intentional misleading assurances to lull White Sands into inaction were a prime example of fraud." White Sands' reply brief, at 23. Viewing the evidence in a light more favorable to White Sands, these "assurances" resemble conduct at issue in *Utah Foam* and *Kinco.*

In *Utah Foam,* this Court affirmed a judgment entered on a jury verdict for Polytec, Inc., in Polytec's counterclaim against Utah Foam Products, Inc., for (1) misrepresentation and (2) tortious interference with Polytec's roofing business. 584 So.2d at 1347-48. The aborted business relationship was between Polytec and Teledyne Continental Motors ("Teledyne") for the installation by Polytec of a urethane-foam roof on a building owned by the City of Mobile and leased to Teledyne. *Utah Foam,* 439 So.2d at 684-85. The same allegedly wrongful conduct was central to both the misrepresentation and the interference claims. Essentially, Polytec alleged that Utah Foam, by its actions, induced Polytec to believe that Utah Foam "*would do nothing to prevent* Polytec from being awarded the contract if a foam roof were to be used by Teledyne." *Utah Foam,* 584 So.2d at 1351 (emphasis added). According to Polytec, "the conduct of [Utah Foam] induced them to act to their detriment in putting forth substantial effort and time in formulating data on foam roofing systems, knowing full well that [it] intended to prevent Polytec from being awarded the contract." *Id.*

Although the Court noted the absence of evidence indicating that Utah Foam had "verbally misrepresented, or for that matter made any verbal representation of, any facts as to the award of the contract," it explained that "[t]he statements and conduct of the parties as a whole ... [were] such that a jury could reasonably find that Utah Foam ... [had] led Polytec to believe that [it] would do nothing to prevent its obtaining a contract with Teledyne." 584 So.2d at 1351. In the context of the interference claim, the Court said:

"In the present case, a jury could conclude that, while outwardly operating in a role of assisting Polytec in making its presentations in an attempt to secure the contract with Teledyne, Utah Foam actually engaged in tactics behind Polytec's back to prevent Polytec from getting the contract, in order to secure the contract for itself.... Utah Foam continually gave the outward appearance of playing a role of assistance toward Polytec, but the jury could conclude that Utah Foam at every opportunity sought to turn Teledyne away from Polytec and to secure the job for itself....

*13 "Regardless of the fact that Teledyne maintains that it would not have awarded the contract to Polytec, Utah Foam's conduct thwarted Polytec's ability to adequately present its products and services and virtually eliminated any remaining possibility that Polytec could have been awarded the contract. Thus, we conclude that the plaintiffs presented sufficient evidence for the jury to find that Utah Foam tortiously interfered with Polytec's business relationship and that Polytec was damaged as a result of that interference."

584 So.2d at 1353. See also *Kinco,* 283 Ark. at 77, 671 S.W.2d at 181 (competitor's privilege defense did not shield the defendant from liability, where the defendant, among other things, gained information about prices of the plaintiff's product by "conceal[ing] from [the plaintiff] the fact that it was competing against him").

[19] In this case, Rolison's affidavit testimony and Morris's e-mail suggest that there was concealment, similar to that in *Utah Foam* and *Kinco,* as to PRS II's true intentions toward the five Langan lots and the disputed business relationship between White Sands and the Langan entities. In other words, there was evidence indicating that PRS II concealed the fact that it was a competitor of White Sands for the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- So.3d ----, 2009 WL 2841114 (Ala.)
(Cite as: 2009 WL 2841114 (Ala.))

Langan lots. "[V]iewing the statements and the conduct of the parties as a whole," *Utah Foam,* 584 So.2d at 1351, it could be inferred that PRS II intentionally "lull[ed] White Sands into inaction," White Sands' reply brief, at 23, delaying efforts that could have firmed up the negotiations and dispelled critical uncertainties regarding the proposed transaction, thus resulting in an enforceable contract for the purchase by White Sands of the five Langan lots. Consequently, PRS II has failed to carry its burden of showing that it is entitled to a judgment as a matter of law on its affirmative defense of justification.

The trial court erred, therefore, in entering a summary judgment in favor of PRS II. That judgment is reversed, and the case is remanded for further proceedings against PRS II.

### D. Prima Facie Case Against Sterling and Asfour

[20] Sterling and Asfour also jointly filed a "renewed motion for summary judgment." However, they filed *no supporting, evidentiary material.* As a corollary, although their brief contains a section entitled "narrative summary of undisputed facts," the brief contains not a single citation to any evidentiary material for factual support as required by Rule 56, Ala. R. Civ. P.:

> "Rule 56(c) ... requires that the movant's narrative summary of facts " 'include *specific references* to pleadings, portions of discovery materials, or affidavits for the court to rely on in determining whether" ' a summary judgment is proper. *Horn v. Fadal Machining Ctrs., LLC,* 972 So.2d 63, 69-70 (Ala.2007) (quoting *Northwest Florida Truss, Inc. v. Baldwin County Comm'n,* 782 So.2d 274, 277 (Ala.2000)). This requirement is not satisfied if the materials on which the movant purports to rely have not been filed with the court.
>
> *14 " " '[T]he party moving for summary judgment has the burden to show that he is entitled to judgment under established principles; and if he does not discharge that burden, then he is not entitled to judgment. *No [response] to an insufficient showing is required."* ' *Horn,* 972 So.2d at 69 (quoting *Ray v. Midfield Park, Inc.,* 293 Ala. 609, 612, 308 So.2d 686, 688 (1975)). Otherwise stated, '[a] motion that does not comply with Rule 56(c) does not require a response ... from the nonmovant,' and a judgment may not be entered on such a motion even in the absence of a response from the nonmovant. *Horn,* 972 So.2d at 70."

*Jones-Lowe Co.,* --- So.3d at ----.

Moreover, although Sterling and Asfour incorporate by reference the arguments set forth in PRS II's renewed summary-judgment motion, that motion does not refer to Sterling or Asfour. Sterling and Asfour have not, therefore, met their initial burden by reliance on the filings of PRS II. For these reasons, the burden never shifted to White Sands to *oppose* the motion filed by Sterling and Asfour. Because the trial court was not authorized to enter a judgment on their noncompliant motion and brief, the judgment in favor of Sterling and Asfour is, likewise, reversed, and the case is remanded for further proceedings against Sterling and Asfour.

### III. Costs

[21] The only issue presented in case no. 1080673 is the propriety of the Sterling/Asfour costs order. Costs are generally allowed "to the prevailing party" in civil litigation. Ala. R. Civ. P. 54(d). " 'The assessment of costs is ... incidental to the [final] judgment ....' " *Ford v. Jefferson County,* 989 So.2d 542, 545 (Ala.Civ.App.2008)(quoting *Littleton v. Gold Kist, Inc.,* 480 So.2d 1236, 1238 (Ala.Civ.App.1985)). Because we are reversing the summary judgment for PRS II, Sterling, and Asfour, we must vacate the PRS II costs order and the Sterling/Asfour costs order.

### IV. Conclusion

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- So.3d ----, 2009 WL 2841114 (Ala.)
**(Cite as: 2009 WL 2841114 (Ala.))**

In summary, the trial court erred in entering a summary judgment for PRS II, Sterling, and Asfour. That judgment is, therefore, reversed. Consequently, the trial court's orders taxing costs against White Sands and Valentine are vacated. This case is remanded for further proceedings consistent with this opinion.

1080312-REVERSED AND REMANDED.

COBB, C.J., and LYONS, STUART, SMITH, BOLIN, PARKER, and SHAW, JJ., concur.
MURDOCK, J., concurs in the result.
1080673-ORDER VACATED; CASE REMANDED.

COBB, C.J., and LYONS, STUART, SMITH, BOLIN, PARKER, MURDOCK, and SHAW, JJ., concur.

> FN1. Valentine is not involved in the appeal from the summary judgment.
>
> FN2. This argument speaks more appropriately to the issues of whether a protectible interest exists and to justification than to the question whether there was, in fact, interference.

Ala.,2009.
White Sands Group, L.L.C. v. PRS II, LLC
--- So.3d ----, 2009 WL 2841114 (Ala.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.